**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| IN RE INNOVATIVE INDUSTRIAL PROPERTIES, INC. SECURITIES LITIGATION | No. 1:25-cv-00182-GLR<br><br>DEMAND FOR JURY TRIAL |

**LEAD PLAINTIFF'S CONSOLIDATED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................1

II.  JURISDICTION AND VENUE .........................................................................3

III.  PARTIES ...........................................................................................................4

IV.  BACKGROUND ...............................................................................................5

    A.  IIPR's Business Model ...........................................................................5

    B.  IIPR's Business Was Dependent on a Small Number of Tenants ...........6

    C.  The Defaulting Tenants...........................................................................7

        1.  PharmaCann .................................................................................7

        2.  4Front ..........................................................................................8

        3.  Gold Flora ...................................................................................9

        4.  Tilt ............................................................................................10

    D.  Immediately Prior to the Class Period, IIPR Suffered a String of Major Tenant Defaults. ..............................................................................11

        1.  Kings Garden .............................................................................11

        2.  Parallel ......................................................................................12

V.  DEFENDANTS' FRAUD ................................................................................13

VI.  DEFENDANTS' MISSTATEMENTS ............................................................25

    A.  Defendants' Misstatements Regarding Oversight of Tenants .................26

        1.  Misstatements First Made During the Class Period in the FY23 10-K ..........26

        2.  Misstatements First Made During the Class Period on March 4, 2024 ..........30

        3.  Misstatements Made on the August 6, 2024, Earnings Call ...........................33

        4.  Misstatements on the November 7, 2024, Earnings Call.................................40

        5.  Misstatements Regarding Resolution of the PharmaCann Defaults...............48

        6.  Misstatements on the February 20, 2025 Earnings Call .................................54

    B.  Defendants' Misstatements Touting Investments in the Defaulting Tenants ..........64

1.      Misstatements in the February 26, 2024 Press Release and FY23 10-K .........64

2.      Misstatements on the February 27, 2024, Earnings Call ...............................67

3.      Misstatements in the May 9, 2024 1Q 10-Q ...................................................72

4.      Misstatements on the May 9, 2024, Earnings Call ........................................76

5.      Misstatements in the August 6, 2024 2Q 10-Q.............................................79

6.      Misstatements in the November 7, 2024, 3Q 10-Q ........................................82

VII.    THE TRUTH IS REVEALED AND LOSS CAUSATION ............................................86

A.      November 6 and 7, 2024 .................................................................................86

B.      December 20, 2024 ..........................................................................................88

C.      March 14, 2025 ...............................................................................................91

D.      March 28, 2025 ...............................................................................................92

VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER.......................................................94

A.      Additional Allegations Supporting the Inference Defendants Knew or
        Recklessly Disregarded Their Statements were Materially False or
        Misleading.......................................................................................................94

B.      Additional Allegations Supporting Certain Individual Defendants' Motives to
        Commit Fraud .................................................................................................95

IX.     APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD
        ON THE MARKET DOCTRINE ...........................................................................97

X.      NO SAFE HARBOR ..........................................................................................99

XI.     CLASS ACTION ALLEGATIONS .......................................................................100

XII.    CLAIMS FOR RELIEF ......................................................................................102

XIII.   PRAYER FOR RELIEF ......................................................................................103

XIV.    JURY DEMAND ...............................................................................................103

Lead Plaintiff City of Birmingham Retirement and Relief System ("Birmingham" or "Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants Innovative Industrial Properties, Inc. ("IIPR" or the "Company"), Alan Gold, Paul Smithers, David Smith, Ben Regin, and Catherine Hastings (collectively, "Defendants"), alleges the following based upon personal knowledge, as to Plaintiff and Plaintiff's own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by the Company, the Company's press releases and earnings conference call transcripts, and analyst and media reports about the Company.[1]  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired IIPR securities between February 26, 2024 and March 28, 2025, inclusive (the "Class Period"), seeking remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, for materially false, misleading, and/or incomplete statements made (and related material omissions committed) during the Class Period.[2]

2.      IIPR is a real estate investment trust ("REIT") that makes its money by renting to, and investing in, state-licensed cannabis companies and, in return, receiving monthly rent

---

[1] A redline comparison to the initial complaint (ECF No. 1) is attached as Exhibit A.

[2] "IIPR securities" as referenced herein includes shares of both common and preferred stock.

payments from these tenants.  IIPR returns a portion of these rent payments to its investors in the form of dividends and stock buybacks.

3.    IIPR's tenants are inherently risky because, among other things, they are engaged in federally illegal sales of recreational cannabis.  Moreover, during the Class Period, licensed cannabis operators, such as IIPR's tenants, were facing macroeconomic and industry headwinds. To mitigate such risks, Defendants repeatedly told investors that the Company had, among other things, a "diligent" process for "underwriting" and "monitoring" tenants, including review of tenants' "financial projections" and a "detailed review of financial statements, strategic initiatives, and growth plans."  Indeed, throughout the Class Period, Defendants' statements—in SEC filings, on earnings calls, and in press releases—over and over again emphasized that IIPR robustly and comprehensively diligenced and monitored its tenants to ensure that IIPR knew their true financial condition, including that those tenants had the financial wherewithal to pay their rent.

4.    These assurances were materially false or misleading.  During the Class Period, four of IIPR's largest tenants were in dire financial straits and would soon default on their rent payments to IIPR.  IIPR never disclosed this ticking timebomb to investors until it was too late. As a result, IIPR either (i) missed the problems with these tenants and so did not have a rigorous tenant-oversight process, in which case their statements touting such a process were false, or (ii) the oversight process did exist but Defendants failed to disclose to investors what it knew about the reality of its tenants' finances, in which case their statements were materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.  Either way, Defendants' material misrepresentations are actionable under Sections 10(b) and 20(a) of the Exchange Act.

5.    Worse still, instead of disclosing what they knew about tenants' financial problems, Defendants touted new investments in cannabis operators that would soon default on their rents

2

and have to be evicted.  These statements misled investors into believing that the additional investments were beneficial to IIPR because they would generate additional rental revenues for the Company, when, in reality, as was known or recklessly disregarded by Defendants, the tenants were financially distressed and would soon not be able to pay rent.

6.      The truth started to trickle out on November 6, 2024, when IIPR announced that two of its main tenants had stopped paying rent.  Understandably concerned, investment analysts asked Defendants if there were other tenants at risk of default.  Instead of coming clean, investors were assured that everything was under control, and that IIPR was "work[ing] with all of our tenants" and was "aware of what's going on with our tenants."  Despite these lulling statements, a little over a month later, IIPR's largest tenant defaulted on rent obligations totaling 17% of IIPR's revenues.  Again, Defendants moved quickly to assure investors that everything was copacetic, telling investors that it had "reached an agreement" with that tenant to resolve the "existing defaults."  This comfort was also short lived.  In the span of two weeks in March 2025, IIPR announced that four of its largest tenants were not paying rent and would have to be evicted, including the tenants that had defaulted in November and December 2024.

7.      At this point, IIPR finally admitted that "a substantial portion of [IIPR's] tenant[s]" were not "financially viable long-term."  Investors lost millions as Defendants' fraud was slowly revealed.  IIPR's common stock price plunged from $132.34 per share the day before the first tenant default was announced down to $54.09 per share when the full extent of the fraud materialized.

## II.    JURISDICTION AND VENUE

8.      The claims asserted in this complaint arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

9.      This Court has jurisdiction over the subject matter of these claims pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

10.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  IIPR is incorporated in this District.

11.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone and wire communications, and facilities of a national securities exchange.

## III.    PARTIES

12.     Plaintiff Birmingham, as set forth in its previously filed certification, acquired IIPR securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective events.  (*See* ECF No. 23).

13.     Defendant IIPR, founded on June 15, 2016, is an internally managed REIT focused on the acquisition, ownership, and management of properties for lease to state-licensed cannabis operators for cannabis cultivation and retail purposes.  IIPR is a Maryland corporation with principal executive offices located at 1389 Center Drive, Suite 200, Park City, UT 84098.  IIPR's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "IIPR" and IIPR's preferred stock trades on the NYSE under the ticker symbol "IIPR-PA."

14.     Defendant Alan D. Gold ("Gold") co-founded IIPR with Defendant Paul E. Smithers, and at all relevant times has served as the Company's Executive Chairman and member of the Company's Board of Directors.  Gold is a resident of Utah.

15.     Defendant Paul E. Smithers ("Smithers") co-founded IIPR with Defendant Gold and has served as the Company's President, Chief Executive Officer, and member of the

Company's Board of Directors since the Company's founding.  Smithers is a resident of North Carolina.

16.    Defendant David Smith ("Smith") has served as the Company's Chief Financial Officer and Treasurer since March 2023.  Smith is a resident of California.

17.    Defendant Ben Regin ("Regin") has served as the Company's Chief Investment Officer since January 2023.  Prior to that, he served as Vice President of Investments starting in January 2020 and previously, he was the Director of Investments and Finance starting in January 2017.  Regin is a resident of California.

18.    Defendant Catherine Hastings ("Hastings") has served as the Company's Chief Operating Officer since March 2023.  Prior to that, she served as Chief Financial Officer from June 2017 to March 2023, Treasurer from January 2017 to March 2023, and as Chief Accounting Officer from January 2017 to January 2021.  Hastings is a resident of California.

19.    Defendants Gold, Smithers, Smith, Regin, and Hastings are collectively referred to herein as the "Individual Defendants."

20.    IIPR and the Individual Defendants are collectively referred to herein as "Defendants."

## IV.    BACKGROUND

### A.    IIPR's Business Model

21.    A REIT is a company that owns, finances, and sometimes operates, income-producing real estate.  IIPR is an internally managed REIT, meaning that its business activities are conducted and overseen by IIPR employees, rather than an outside investment manager or other firm.  IIPR is focused on the acquisition, ownership, and management of properties for lease to state-licensed cannabis operators for cannabis cultivation and retail purposes.

22.    IIPR is structured as a traditional umbrella partnership real estate investment trust, where properties are owned by an operating limited partnership, of which IIPR (or its subsidiaries) is the general partner and owner of all limited partnership units.  As a REIT, IIPR's primary source of income is derived from rental revenue generated by the properties that it acquires.  IIPR acquires properties through sale-leaseback transactions from cannabis operators, as well as through third-party purchases.  In general, in a sale-leaseback transaction the landlord (here, IIPR) will purchase a property from a tenant (here, a cannabis operator) and then enter into a long-term lease for that property.  As a result of that transaction, the landlord ends up owning the tenant's original property in exchange for a cash payment from the landlord and the tenant begins paying rent to the landlord for the term of the lease.

23.    IIPR leases its properties to cannabis operators on a triple-net lease basis, where the operator-tenant is responsible for all property and operating costs during the lease term, including structural repairs, maintenance, real estate taxes, and insurance.

24.    REITs like IIPR use their rent proceeds to fund operations and pay shareholders through dividends and stock buyback programs.

**B.    IIPR's Business Was Dependent on a Small Number of Tenants**

25.    As of December 31, 2024, IIPR owned 109 properties comprising a total of 9 million rentable square feet in 19 states.  The Company has invested $2.4 billion across these properties, with an additional $38.3 million currently committed.  Over 90% of the Company's properties by square foot and rental income are industrial, focused on cannabis cultivation.

26.    As of December 31, 2024, IIPR had about 30 tenants.  According to the table below, which is reproduced from IIPR's 10-K for 2024, just ten cannabis operators leased 67 of IIPR's 109 properties and together accounted for 73% of the Company's collected rents:

| Tenant | Number of Properties | Total Invested and Committed Capital | Contractual Rent Collected for 2024 | Proportion of Total Rent |
|--------|---------------------|--------------------------------------|-------------------------------------|--------------------------|
| PharmaCann | 11 | $337,172,000 | $48,269,000 | 17% |
| Ascend Wellness | 4 | $214,050,000 | $30,261,000 | 11% |
| Green Thumb Indus. | 3 | $176,800,000 | $21,931,000 | 8% |
| Curaleaf | 8 | $175,047,000 | $20,175,000 | 7% |
| The Cannabist Co. | 21 | $147,834,000 | $17,785,000 | 6% |
| Trulieve Cannabis | 6 | $146,503,000 | $19,129,000 | 7% |
| Cresco Labs | 5 | $120,845,000 | $16,456,000 | 6% |
| 4Front Ventures | 4 | $120,750,000 | $9,266,000 | 3% |
| Gold Flora | 3 | $117,137,000 | $8,631,000 | 3% |
| SH Parent | 2 | $107,900,000 | $15,666,000 | 5% |
| **Total** | **67** | **$1,664,038,000** | **$207,568,000** | **73%** |

C.    **The Defaulting Tenants**

27.    There are four tenants that are especially relevant to Plaintiff's allegations: PharmaCann Inc. ("PharmaCann"), 4Front Ventures Corp. ("4Front"), Gold Flora, LLC ("Gold Flora"), and Tilt Holdings Inc. ("Tilt").  During the Class Period, all four of these tenants' businesses were collapsing, which would result in IIPR having to evict them at a staggering loss of revenues.  PharmaCann, 4Front, Gold Flora, and Tilt are collectively referred to as the "Defaulting Tenants."

28.    The following paragraphs summarize the Defaulting Tenants' businesses.

1.    **PharmaCann**

29.    IIPR's largest and longest-standing tenant, PharmaCann is one of the largest vertically integrated cannabis companies in the country.  PharmaCann operates as a state-licensed cannabis grower and distributor in at least New York, Michigan, Massachusetts, Illinois, Pennsylvania, Ohio, and Colorado.  PharmaCann was IIPR's very first tenant and signed its first lease agreement with IIPR in December 2016 for a property in New York.

30.    By the end of the Class Period, PharmaCann had 11 leases with IIPR across the states in which PharmaCann operated.  According to IIPR's March 28, 2025 press release, these leases represented 17% of the Company's total contractual rent as of December 31, 2024.

7

31.    As of December 2024, IIPR had separately invested nearly $327,000,000 in properties leased to PharmaCann.  Before defaulting on its rent payments to IIPR in November 2024, PharmaCann was contractually obligated to pay approximately $4.08 million per month in annualized base rent to IIPR.

32.    PharmaCann's leases with IIPR contained certain disclosure obligations regarding PharmaCann's finances and business plans.  For example, Section 34.1 of the lease agreement for a Pennsylvania property required PharmCann to provide IIPR with (a) audited year-end unconsolidated financial statements within 60 days after the end of the fiscal year; (b) unaudited quarterly financial statements "as soon as produced after the end of each of the Tenant's fiscal first, second and third quarters, and in any event within a reasonable time period before Landlord is required to make any filings to the SEC"; and (c) copies of "any budgets, forecasts and investor materials."

33.    Just before the start of the Class Period, on February 24, 2024, IIPR and PharmaCann amended their lease agreements to add a cross-default provision stating that a default under any lease agreement with PharmaCann or an affiliate would trigger a default under all of PharmaCann's leases with IIPR.

### 2.    4Front

34.    4Front, headquartered in Arizona, owns, operates, and manages cannabis cultivation and manufacturing facilities in Washington, Illinois, and Massachusetts.  During the Class Period, 4Front was publicly traded on Canadian exchanges under the ticker symbol "FFNT."

35.    During the Class Period, 4Front, through its subsidiaries, had four leases with IIPR: two in Massachusetts and one each in Washington and Illinois.  According to IIPR's March 28, 2025 press release, these leases represented 5.7% of the Company's total contractual rents as of December 31, 2024.  As of December 2024, IIPR had invested over $120,000,000 across these

four properties.  Before November 2024, 4Front was contractually obligated to pay approximately $1.4 million per month in annualized base rent to IIPR.

36.    IIPR's lease agreements with 4Front and its subsidiaries contained disclosure obligations regarding 4Front's finances and business plans.  For example, IIPR's agreement with 4Front's Massachusetts subsidiary, Healthy Pharms, required both the tenant (Healthy Pharms) and the guarantor (4Front) to provide audited financial documents to IIPR every quarter and year-end consolidated financial statements.  Tellingly, the disclosure provision exempted 4Front as "a Guarantor that is traded on any nationally recognized Canadian or United States stock exchange," but still required disclosure of detailed financial information for 4Front's subsidiary, Healthy Farms.  This indicates that IIPR wanted to receive, and did receive, financial information concerning 4Front's subsidiaries that was not publicly available.

37.    In May 2025, 4Front's U.S. subsidiaries filed for voluntary receivership in aid of liquidation and as of June 2025, 4Front had declared bankruptcy in Canada.

### 3.    Gold Flora

38.    Gold Flora is a vertically integrated cannabis company based in California that cultivates cannabis and makes and sells cannabis products under a portfolio of cannabis brands.  Gold Flora sells to both to distributors and through retail dispensaries that it owns and operates across California.  During the Class Period, common shares of Gold Flora were traded on Cboe Canada and on the OTCQB market under the symbol "GRAM."

39.    As of December 2024, Gold Flora had three leases with IIPR for properties in California.   According to IIPR's March 28, 2025 press release, these leases represented 2.9% of the Company's total contractual rent.  IIPR had also invested over $117,000,000 in these two properties.  Before November 2024, Gold Flora was paying approximately $719,250 per month in rent to IIPR, based on the contractual rent collected by IIPR from Gold Flora in 2024.

40.     Given that IIPR's leases with PharmaCann and 4Front contained provisions requiring periodic disclosures of financial information to IIPR, it is reasonable to infer that Gold Flora's agreements with IIPR contained similar terms and so IIPR was privy to non-public financial information about Gold Flora.

41.     On March 27, 2025, Gold Flora and its related entities filed for dissolution and receivership in Los Angeles Superior Court.

### 4.     Tilt

42.     Tilt is a business solutions provider to the global cannabis industry, which is incorporated in Nevada.  Its head office is in Phoenix, Arizona and its registered office is in Vancouver, Canada.  Tilt is a reporting issuer in Canada in the Provinces of British Columbia, Alberta, and Ontario and its common shares are listed for trading on the Cboe Canada under the symbol "TILT."  The common shares are also traded on the OTCQB in the United States under the symbol "TLLTF."  Tilt's Cannabis division supports third-party cannabis clients through turn-key retail, distribution, cultivation, and manufacturing offerings.

43.     By December 2024, IIPR had two leases with two Tilt subsidiaries, one in Massachusetts and the other in Pennsylvania.  According to IIPR's March 28, 2025 press release, these two leases represented 2.2% of the Company's total contractual rents as of December 31, 2024.  IIPR had also invested $55,000,000 in these two properties.

44.     Given that IIPR's leases with PharmaCann and 4Front contained provisions requiring periodic disclosures of financial information to IIPR, it is reasonable to infer that Tilt's agreements with IIPR contained similar terms and so IIPR was privy to non-public financial information about Tilt.

**D.    Immediately Prior to the Class Period, IIPR Suffered a String of Major Tenant Defaults.**

45.    PharmaCann, 4Front, Gold Flora, and Tilt were not the first major tenants that defaulted on their leases with IIPR.  Starting in the summer of 2022 and continuing through early 2023, two of IIPR's then-largest tenants defaulted on their rent obligations, leading to extensive litigation and lost revenues.  Those tenants individually represented up to 11% of IIPR's total revenues when they defaulted.

**1.    Kings Garden**

46.    Between April 2019 and March 2021, IIPR executed leases with Kings Garden for six properties in southern California.  In July 2022, Kings Garden defaulted on its obligations to pay rent on all six properties.  That same month, IIPR filed a complaint against Kings Garden in California Superior Court for breach of contract, seeking over $2.2 million for nonpayment of rent for the month of July.  In addition, the complaint sought damages against Kings Garden for submitting false draw requests for tenant improvement-related construction costs at two of IIPR's properties; IIPR claimed that it had paid Kings Garden millions of dollars for construction costs based on forged invoices, which allegedly went undetected by IIPR.  At the time of the default, the rental revenue from those leases represented 8% of IIPR's total rental revenue.

47.    After IIPR announced on July 14, 2022 that Kings Garden had not paid rent under any of its leases, IIPR's common stock price fell by 14.3%, from $111.61 per share to $95.70 per share.

48.    IIPR ultimately settled the lawsuit in September 2022 for $15.4 million.  Kings Garden never resumed rental payments.  In its 10-K for fiscal year 2022, IIPR reported a total default of $7.3 million under the six leases.

### 2.    Parallel

49.    In May 2021, IIPR executed leases with SH Parent, Inc. ("Parallel") for four properties.  In November 2022, Parallel defaulted on its obligations to pay its monthly rent at one of IIPR's properties in Allegheny County, Pennsylvania.  At the time of the default, Parallel was IIPR's second-largest tenant (after PharmaCann) and the rental revenue from those leases represented approximately 10% of IIPR's total rental revenue.

50.    IIPR sent its first Notice of Default to Parallel on January 10, 2023, seeking $2.37 million for three months' rental payments plus fees owed for operating expenses, late charges, and interest.  IIPR delivered a second Notice of Default on January 19, 2023 after Parallel failed to cure its breach.

51.    On January 25, 2023, after Parallel again failed to remit payment, IIPR served on Parallel a Notice to Vacate.  Shortly thereafter, on February 6, 2023, IIPR filed an ejectment action against Parallel in the Pennsylvania Court of Common Pleas, seeking a total of $3.2 million in rental payments and additional fees, in addition to pre-judgment and post-judgment interest.

52.    The lawsuit did not end IIPR's issues with Parallel.  On February 11, 2023, Surterra San Marcos, LLC ("Surterra"), a subsidiary of Parallel, defaulted on its rental obligations for a property leased from IIPR in San Marcos, Texas.  IIPR filed suit that same month, and was awarded possession of the property as well as rental back payments in March 2023.

53.    After IIPR announced on February 28, 2023 that it had filed two actions against Parallel for nonpayment of rent at two properties, its common stock price fell by 4.5%, from $88.41 per share to $84.45 per share.

54.    Parallel never resumed its rent payments for the Pennsylvania property; in October 2023, the court awarded possession of the property to IIPR and damages of approximately $15.5 million.

55.     The pre-Class Period defaults of Kings Garden and Parallel should have put Defendants on notice that even IIPR's largest tenants were on shaky financial footing.

## V.    DEFENDANTS' FRAUD

56.     As IIPR repeatedly told investors, it "serve[d] as a source of capital to [] licensed regulated cannabis operators, allowing them to redeploy their sale proceeds into their core operation to grow their business and achieve higher returns."  It accomplished this in two ways: (i) through sale-leaseback transactions with tenants in which IIPR would buy a property from a cannabis operator and then lease that property back to the operator, and (ii) by directly investing money to pay for upgrades to those properties to hopefully allow tenants to expand their businesses.  In other words, IIPR was essentially acting as an unlicensed bank for cannabis operators—lending money in the form of sale-leasebacks and direct investments and receiving interest on those loans in the form of monthly rent payments.

57.     IIPR was able serve this unlicensed banking function because, despite being legal in certain states, cannabis remains federally illegal and, as such, cannabis operators cannot access traditional lines of credit from banks to fund their operations.  IIPR stood to be paid handsomely for these services, as it was able to charge tenants much higher rents than those cannabis operators would have been paying had they been able to borrow money from more traditional lenders to fund their operations and rent properties from a traditional landlord.  As IIPR's Chairman and Co-Founder Alan Gold explained, "the sale leaseback concept is our basic business model" which since 2016 has produced "above average returns."

58.     Acting as an unlicensed bank for cannabis operators was risky.  Even if IIPR's tenants were legally licensed to grow and sell cannabis within a specific state, the tenants were still violating federal drug laws.  As a result, cannabis operators (unlike federally legal businesses) are subject to Section 280E of the Internal Revenue Code, which prevents IIPR's tenants from

deducting traditional business expenses and therefore made the business of selling cannabis less profitable than it otherwise would have been.

59.    But, in addition to potential criminal liability and unfavorable tax treatment, throughout the Class Period IIPR's tenants were facing significant industry-wide risks. Specifically, as IIPR stated in February 2024 (i) declining cannabis prices leading to "compresse[d] operating margins for operators," (ii) "inflation" impacting "costs for labor and production inputs for cannabis operators," and (iii) "labor shortages[,] and global supply chain issues."  As a result of leasing to, and investing in, tenants engaged in risky and potentially unlawful enterprises, IIPR faced an acute threat that the Company's tenants would not be able to make their rent payments, which made up essentially all of IIPR's revenues and the money it used to pay dividends to investors.

60.    IIPR's investors knew the general risks of IIPR's business model, so the specific steps IIPR took to identify and mitigate these risks were highly material to investors' assessment of IIPR's business and future prospects.  IIPR repeatedly told investors that it had robust due diligence practices and constantly monitored tenants' finances.  In other words, while investors may have known that IIPR was lending money to risky cannabis operators, IIPR also reassured them there was no specific reason for concern.  For example, in IIPR's February 27, 2024, annual report filed with the SEC, IIPR told investors that (i) "we expect that many of our current and future tenants will continue to incur losses as their expenses increase," but assured investors that "[w]e evaluate the credit quality of our tenants and any guarantors on an ongoing basis" and also "monitor the payment history data for all of our tenants, and in some instances, we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations."

14

61.     As particularized below (*see infra* Section VI.A), throughout the Class Period Defendants repeatedly told investors that they were constantly evaluating the creditworthiness of tenants and monitoring the tenants' finances on at least a quarterly basis.  These statements, among other things, represented to investors that IIPR engaged in "Ongoing Monitoring" including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials."

62.     These assurances were particularly important to investors because IIPR had only around 30 tenants throughout the Class Period.  As a result, conducting rigorous due diligence and monitoring of tenants was reasonably doable.  This supposedly robust oversight was also crucial because IIPR leased "properties to a limited number of tenants," so "the inability of any single tenant to make its lease payments could adversely affect [IIPR's] business" and "defaults by *any* of our tenants or a significant decline in the value of *any* single property would materially adversely affect our business."  (Emphasis added.)

63.     In sum, the fundamental premise of IIPR's business was that (i) it would lend money to cannabis operators—through sale-leaseback transactions and direct investments—and receive steady rent payments from those tenants, which would be paid out to investors as dividends; and (ii) it would undertake the rigorous underwriting and continuous monitoring necessary to ensure tenants would be able to keep making rent payments, so that IIPR could continue to pay out dividends.

64.     Unfortunately for investors, Defendants' assurances during the Class Period that they were undertaking due diligence on, and monitoring of, tenants were materially false or misleading.  These assurances misled investors into believing that there were no tenants in dire financial straits during the Class Period because IIPR had conducted sufficiently robust and

comprehensive due diligence on, and monitoring of, its tenants, and that any problems would be identified and addressed before the tenant could no longer pay rent.

65.     In reality, at least four of IIPR's largest tenants—the Defaulting Tenants—were struggling financially.  At the start of the Class Period, rent from PharmaCann and 4Front alone comprised 23% of IIPR's quarterly revenues.  And, the Defaulting Tenants were collectively 27.8% of IIPR's quarterly revenues as of December 31, 2024.

66.     If IIPR's management really was rigorously diligencing and monitoring its tenants, it would have uncovered at least the following adverse facts showing that the Defaulting Tenants were on the verge of financial collapse.

67.     ***The Two Largest Defaulting Tenants Were Behind on Their Taxes.***  Starting before the Class Period and continuing throughout the Class Period, PharmaCann and 4Front were not paying their taxes as required by law.  That these tenants did not have the money necessary to pay legally required taxes should have been a glaring red flag to Defendants that these tenants were likely unable to continue paying IIPR millions of dollars per month in rent.  Specifically, no later than January 30, 2024, PharmaCann was unable to pay its state tax obligations in Ohio, New York, and Illinois, resulting in these states filing numerous tax liens against PharmaCann for unpaid taxes totaling nearly half a million dollars by the end of the Class Period.  Similarly, 4Front was not paying all of its federal income taxes for the period 2022 to 2023, which on January 3, 2025, resulted in the U.S. government filing a tax lien against 4Front for $15,000,000.  Illinois and California also placed tax liens on 4Front in April 2024 for failure to pay $1,561,245 and $19,648 in back taxes, respectively.

68.     ***The Defaulting Tenants Did Not Have Money to Pay for Day-to-Day Operations.***  Throughout the Class Period, the defaulting tenants failed to pay many vendors and third-parties necessary to operate their businesses.  That the Defaulting Tenants were unable to stay current on

16

their trade debts—to the point of being sued by numerous vendors—should have alerted Defendants that these tenants were similarly likely to be unable to pay rent to IIPR.

a)    For example, PharmaCann was sued in December 2024 in New York Supreme Court by McCoy Sales, LLC, a company that provides commercial HVAC and heating equipment, for failing to pay six invoices totaling over $1 million for materials and equipment that McCoy supplied to PharmaCann in 2023 for improvements to an IIPR-owned property in Hamptonburgh, New York.

b)    At least three separate lawsuits were filed against 4Front in 2024 for nonpayment.   First, in February 2024, Elevated Equipment Supply, a supplier of commercial grower and cultivation equipment, sued 4Front in a California court for over $68,000 for nonpayment of invoices.   In August 2024, Mattio Communications, Inc. brought a suit against 4Front in New York seeking $25,000 in unpaid fees for marketing-related services that were provided to 4Front in the fall of 2023.   One month later, in September 2024, AE Global, a packaging vendor, sued 4Front in Florida for over $100,000 in unpaid invoices that AE Global had been trying to collect since the spring of 2023. Default judgment was entered against 4Front in all three cases in November and December 2024.

c)    Numerous vendors and suppliers were also chasing Gold Flora for nonpayment.  For example, in September 2024, a $6 million judgment was entered against Gold Flora by a California court for failing to pay the promised consideration in a 2019 asset purchase agreement that Gold Flora had entered into with Shelf Life, Inc.  One month later, in October 2024, Gold Flora was also sued by a cannabis product supplier, Four Star Distribution & Delivery, LLC, for failing to pay invoices totaling more than $250,000 for cannabis-related products sold and delivered in 2023 and 2024.

17

      d)    The full extent of these problems is further detailed in the insolvency proceedings filed by Gold Flora and 4Front.  Importantly, while the detailed financial information disclosed by these two tenants in their insolvency proceedings was not publicly available to investors until after the Class Period, it was available to IIPR and Defendants in real time because IIPR's leases required disclosure of such information to IIPR. Specifically, on March 27, 2025, Gold Flora and its related entities and subsidiaries filed a petition for dissolution in Los Angeles Superior Court and sought the appointment of a receiver to oversee the sale of its business and assets.  At the time of the petition, these entities collectively owed more than $52 million to lenders and over $60 million to unsecured creditors and providers of goods and services.  On May 22, 2025, 4Front and its related entities and subsidiaries filed a petition for dissolution and appointment of a receiver to oversee the management and sale of its business and assets.  At the time of the filing, these entities collectively owed more than $59 million to lenders, and an additional $16 million to sellers of businesses that 4 Front acquired, with total cost of debt payments and potential exposure resulting from litigation estimated at over $140 million.

69.    ***At Least Three of the Defaulting Tenants Were Hemorrhaging Cash and Warning that They Were at Imminent Risk of Insolvency.***  4Front, Gold Flora, and Tilt had been warning their investors from as early as 2023 that their auditors had substantial concerns about these companies being able to continue as going concerns:

> [4Front:] As of March 31, 2023, the Company had cash and cash equivalents of $4.6 million and working capital deficit of $29.0 million.  The Company incurred net losses of $11.4 million and $5.9 million for the three months ended March 31, 2023 and 2022, respectively.  *The conditions described above raise substantial doubt with respect to the Company's ability to meet its obligations for at least one year from the issuance of these consolidated financial statements, and therefore, to continue as a going concern.*

***

[Gold Flora:] Company has suffered recurring losses from operations and its total liabilities exceed its total assets. The Company is currently meeting its current operational obligations as they become due from its current working capital and from operations. However, the Company has sustained annual losses since inception and may require additional capital in the future. *This raises substantial doubt about the Company's ability to continue as a going concern.*

\*\*\*

[Tilt:] As a result, the Company cannot predict with certainty the outcome of its actions to generate liquidity as discussed above, including the availability of additional financing as necessary, or whether such actions would generate the expected liquidity as currently planned. *Therefore, management has concluded there is substantial doubt about the Company's ability to continue as a going concern within 12 months after the date of this filing.*

70.    Consistent with these "going concern" warnings, 4Front, Gold Flora, and Tilt had mounting year-over-year net losses throughout the Class Period, as shown in the first table below. The second table shows that throughout the Class Period, 4Front, Gold Flora, and Tilt also had negative working capital, which is the measure of financial resources available to a company to cover day-to-day obligations, like paying rent.

Financial performance: Net Loss

|  | As of 12/31/22 | As of 12/31/23 | As of 9/30/2024 | As of 12/31/24 |
|---|---|---|---|---|
| 4Front | -$46,898,000 | -$91,647,000 | -$29,723,000 | N/A - Insolvent |
| Gold Flora | -$22,925,000 | -$43,445,000 | -$56,301,000 | N/A - Insolvent |
| Tilt | -$107,466,000 | -$62,399,000 | -$58,254,000 | -$99,679,000 |

Liquidity resources: Negative working capital

|  | As of 12/31/22 | As of 12/31/23 | As of 9/30/2024 | As of 12/31/24 |
|---|---|---|---|---|
| 4Front | -$46,898,000 | -$71,100,000 | -$74,800,000 | N/A - Insolvent |
| Gold Flora | -$33,509,000 | -$34,863,000 | -$64,208,000 | N/A - Insolvent |
| Tilt | -$39,570,000 | -$19,798,000 | -$43,687,000 | -$46,608,000 |

71.    Because IIPR received detailed financial information from all of the Defaulting Tenants, Defendants knew or recklessly disregarded that 4Front, Gold Flora, and Tilt were on the precipice of financial collapse before and during the Class Period, which would make these tenants unable to continue paying all the rent due to IIPR.

72.     Given that PharmaCann (i) operated in the same industry as the three other Defaulting Tenants; (ii) had operations in many of these same markets (Illinois, Massachusetts, and Pennsylvania); (iii) was not paying all of its legally-required taxes before and during the Class Period; (iv) and was unable to pay all of its vendors; then (v) it is reasonable to infer that IIPR's review of PharmaCann's finances would have revealed a dire financial outlook similar to what appears in the financial records of 4Front, Gold Flora, and Tilt.

73.     ***The Defaulting Tenants Were Effectively Unable to Raise Money to Fund Their Businesses***.  When faced with both mounting expenses (including taxes) and limited cash flow, a normal business would seek financing, typically from a bank or other financial institution, to keep the company afloat.  This was not possible for the Defaulting Tenants.  As cannabis operators involved in a federally illegal enterprise, the Defaulting Tenants did not have access to traditional financing and so, as illustrated below, to the extent they could raise money at all, it was at crushing interest rates.

a)     For example, in July 2023 Gold Flora merged with The Parent Company ("TPCO") to secure much-needed capital, but the promised capital was far less than expected.  Gold Flora was saddled with TPCO's legacy liabilities, which further added to Gold Flora's debt burden.  To address these and other debts, Gold Flora sought loans to fend off its debt collectors, but by August 2024, had only been able to secure a single $6.9 million loan from a private debt collector with an astounding effective interest rate of approximately 40%.

b)     A similar story was also playing out at 4Front.  In 2023, the company closed its California business and laid off hundreds of employees.  In October 2023, 4Front obtained a loan of up to $10 million from a specialty finance firm but received only $4.4

million due to its inability to satisfy certain covenants. Since then, 4Front has been unable to secure new funding from any lenders.

   c) Tilt was also facing problems raising capital. During the second quarter of 2023, one of its primary suppliers significantly and unexpectedly changed the payment terms of Tilt's trade payable, which impacted Tilt's short-term liquidity and forced them to obtain additional financing. As a result, Tilt had to seek a waiver for financial covenant defaults expected to occur under the terms of other promissory notes, and as of December 31, 2024, Tilt was still paying the default rates of 24% and 25% on those promissory notes due to its non-compliance with payment obligations and covenants.

  74. The fact that the Defaulting Tenants were unable to raise additional capital to finance their operations at reasonable rates was another red flag to Defendants that these tenants would soon be unable to continue paying IIPR rent.

  75. The adverse facts about the Defaulting Tenants detailed above were either known to or recklessly disregarded by Defendants. Defendants repeatedly told investors that *all* tenants, including the Defaulting Tenants, were subject to, among other things, "Ongoing Monitoring" and "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials." And IIPR's leases entitled Defendants to detailed financial information about the Defaulting Tenants. For example, PharmaCann's lease agreement with IIPR required detailed and periodic financial disclosures:

> Tenant agrees that it shall, (a) within sixty (60) days after the end of Tenant's financial year, furnish Landlord with a certified copy of Tenant's audited year-end unconsolidated financial statements for the previous year and shall cause each Guarantor to furnish Landlord with a certified copy of their respective audited year-end unconsolidated financial statements for the previous year; (b) as soon as produced after the end of each of the Tenant's fiscal first, second and third quarters, and in any event within a reasonable time period before Landlord is required to

make any filings to the SEC requiring such information, furnish Landlord with a certified copy of Tenant's unaudited financial statements for the quarter; and (c) provide copies to Landlord of any budgets, forecasts and investors materials. . . . In addition, Tenant and each Guarantor agrees to timely provide financial statements to the Landlord to the extent that such financial statements are required to be included in filings made by the Landlord or Landlord's affiliates with the [SEC] which may include consolidated balance sheets, statements of operations, statements of cash flows and statements of stockholders equity, and related footnotes . . . .

76.    Importantly, as PharmaCann's lease shows, tenant financial information had to be disclosed to Defendants "*within a reasonable time period <u>before</u> [IIPR] is required to make any filings with the SEC.*"  In other words, IIPR was able to inform itself of current information about tenants' finances before it made its periodic disclosures to IIPR's investors, which, as detailed below, Plaintiff alleges were riddled with misstatements concerning tenants' finances.

77.    In addition to periodic monitoring of the Defaulting Tenants, they should have been subject to IIPR's purportedly "[d]iligent underwriting process."  IIPR told investors that its underwriting process included at least "[e]valuation of financial projections utilizing existing knowledge of industry dynamics," "[d]etailed review of financial statements, strategic initiatives, and growth plans," as well as tenants' "Ability to Raise Capital."  IIPR should have conducted this due diligence on all of the Defaulting Tenants before the Class Period, when they first obtained leases from IIPR.

78.    In addition, three of the four Defaulting Tenants also should have gone through IIPR's pre-loan due diligence processes days before and during the Class Period.  PharmaCann should have gone through this additional process immediately before the start of the Class Period when sometime "[i]n February 2024, [IIPR] amended [its] lease and development agreement with PharmaCann" to invest an additional $16 million at one property located in New York and extend the term of the lease.  4Front should have gone through the due diligence process at several points immediately before and during the Class Period, including in January 2024, when IIPR "entered

into lease amendments with subsidiaries of [4Front] at . . . four properties," and again in April 2024 when IIPR "amended the lease with a subsidiary of 4Front" to invest an additional $1.6 million at a property in Illinois.  And Gold Flora should have gone through the due diligence process during the Class Period in March 2024, when IIPR "executed a new long-term lease" with Gold Flora at a property in California, and again during the Class Period in May 2024, when IIPR executed another "new long-term lease with a subsidiary of Gold Flora" for a different property in California.

79.    Defendants' ongoing monitoring and due diligence would have uncovered the truth of the financial prospects of the Defaulting Tenants, including the fact that these tenants would soon be unable to meet their current rent obligations well before these tenants became unable to make rent.  As a result, IIPR either (i) did not have a rigorous tenant-oversight process, or (ii) that oversight process did exist but Defendants failed to disclose to investors what it knew about the financial circumstances of the Defaulting Tenants and so Defendants gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

80.    In addition to misleading investors about their ongoing oversight of the Defaulting Tenants, Defendants also lauded new investments in these tenants throughout the Class Period. As particularized below (*see infra*, Section VI.B), these misstatements failed to disclose what IIPR knew (or recklessly disregarded) about the Defaulting Tenants' then-existing finances and future ability to pay rent.

81.    The full extent of Defaulting Tenants' dire financial situations would be revealed to IIPR investors over the course of a few months starting on November 6, 2024, when Defendants announced 4Front and Tilt had stopped paying rent two months earlier in September.  When asked on a November 7 conference call if these tenants had just "stop[ped] paying out of the blue,"

Defendants, among other things, assured investors "we continue to work with all of our tenants" and "so we are aware of what's going on with our tenants."  And Defendant Gold claimed that IIPR had "been able to work through" the issue with 4Front and "come to a very amicable and positive resolution."  In other words, Defendants actively concealed the full scope of the problems at 4Front and Tilt, which would be revealed a few months later.  The press release announcing these tenants' failure to pay rent was issued shortly before markets closed on November 6, 2024, and in reaction to this news, IIPR's common stock began dropping before markets closed, and continued through the next day, November 7, 2024, when trading resumed.  In response to the news of November 6, 2024, IIPR's common stock dropped over 16% to close at $110.70 per share on November 7, 2024, from a closing price of $132.34 per share two days before.

82.     The next shoe dropped on December 20, 2024, when IIPR announced that PharmaCann—the Company's oldest and largest tenant—had stopped paying rent on six of its 11 leases and that IIPR was declaring PharmaCann in default on all 11 leases.  In response to this news, IIPR's common stock dropped 22.74% to close at $73.66 per share, down from $95.34 per share the day before.  Defendants acted quickly to assuage investors, claiming on January 30, 2025, that IIPR had "reached an agreement with PharmaCann Inc. and its affiliates . . . to resolve PharmaCann's existing defaults under leases for eleven properties that the Company owns."  This assurance was materially misleading, as would be revealed less than two months later.  Rent for December and January was taken out of PharmaCann's security deposits, which were held by IIPR.  And, after making a single rent payment for February, PharmaCann stopped paying rent altogether.  So, on March 14, 2025, after the close of trading, IIPR issued a press release confirming that "PharmaCann defaulted on its obligations to pay rent for the month of March under nine of its eleven leases for properties located in New York, Illinois, Pennsylvania, Ohio, and Colorado" and that IIPR was moving to evict PharmaCann.  In response to the news of PharmaCann's second

failure to pay rent, when trading resumed on March 17, IIPR's common stock dropped 7.77% to close at $64.21 per share, down from a closing price of $69.62 per share on March 14.

83.     Two weeks after announcing that PharmaCann was being evicted, IIPR issued a press release declaring 4Front, Tilt, and Gold Flora in default for failing to pay rent and announcing that it would move to evict these tenants.  IIPR further revealed that it was "proactively seeking to refresh a substantial portion of its tenant base with more financially viable long-term tenants to better position the Company for sustainable growth and improved financial performance."  In other words, IIPR admitted that its oft-touted due diligence and monitoring of tenants had failed so completely that "a substantial portion of its tenant base" were not "financially viable long-term."  On this news, IIPR's common stock price fell $9.66 per share, or 15.15%, to close at $54.09 per share on March 31, 2025.

84.     In sum, as the truth trickled out to investors, IIPR's common stock dropped from $132.34 per share the day before the first 4Front and Tilt defaults were announced to close at $54.09 per share when Defendants finally admitted that "a substantial portion of [IIPR's] tenants" were not "financially viable long-term."  As a result, investors lost millions.

## VI.    DEFENDANTS' MISSTATEMENTS

85.     Pursuant to the applicable pleading requirements, the following paragraphs particularize Defendants' alleged misstatements during the Class Period.  Those misstatements fall into two categories: (i) materially false and misleading statements about Defendants' ongoing tenant oversight and due diligence; and (ii) materially misleading statements touting new leases and investments with the Defaulting Tenants that failed to disclose what Defendants know about the Defaulting Tenants' then-existing finances.  Some statements in this section are presented with necessary context so that they can be fairly read and understood.  In all instances, the specific

statements (or portions of statements) that Plaintiff allege are actionable have been highlighted in yellow. Quotations that have not been highlighted are provided for context.

### A.     Defendants' Misstatements Regarding Oversight of Tenants

#### 1.     Misstatements First Made During the Class Period in the FY23 10-K

86.     On February 26, 2024, IIPR issued financial results for the fourth quarter and full-year 2023, and on February 27, 2024, IIPR filed its Form 10-K with the SEC (the "FY23 10-K").

87.     Under the heading "Our Competitive Strengths" and the introductory clause "We believe that we have the following competitive strengths," the FY23 10-K states the following as one of four "strengths":

> **Demonstrated Investment Acumen.** We utilize rigorous underwriting standards for evaluating acquisitions and potential tenants to ensure that they meet our strategic and financial criteria. Our extensive experience and relationships in the real estate and regulated cannabis industry enable us to identify, negotiate and close on acquisitions and leases with established operators and other operators which meet our criteria.

88.     ***The statement highlighted above in paragraph 87 was materially false or misleading when made.*** By telling investors that IIPR "utilize[d] rigorous underwriting standards for evaluating acquisitions and potential tenants," Defendants assured investors that IIPR had processes and procedures to "ensure" IIPR's risky tenants met IIPR's "strategic and financial criteria." In reality, as would be revealed gradually from November 6, 2024 through March 28, 2025, four of IIPR's largest tenants were failing, would be unable to pay rent, and would have to be evicted. These tenants were at least 23% of IIPR's revenues for the quarter in which the misstatement was made. IIPR stated elsewhere that management was undertaking ongoing monitoring of tenants' finances and ability to pay rent. The misstatement highlighted in paragraph 87 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial

condition of the Defaulting Tenants well before those tenants defaulted.  As a result, IIPR either (i) did not have a rigorous tenant-oversight process, in which case the highlighted statement in paragraph 87 was false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about the Defaulting Tenants, in which case the highlighted statement in paragraph 86 was materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

89.     Under the heading "Risk Management," the FY23 10-K notes that IIPR expected "many of our current and future tenants will continue to incur losses as their expenses increase in connection with the expansion of their operations, and that they have made and will make rent payments to us from proceeds from the sale of the applicable property or cash on hand, and not funds from operations."  After noting this potential risk, the FY23 10-K assured investors of the following:

> We evaluate the credit quality of our tenants and any guarantors on an ongoing basis.  In addition, we monitor the payment history data for all of our tenants and, in some instances, we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations.

90.     ***The statement highlighted above in paragraph 89 was materially false or misleading when made.***  By telling investors that IIPR was "evaluat[ing]" the "credit quality" of tenants "on an ongoing basis," and also "monitor[ing]" tenants' "payment history data," "periodically conducting site visits[,] and meeting with the tenants to discuss their operations," Defendants assured investors that IIPR had the processes and procedures in place to "monitor" their tenants' finances and future prospects.  In reality, as would be revealed gradually from November 6, 2024 through March 28, 2025, four of IIPR's largest tenants were failing, would be unable to pay rent, and would have to be evicted.  These tenants were at least 23% of IIPR's revenues for the quarter in which the misstatement was made.  IIPR stated elsewhere that

management was undertaking ongoing monitoring of tenants' finances and ability to pay rent.  The misstatement highlighted in paragraph 89 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial condition of the Defaulting Tenants well before those tenants defaulted.  As a result, IIPR either (i) did not have a rigorous tenant-oversight process, in which case the highlighted statement in paragraph 89 were false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about the Defaulting Tenants, in which case the highlighted statement in paragraph 89 was materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

91.    Under the heading "Risks Related to Our Business," and the sub-heading stating in part, "Many of our existing tenants . . . [are] companies with limited histories of operations and may be unable to pay rent with funds from operations," the FY23 10-K assured investors of the following:

> We rely on our management team to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information.

92.    ***The statement highlighted above in paragraph 91 was materially false or misleading when made.***  By telling investors that IIPR's "management team" was "perform[ing] due diligence investigations" on tenants' "properties, operations and prospects"—which were critically important because "there is generally little or no publicly available operating and financial information" on IIPR's tenants—Defendants assured investors that IIPR's management was actually performing adequate due diligence on IIPR's tenants.  In reality, as would be revealed gradually from November 6, 2024 through March 28, 2025, four of IIPR's largest tenants were

failing, would be unable to pay rent, and would have to be evicted. These tenants were at least 23% of IIPR's revenues for the quarter in which the misstatement was made. IIPR stated that "management" was undertaking ongoing monitoring of tenants' finances and ability to pay rent. The misstatement highlighted in paragraph 91 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial condition of the Defaulting Tenants well before those tenants defaulted. As a result, IIPR either (i) did not have a rigorous tenant-oversight process, in which case the highlighted statement in paragraph 91 was false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about the Defaulting Tenants, in which case the highlighted statement in paragraph 91 was materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

93.     ***The statements highlighted above in paragraphs 87, 89, and 91 were made with scienter.*** The FY23 10-K was prepared and filed with the SEC at the direction of the Individual Defendants. Indeed, the SEC filing was certified by Defendant Smithers and Defendant Hastings. Both Smithers and Hastings certified that they had "reviewed" the FY23 10-K and represented that it did "not contain any untrue statement of material fact" or material misrepresentations. According to IIPR, the Company "rel[ied] on our management team," including the Individual Defendants "to perform due diligence investigations" and monitor tenants' finances and operations. Given (i) the Individual Defendants' roles as managers of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that they either knew or recklessly disregarded that the statements highlighted in paragraphs 87, 89, and 91 were false or misleading. Also, as detailed below, several of the Individual Defendants had the clear motive to mislead investors because Gold, Smithers, and Hastings stood to be awarded

29

millions of dollars in discretionary compensation if IIPR's stock price performed well. This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

94.    The materially false or misleading statements set out above in paragraphs 87, 89, and 91 were repeated word-for-word in IIPR's February 21, 2025 Fiscal Year 2024 10-K. Those identical statements were materially false or misleading, and made with *scienter*, for the same reasons set out above in paragraphs 87, 89, and 91.

## 2.    Misstatements First Made During the Class Period on March 4, 2024

95.    On March 4, 2024, IIPR published a "Company Presentation" for investors. This presentation was available on IIPR's website under the Company's "Investors" page throughout the Class Period (and is still available there as of the date of this filing). That presentation included the following slide assuring investors that Defendants were engaged in "Underwriting & Monitoring" of tenants:[3]

---

[3] In order to preserve its legibility, the text of the slide excerpted in paragraph 95 has not been highlighted. Plaintiff alleges that the portion of the slide within the yellow box was materially false or misleading when made.



96. ***The statements highlighted above in paragraph 95 were materially false or misleading when made.*** This IIPR investor presentation assured investors that Defendants had a robust and process for "underwriting" and "monitoring" to ensure IIPR's tenants had the financial resources to pay rent. According to this investor presentation, Defendants' oversight included both front-end due diligence and underwriting that reviewed, among other things, tenants' (i) "management"; (ii) "[h]istory of successful capital raising" and "cash balance on hand"; (iii) "financial projections" and a "detailed review of financial statements, strategic initiatives, and growth plans." In addition to these steps, Defendants also told investors that tenants were subject to "Ongoing Monitoring" including both "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials." In sum, Defendants devoted an entire slide from a 16-slide presentation to assuring investors that IIPR had the due diligence and monitoring processes to detect and address tenants in financial distress before they stopped being able to pay rent.

97.     In reality, as would be revealed gradually from November 6, 2024 through March 28, 2025, four of IIPR's largest tenants were failing, would be unable to pay rent, and would have to be evicted.  These tenants were at least 23% of IIPR's revenues for the quarter in which the misstatements were made.  IIPR stated elsewhere that management was undertaking ongoing monitoring of tenants' finances and ability to pay rent.  The misstatements highlighted in paragraph 95 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial condition of the Defaulting Tenants well before those tenants defaulted.  As a result, IIPR either (i) did not have a rigorous tenant-oversight process in which case the highlighted statements in paragraph 95 were false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about the Defaulting Tenants, in which case the highlighted statements in paragraph 95 were materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

98.     *The statements highlighted above in paragraph 95 were made with scienter.*  The March 4, 2024 investor presentation identifies Defendants Smithers, Smith, Hastings, and Regin as part of IIPR's "senior management team," and Defendant Gold has an entire slide devoted to his role as IIPR's "Executive Chairman & Co-Founder."  Given their roles at IIPR, and that the presentation was meant to inform investors about IIPR, it is reasonable to infer that this March 4, 2024 investor presentation was prepared at the direction of the Individual Defendants and that they had control over its contents.

99.     In addition, according to IIPR, the Company "rel[ied] on our management team," including the Individual Defendants, "to perform due diligence investigations" and monitor tenants' finances and operations.  Given (i) the Individual Defendants' roles as managers of IIPR,

and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that they either knew or recklessly disregarded the statements highlighted in paragraph 95 were false or misleading. Also, as detailed below, several of the Individual Defendants had the clear motive to mislead investors because Gold, Smithers, and Hastings stood to be awarded millions of dollars in discretionary compensation if IIPR's stock price performed well. This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

100.    The materially false or misleading statements in the slide above in paragraph 95, were repeated almost word-for-word in investor presentations Defendants published to investors on (i) May 13, 2024, (ii) August 6, 2024, and (iii) November 7, 2024. Those substantially similar statements were materially false or misleading, and made with *scienter*, for the same reasons set out above in paragraphs 96 through 99.

### 3.    Misstatements Made on the August 6, 2024, Earnings Call

101.    On August 6, 2024, Defendants held a call with investors and investment analysts to, among other things, discuss IIPR's second quarter 2024 results. On this call, investment analysts asked several questions about Defendants' oversight of tenant finances and the Company's due diligence process.

102.    BTIG analyst, Tom Catherwood, asked Defendant Regin the following question:

Ben, you had mentioned pursuing new investments on a highly selective basis. What characteristics does a sale leaseback or follow-on investment have to include to meet your underwriting? And have these requirements changed at all in recent quarters?"

103.    Before Defendant Regin could respond, Defendant Gold interjected the following:

I think before Ben starts with that, I'd like to remind not only Tom but everybody that the sale-leaseback concept is our basic business model that we've been following since for the last 8 years, and it seems to be – it has continued to produce what we think are below average risks with above average returns. Now with that, I'm going to turn it over to Ben to go ahead and describe that what [*sic*] we do in a sale-leaseback acquisition and underwriting.

33

104.    ***The statement highlighted above in paragraph 103 was materially false or misleading when made.***  By telling investors that IIPR's "basic business model . . . has continued to produce . . . below average risks with above average returns," Gold assured investors that IIPR had the due diligence and monitoring processes in place to determine what those "risks" actually were as compared to potential "returns" for investors.  In reality, as would be revealed gradually from November 6, 2024 through March 28, 2025, four of IIPR's largest tenants, including PharmaCann, were failing, would be unable to pay rent, and would have to be evicted.  These tenants were at least 25% of IIPR's revenues for the quarter in which the misstatement was made.  IIPR stated elsewhere that management was undertaking ongoing monitoring of tenants' finances and ability to pay rent.  The misstatement highlighted in paragraph 103 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial condition of the Defaulting Tenants well before those tenants defaulted.  As a result, IIPR either (i) did not have a rigorous tenant-oversight process in which case the highlighted statement in paragraph 103 was false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about the Defaulting Tenants, in which case the highlighted statement in paragraph 103 was materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

105.    ***The statement highlighted above in paragraph 103 was made with scienter.***  At the time this statement was made, Gold was IIPR's Executive Chairman.  According to IIPR, the Company "rel[ied] on our management team," including Gold, "to perform due diligence investigations" and monitor tenants' finances and operations.  Given (i) Gold's role as a manager of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling

inference here is that he either knew or recklessly disregarded that the statement highlighted in paragraph 103 was false or misleading. Also, as detailed below, Gold had the clear motive to mislead investors because he stood to be awarded millions of dollars in discretionary compensation if IIPR's stock price performed well. This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

106. Defendant Regin then responded to Mr. Catherwood's question (*see supra* ¶102) as follows:

> I wouldn't say that our underwriting criteria has necessarily changed over the years. And I think we're still highly selective on the types of opportunities in markets we like with tenants we like as we have been since our inception. I think we're very pleased with the state of the pipeline. We're still seeing the low to mid-teens yields on the opportunities in the pipeline. . . . On top of the investment activity that we've seen year-to-date and very pleased [*sic*] with the leasing activity as well . . . . So between that, executing on selective pipeline opportunities, we feel very good about the state of the pipeline and the portfolio overall.

107. ***The statement highlighted above in paragraph 106 was materially false or misleading when made.*** By telling investors that IIPR had "[un]changed" "underwriting criteria" that were "highly selective," Regin assured investors that IIPR had the due diligence and monitoring processes to detect and address tenants in financial distress before they stopped being able to pay rent. In reality, as would be revealed gradually from November 6, 2024 through March 28, 2025, four of IIPR's largest tenants were failing, would be unable to pay rent, and would have to be evicted. These tenants were at least 25% of IIPR's revenues for the quarter in which the misstatement was made. IIPR stated elsewhere that management was undertaking ongoing monitoring of tenants' finances and ability to pay rent. The misstatement highlighted in paragraph 106 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial condition of the Defaulting Tenants well before those tenants defaulted. As a result, IIPR either

(i) did not have a rigorous tenant-oversight process in which case the highlighted statement in paragraph 106 were false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about the Defaulting Tenants, in which case the highlighted statement in paragraph 106 was materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

108.    ***The statement highlighted above in paragraph 106 was made with scienter.***  At the time this statement was made, Regin was IIPR's Chief Investment Officer.  According to IIPR, the Company "rel[ied] on our management team," including Regin "to perform due diligence investigations" and monitor tenants' finances and operations.  Given (i) Regin's role as a manager of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that he either knew or recklessly disregarded the statement highlighted in paragraph 106 was false or misleading.  This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

109.    Piper Sandler analyst Connor Mitchell asked about how IIPR was "balancing investments with new [] tenants" versus making "additional investment commitment[s]" with existing tenants:

> Maybe just continuing on that and really focusing on the tenants.  I was just wondering how you guys think about balancing investments with the new external tenants and then the existing tenants in terms of additional investment commitments, retenanting, et cetera?

110.    Defendant Regin responded as follows:

> I feel very good about our current tenant roster of our 30 tenants and north of 90% of our revenue comes from multistate operators, and we really feel that we have some of the best operators in the industry in our portfolio and have continued to support them over the years while also maintaining a well-diversified portfolio across our tenant base as well as across state markets.

36

<mark>We, of course, will look at new opportunities to work with new operators as we see fit with management teams that we like that have strong financials, track record of performance in the same rigorous underwriting criteria that we've used historically for our existing tenants.</mark>

111.    ***The statements highlighted above in paragraph 110 were materially false or misleading when made.***  By telling investors that IIPR's "portfolio" consisted of "some of the best operators in the industry," that IIPR "continued to support" those tenants, and that IIPR had used "rigorous underwriting criteria" to determine that "existing tenants" had "strong financials" and a "track record of performance," Regin assured investors that IIPR had the due diligence and monitoring processes to detect and address tenants in financial distress before they stopped being able to pay rent and would continue to engage in this same process with "new opportunities to work with new operators."  In reality, as would be revealed gradually from November 6, 2024 through March 28, 2025, four of IIPR's largest tenants, were failing, would be unable to pay rent, and would have to be evicted.  These tenants were at least 25% of IIPR's revenues for the quarter in which the misstatements were made.  IIPR stated elsewhere that management was undertaking ongoing monitoring of tenants' finances and ability to pay rent.  The misstatements highlighted in paragraph 110 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial condition of the Defaulting Tenants well before those tenants defaulted.  As a result, IIPR either (i) did not have a rigorous tenant-oversight process in which case the highlighted statements in paragraph 110 were false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about the Defaulting Tenants, in which case the highlighted statements in paragraph 110 were materially misleading because they gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

37

112.    ***The statements highlighted above in paragraph 110 were made with scienter.***  At the time these statements were made, Regin was IIPR's Chief Investment Officer.  According to IIPR, the Company "rel[ied] on our management team," including Regin, "to perform due diligence investigations" and monitor tenants' finances and operations.  Given (i) Regin's role as a manager of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that he either knew or recklessly disregarded the statements highlighted in paragraph 110 were false or misleading.  This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

113.    Mr. Mitchell, then specifically asked Defendants about their "watch list" of tenants and for a "tenant credit update":

> And then maybe one more question from me.  You guys have had a pretty good handle on correcting any issues or fixing any issues you've had with tenants in the system.  Just wondering if you could provide an update on maybe a watch list or a tenant credit update, if anything might be brewing? Or you guys feel pretty good about the environment as it is?

114.    Defendant Smithers responded as follows:

> So I think the statement that we talk about when we talk about a watch list is that we watch all of our tenants.  And even with 30 tenants, we think we have that pretty well in hand.  We've reminded the audience about the difficult macroeconomic environment in general and in particularly in the cannabis industry and we are still working – the industry is still working through some of those issues and we believe that there are tenants that because of supply chain issues or getting up to speed with the changing environment that there will be some difficulties.  But in general, we're very – as Ben and Cat has indicated, we're very pleased with the quality and strength of our tenants.

115.    ***The statements highlighted above in paragraph 114 were materially false or misleading when made.***  In response to a direct question seeking an "update on" IIPR's tenant "watch list" or a "tenant credit update" to determine if "anything might be brewing," CEO Smithers assured that Defendants "watch all of our tenants," "we have that pretty well in hand," and that while there "will be some difficulties . . . we're very pleased with the quality and strength  of our

tenants." In reality, as would be revealed gradually from November 6, 2024 through March 28, 2025, four of IIPR's largest tenants, were failing, would be unable to pay rent, and would have to be evicted. These tenants were at least 25% of IIPR's revenues for the quarter in which the misstatements were made. IIPR stated elsewhere that management was undertaking ongoing monitoring of tenants' finances and ability to pay rent. The misstatements highlighted in paragraph 114 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial condition of the Defaulting Tenants well before those tenants defaulted. As a result, IIPR either (i) did not have a rigorous tenant-oversight process, in which case the highlighted statements in paragraph 114 were false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about the Defaulting Tenants, in which case the highlighted statements in paragraph 114 were materially misleading because they gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

116.    ***The statements highlighted above in paragraph 114 were made with scienter.*** At the time these statements were made, Smithers was the CEO, President and Co-Founder of IIPR. According to IIPR, the Company "rel[ied] on our management team," including Smithers "to perform due diligence investigations" and monitor tenants' finances and operations. Given (i) Smithers' role as a manager of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that he either knew or recklessly disregarded the statements highlighted in paragraph 114 were false or misleading. Also, as detailed below, Smithers had the clear motive to mislead investors because he stood to be awarded millions of dollars in discretionary compensation if IIPR's stock price performed well. This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

#### 4.     Misstatements on the November 7, 2024, Earnings Call

117.     On November 7, 2024, Defendants held a call with investors and investment analysts to, among other things, discuss IIPR's third quarter 2024 results.  On this call, investment analysts asked many pointed questions about Defendants' oversight of tenant finances and the Company's due diligence process, in light of Defendants' announcement that certain tenants, including 4Front and Tilt had failed to pay all rent due for two months.

118.     Tom Catherwood, the BTIG analyst, asked the following:

In the past, you've worked with tenants that faced operating challenges usually by doing short-term lease amendments for the tenants that paid partial or no rent in Q3, did they just stop paying out of the blue?  Or did they come to you ahead of time looking for some kind of amendment or work out and you declined?

119.     Defendant Gold responded to the questions as follows:

So, well, first, we have worked, we continue to work with all of our tenants on understanding their businesses and making sure that we are [*sic*] know what they are doing and how things are going.  So, we are aware of what's going on with our tenants.  So that's #1.

Number two, we want to work with our tenants when they are experiencing unusual or unforeseen issues such as what we've done with [4Front] with the power issue in Illinois.  And we've been able to work through that issue with them and I think come to a very amicable and positive resolution for our shareholders and ourselves, in addition to themselves.

120.     ***The statements highlighted above in paragraph 119 were materially false or misleading when made.***  In light of 4Front and Tilt's failure to pay rent, Defendants were asked point-blank whether these tenants "just stop[ped] paying out of the blue" or went to IIPR "ahead of time looking for some kind of amendment or work out."  In response, Defendant Gold first assured investors that "*we are aware of what's going on with our tenants*" because "we continue to work with all of our tenants on understanding their businesses and making sure that we . . . know what they are doing and how things are going."  Defendant Gold then assured investors that the issue with 4Front was "unusual or unforeseen" and that Defendants had "been able to work

through" the "issue" with 4Front to "come to a very amicable and positive resolution for our shareholders."

121.    In reality, as would be fully revealed over the course of the next several months culminating on March 28, 2025, four of IIPR's largest tenants, including 4Front and Tilt, were failing, would be unable to pay rent, and would have to be evicted.  These tenants were at least 27% of IIPR's revenues for the quarter in which the misstatements was made.  IIPR stated elsewhere that management was undertaking ongoing monitoring of tenants' finances and ability to pay rent.  The misstatements highlighted in paragraph 119 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial condition of the Defaulting Tenants well before those tenants defaulted.  As a result, IIPR either (i) did not have a rigorous tenant-oversight process, in which case the highlighted statements in paragraph 119 were false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about the Defaulting Tenants, in which case the highlighted statements in paragraph 119 were materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

122.    ***The statements highlighted above in paragraph 119 were made with scienter.***  At the time these statements were made, Gold was IIPR's Executive Chairman.  According to IIPR, the Company "rel[ied] on our management team," including Gold, "to perform due diligence investigations" and monitor tenants' finances and operations.  Given (i) Gold's role as a manager of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that he either knew or recklessly disregarded the statements highlighted in paragraph 119 were false or misleading.  Also, as detailed below, Gold had the clear motive to mislead investors because he stood to be awarded millions of dollars in discretionary compensation

if IIPR's stock price performed well. This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

123.    Defendant Smithers then jumped in and added the following in response to Mr. Catherwood's question (*see supra* ¶118):

> Yes. I think, Tom, you've seen how we've dealt with these issues in the past. And we do take a different path to paying on each situation. So if I describe it, it's a situation that is something unusual, we saw some of this during COVID, supply chain issues. We work with that tenant.
>
> But on the other hand, if the situation as we've seen in the past is it was a tenant that just stops paying rent, and we don't see a reasonable path for them to restart paying rent and get back to even, we take a very aggressive scans [*sic*] and regaining the possession of the property. So there's two paths that we take, and it's really dependent on the situation.

124.    ***The statements highlighted above in paragraph 123 were materially false or misleading when made.*** Defendant Smithers doubled-down on Defendant Gold's response to the question of whether 4Front and Tilt had "just stop[ped] paying out of the blue." He assured investors that if this had been an unforeseen "situation" where "a tenant . . . just stops paying rent," but if there had been "reasonable path for them to restart paying rent and get back even," then IIPR would have "take[n] a very aggressive [stance]" and evicted the tenant. In other words, Defendant Smithers assured investors that IIPR was confident that the problems with 4Front and Tilt were "something unusual," like "COVID supply chain issues," that could be quickly resolved to get the tenants on a "path to paying" because IIPR had not taken aggressive action against these tenants.

125.    In reality, as would be fully revealed over the course of the next several months, culminating on March 28, 2025, four of IIPR's largest tenants were failing, would be unable to pay rent, and would have to be evicted. These tenants were at least 27% of IIPR's revenues for the quarter in which the misstatements were made. IIPR stated elsewhere that management was undertaking ongoing monitoring of tenants' finances and ability to pay rent. The misstatements

highlighted in paragraph 123 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial condition of the Defaulting Tenants well before those tenants defaulted.  As a result, IIPR either (i) did not have a rigorous tenant-oversight process in which case the highlighted statements in paragraph 123 were false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about the Defaulting Tenants, in which case the highlighted statements in paragraph 123 were materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

126.    ***The statements highlighted above in paragraph 123 were made with scienter.***  At the time these statements were made, Smithers was the CEO, President, and Co-Founder of IIPR. According to IIPR, the Company "rel[ied] on our management team," including Smithers "to perform due diligence investigations" and monitor tenants' finances and operations.  Given (i) Smithers' role as a manager of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that he either knew or recklessly disregarded the statements highlighted in paragraph 123 were false or misleading.  Also, as detailed below, Smithers had the clear motive to mislead investors because he stood to be awarded millions of dollars in discretionary compensation if IIPR's stock price performed well.  This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

127.    Later on the November 7, 2024 call with investors, Piper Sandler analyst Alexander Goldfarb went back to "Tom [Catherwood's] question on the tenant credit":

> Maybe just continuing on Tom's question on the tenant credit.  A 2-parter in the tenant credit.  One is you guys made an additional investment in [4Front] in the second quarter.  They have four properties, and it sounds like there was only an issue with one of the properties.  So just want to get a bit more understanding on maybe it was all on lease [*sic*] across the four properties.  So, in order for them to

not pay on one, it implied all of them. But maybe just some more color on the comfort of giving them more investment last quarter, four properties and then a power issue on one of the properties.

And then regarding the other 2 tenants, is this – years ago, we used to talk – or I used to – it was my word, my words, sort of a whack a mole where there'd be a tenant issue that will get resolved, there will be another one. So I just want to understand if that maybe is, in fact, how the business works, that there's always going to be a few tenants not necessarily the same, but a few that are always surfacing. And therefore, this isn't a bad thing. It's just part of the business.

128.    Defendant Gold responded, in part, as follows:

[E]very real estate sector has ups and downs and has tenants that over expand and need to retrench. And so, we're not different than all the others. The difference is we've been paid a very high adjusted rate of return for what we believe is a very – a much lower risk – risk profile.

129.    ***The statement highlighted above in paragraph 128 was materially false or misleading when made.*** By telling investors that IIPR was different from other real estate sector investments because it had "been paid a very high adjusted rate of return for what we believe is a very . . . much lower risk," Gold assured investors that IIPR had the due diligence and monitoring processes in place to determine what that "risk profile" actually was as compared to the potential "rate of return" for investors. In reality, as would be fully revealed over the course of the next several months, culminating on March 28, 2025, four of IIPR's largest tenants were failing, would be unable to pay rent, and would have to be evicted. These tenants were at least 27% of IIPR's revenues for the quarter in which the misstatement was made. IIPR stated elsewhere that management was undertaking ongoing monitoring of tenants' finances and ability to pay rent. The misstatement highlighted in paragraph 128 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial condition of the Defaulting Tenants well before those tenants defaulted. As a result, IIPR either (i) did not have a rigorous tenant-oversight process, in which case the highlighted statement in paragraph 128 was false, or (ii) such a process did exist

44

but Defendants failed to disclose to investors what they knew about the Defaulting Tenants, in which case the highlighted statement in paragraph 128 was materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

130.    *The statement highlighted above in paragraph 128 was made with scienter.*  At the time this statement was made, Gold was IIPR's Executive Chairman.  According to IIPR, the Company "rel[ied] on our management team," including Gold, "to perform due diligence investigations" and monitor tenants' finances and operations.  Given (i) Gold's role as a manager of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that he either knew or recklessly disregarded the statement highlighted in paragraph 128 was false or misleading.  Also, as detailed below, Gold had the clear motive to mislead investors because he stood to be awarded millions of dollars in discretionary compensation if IIPR's stock price performed well.  This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

131.    Defendant Regin then responded to Mr. Goldfarb's question about "tenant" credit (*see supra* ¶127) as follows:

> I just wanted to touch on your question on [4Front].  I mean we did make an investment in the Illinois facility to round out construction there.  We do have four individual leases with [4Front], but that is by far the largest, and there was significant delays in construction, which understandably had an impact on the overall cash flow.
>
> That asset is in Illinois, which is one of the top 5 markets in the U.S.  We feel very confident in the Illinois market.  And as Paul described, we look at each of these situations individually, and we're looking to maximize value of our portfolio, and we feel very positive about the future resolution for these issues.

132.    *The statements highlighted above in paragraph 131 were materially false or misleading when made.*  By telling investors that the issues with 4Front's lease in Illinois

"understandably had an impact on the overall cash flow" of 4Front but that this property was in "one of the top five markets in the U.S.," and that Defendants were "very positive about the future resolution of these issues" with 4Front, Regin assured investors that Defendants did "understand[]" 4Front's problems, had resolved those issues, and so a very lucrative tenant would be able to restart paying rent.  In reality, as would be fully revealed over the course of the next several months, culminating on March 28, 2025, four of IIPR's largest tenants were failing, would be unable to pay rent, and would have to be evicted.  These tenants were at least 27% of IIPR's revenues for the quarter in which the misstatements were made.  IIPR stated elsewhere that management was undertaking ongoing monitoring of tenants' finances and ability to pay rent.  The misstatements highlighted in paragraph 131 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial condition of the Defaulting Tenants well before those tenants defaulted.  As a result, IIPR either (i) did not have a rigorous tenant-oversight process, in which case the highlighted statements in paragraph 131 were false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about the Defaulting Tenants, in which case the highlighted statements in paragraph 131 were materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

133. ***The statements highlighted above in paragraph 131 were made with scienter.***  At the time these statements were made, Regin was IIPR's Chief Investment Officer.  According to IIPR, the Company "rel[ied] on our management team," including Regin "to perform due diligence investigations" and monitor tenants' finances and operations.  Given (i) Regin's role as a manager of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that he either knew or recklessly disregarded the statements highlighted in

paragraph 131 were false or misleading. This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

134.    Mr. Goldfarb then pressed Defendant for more clarity on his answer asking, "So, it was just the one asset that defaulted, the other three were still paying. Is that . . . what I hear you saying?"

135.    Defendant Regin responding as follows:

> I should just – again, just to talk generally, we do have cross-default language on those. ==We look at each tenant overall, with our parent company guarantees that we have on all of our leases. This asset, given the size and what we think this is going to produce once this is fully up and running, is going to be very meaningful to their business overall going into 2025. We really like the Illinois market. We think it's going to be a tremendous boost to their business once what that [*sic*] deal in Illinois building is fully operational.==

136.    ***The statement highlighted above in paragraph 135 was materially false or misleading when made.*** When pressed to provide additional details about whether 4Front's failure to pay rent was limited to a single lease or implicated multiple properties, Defendant Regin assured investors that Defendants "[w]e look at each tenant overall" and have "parent company guarantees . . . on all our leases" so there was no need for concern about the 4Front default. Regin told investors that 4Front's Illinois property "is going to be very meaningful to their business overall" and will "be a tremendous boost to their business once" the property "is fully operational." With this statement, Defendant Regin assured investors that Defendants sufficiently understood 4Front's current financial situation and future prospects because he was able to confidently tout the impact to the 4Front property on that tenant's future finances (and ability to pay rent).

137.    In reality, as would be fully revealed over the course of the next several months culminating on March 28, 2025, four of IIPR's largest tenants, including 4Front, were failing, would be unable to pay rent, and would have to be evicted. These tenants were at least 27% of IIPR's revenues for the quarter in which the misstatement was made. IIPR stated elsewhere that

47

management was undertaking ongoing monitoring of tenants' finances and ability to pay rent. The misstatement highlighted in paragraph 135 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial condition of the Defaulting Tenants well before those tenants defaulted. As a result, IIPR either (i) did not have a rigorous tenant-oversight process, in which case the highlighted statement in paragraph 135 was false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about the Defaulting Tenants, in which case the highlighted statement in paragraph 135 was materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

138.    ***The statement highlighted above in paragraph 135 was made with scienter.*** At the time this statement was made, Regin was IIPR's Chief Investment Officer. According to IIPR, the Company "rel[ied] on our management team," including Regin "to perform due diligence investigations" and monitor tenants' finances and operations. Given (i) Regin's role as a manager of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that he either knew or recklessly disregarded the statement highlighted in paragraph 135 was false or misleading. This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

### 5.    Misstatements Regarding Resolution of the PharmaCann Defaults

139.    On December 20, 2024, IIPR announced a "Default by PharmaCann on All Leases." The Company explained that it had previously entered into leases with PharmaCann and its affiliates as tenants for eleven IIPR properties, which "represented 17% of [IIPR]'s total rental

48

revenues for the three and nine months ended September 30, 2024." According to IIPR, its largest client had failed to pay rent on six of 11 leases, totaling $4.3 million in rent for December 2024.

140.    Defendants moved quickly to assure investors that matters with PharmaCann were being handled appropriately and being resolved quickly.

141.    On January 30, 2025, IIPR issued a press release touting its quick and effective resolution with PharmaCann. That press release stated:

> [IIPR] announced today that it has reached an agreement with PharmaCann Inc. and its affiliates . . . to resolve PharmaCann's existing defaults under leases for eleven properties that the Company owns . . ..

142.    ***The statement highlighted above in paragraph 141 was materially false or misleading when made.*** By telling investors that IIPR had "reached an agreement with PharmaCann . . . to resolve PharmaCann's existing defaults under leases for eleven properties," Defendants assured investors that IIPR had taken the necessary steps to determine that PharmaCann's then-existing financial situation would allow this tenant to resume paying rent. In reality, and as would be revealed a few short months later, on March 14, 2025, PharmaCann never really restarted paying after it defaulted in December 2024 and did not have the financial resources to do so. PharmaCann's ability to pay rent was material information to investors because at the time the misstatement highlighted in paragraph 141 was made, rent from PharmaCann was 17% of IIPR's monthly revenues. IIPR stated elsewhere that management was undertaking ongoing monitoring of tenants' finances and ability to pay rent. The misstatement highlighted in paragraph 141 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial condition of PharmaCann. As a result, IIPR either (i) did not have a rigorous tenant-oversight process in which case the highlighted statement in paragraph 141 was false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about PharmaCann, in

which case the highlighted statement in paragraph 141 was materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

143.    ***The statement highlighted above in paragraph 141 was made with scienter.***  The Individual Defendants were all part of IIPR's senior management as of January 30, 2025, and therefore had control over IIPR's public statements to investors.  Given the materially important subject matter of the January 30 press release—purported resolution of a default with a tenant representing 17% of IIPR's monthly revenues—it is reasonable to infer that the Individual Defendants were involved in drafting and authorizing this statement to investors.

144.    According to IIPR, the Company "rel[ied] on our management team," including the Individual Defendants "to perform due diligence investigations" and monitor tenants' finances and operations.  Given (i) the Individual Defendants' roles as managers of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that they either knew or recklessly disregarded the statement highlighted in paragraph 141 was false or misleading.  Also, as detailed below, several of the Individual Defendants had the clear motive to mislead investors because Gold, Smithers, and Hastings stood to be awarded millions of dollars in discretionary compensation if IIPR's stock price performed well.  This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

145.    On February 19, 2025, IIPR issued a press release announcing its fourth quarter and full-year results for 2024.  Among other things, that press release touted the Company's resolution of the PharmaCann defaults:

> As previously reported on January 30, 2025, IIP reached an agreement to resolve the existing lease defaults with [PharmaCann] under leases for eleven properties that the Company owns.

146.     ***The statement highlighted above in paragraph 145 was materially false or misleading when made.***   By telling investors that IIPR had "reached an agreement with PharmaCann . . . to resolve PharmaCann's existing defaults under leases for eleven properties," Defendants assured investors that IIPR had taken the necessary steps to determine that PharmaCann's then-existing financial situation would allow this tenant to resume paying rent.   In reality, and as would be revealed a few short months later, on March 14, 2025, PharmaCann never really restarted paying after it defaulted in December 2024 and did not have the financial resources to do so.   PharmaCann's ability to pay rent was material information to investors because at the time the misstatement highlighted in paragraph 145 was made, rent from PharmaCann was 17% of IIPR's monthly revenues.   IIPR stated elsewhere that management was undertaking ongoing monitoring of tenants' finances and ability to pay rent.   The misstatement highlighted in paragraph 145 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial condition of PharmaCann.   As a result, IIPR either (i) did not have a rigorous tenant-oversight process in which case the highlighted statement in paragraph 145 was false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about PharmaCann, in which case the highlighted statement in paragraph 145 was materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

147.     ***The statement highlighted above in paragraph 145 was made with scienter.***   The Individual Defendants were all part of IIPRs senior management as of February 19, 2025, and therefore had control over IIPR's public statements to investors.   Given the materially important subject matter of the February 19 press release—announcing IIPR's financial results and the underscoring the purported resolution of a default with a tenant representing was 17% of IIPR's

monthly revenues—it is reasonable to infer that the Individual Defendants were involved in drafting and authorizing this statement to investors.

148.    In addition, according to IIPR, the Company "rel[ied] on our management team," including the Individual Defendants "to perform due diligence investigations" and monitor tenants' finances and operations.  Given (i) the Individual Defendants' roles as managers of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that they either knew or recklessly disregarded the statement highlighted in paragraph 145 was false or misleading.  Also, as detailed below, several of the Individual Defendants had the clear motive to mislead investors because Gold, Smithers, and Hastings stood to be awarded millions of dollars in discretionary compensation if IIPR's stock price performed well.  This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

149.    Also, on February 21, 2025, IIPR filed its financial results for the fourth quarter and full-year 2024 with the SEC on Form 10-K (the "FY24 10-K").  In addition to reiterating the many misstatements made in the FY23 10-K (*see supra* ¶¶87, 89, and 91), the FY24 10-K contained the additional statement about PharmaCann's failure to pay rent in December 2024:

> In December 2024, PharmaCann defaulted on its obligations to pay rent for the month of December under six of its eleven leases for properties located in Illinois, Massachusetts, Michigan, New York, Ohio and Pennsylvania.  December rent, including base rent, property management fees and estimated tax and insurance payments, totaled $4.3 million for these six properties.  In January 2025, we entered into lease amendments with PharmaCann with respect to nine of its leases for properties located in New York, Illinois, Pennsylvania, Ohio, and Colorado.  Those amendments reduced cumulative total base rent from $2.8 million per month to $2.6 million per month, with cash rent payments commencing February 1, 2025, and provided for pro-rata replenishment of security deposits over thirty-six months commencing February 1, 2027.  We also entered into amendments with PharmaCann with respect to two of its leases for cultivation properties in Michigan and Massachusetts.  These amendments provided that monthly past rent of $1.3 million for these two properties will be abated in full effective February 1, 2025 and, if the properties have not been transitioned to new tenant(s) by August 1, 2025, we will regain full control over the properties.  We applied security deposits held by us pursuant to all of the PharmaCann leases for the payment in full of all

defaulted rent for December 2024 and January 2025 and certain penalties.  If PharmaCann is not able to refinance its existing senior secured credit facility maturing June 30, 2025, all modifications to our leases with PharmaCann described above will immediately be null and void and the leases will revert to the terms in effect as of January 1, 2025.

150.    ***The statement highlighted above in paragraph 149 was materially false or misleading when made.***  By telling investors that IIPR had "entered into lease amendments with PharmaCann" at nine properties and other "amendments with PharmaCann with respect to two [other] properties," and providing additional details about this purported resolution of PharmaCann's default, Defendants assured investors that IIPR had taken the necessary steps to determine that PharmaCann's then-existing financial situation would allow this tenant to resume paying rent.  In reality, and as would be revealed a few short months later, on March 14, 2025, PharmaCann never really restarted paying after it defaulted in December 2024 and did not have the financial resources to do so.  PharmaCann's ability to pay rent was material information to investors because at the time the misstatement highlighted in paragraph 149 was made, rent from PharmaCann was 17% of IIPR's monthly revenues.  IIPR stated elsewhere that management was undertaking ongoing monitoring of tenants' finances and ability to pay rent.  The misstatement highlighted in paragraph 149 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial condition of PharmaCann.  As a result, IIPR either (i) did not have a rigorous tenant-oversight process, in which case the highlighted statement in paragraph 149 was false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about PharmaCann, in which case the highlighted statement in paragraph 149 was materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

151.   ***The statement highlighted above in paragraph 149 was made with scienter.***   The FY24 10-K was prepared and filed with the SEC at the direction of the Individual Defendants. Indeed, the SEC filing was certified by Defendant Smithers and Defendant Smith.  Both Smithers and Smith certified that they had "reviewed" the FY24 10-K and represented that it did "not contain any untrue statement of material fact" or material misrepresentations.  According to IIPR, the Company "rel[ied] on our management team," including the Individual Defendants "to perform due diligence investigations" and monitor tenants' finances and operations.  Given (i) the Individual Defendants' roles as managers of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that they either knew or recklessly disregarded that the statement highlighted in paragraph 149 was false or misleading. Also, as detailed below, several of the Individual Defendants had the clear motive to mislead investors because Gold, Smithers, and Hastings stood to be awarded millions of dollars in discretionary compensation if IIPR's stock price performed well.  This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

**6.   Misstatements on the February 20, 2025 Earnings Call**

152.   On February 20, 2025, Defendants held a call with investors and investment analysts to, among other things, discuss IIPR's full-year 2024 results.  In light of PharmaCann's failure to pay rent in December 2024, investors were eager to learn more about the resolution with PharmaCann and whether there were any additional at-risk tenants.

153.   As part of his prepared remarks, Defendant Smithers stated the following:

As we noted in our press release last month, we reached a comprehensive resolution to PharmaCann's defaults that included, among other things, PharmaCann recommencing rent payments on 9 of 11 leases in February, a required capital infusion by PharmaCann investors and a junior secured note issued to IIP.  We are proud of our team's ability to navigate this situation swiftly and believe this is the best path forward to maximize shareholder value.

154.    ***The statement highlighted above in paragraph 153 was materially false or misleading when made.***  By telling investors that IIPR had "reached a comprehensive resolution to PharmaCann's defaults" and touting the details of that "resolution," Defendant Smithers assured investors that IIPR had taken the necessary steps to determine that PharmaCann's then-existing financial situation would allow this tenant to resume paying rent.  In reality, and as would be revealed a few short months later, on March 14, 2025, PharmaCann never really restarted paying after it defaulted in December 2024 and did not have the financial resources to do so.  PharmaCann's ability to pay rent was material information to investors because at the time the misstatement highlighted in paragraph 153 was made, rent from PharmaCann was 17% of IIPR's monthly revenues.  IIPR stated elsewhere that management was undertaking ongoing monitoring of tenants' finances and ability to pay rent.  The misstatement highlighted in paragraph 153 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial condition of PharmaCann.  As a result, IIPR either (i) did not have a rigorous tenant-oversight process, in which case the highlighted statement in paragraph 153 was false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about PharmaCann, in which case the highlighted statement in paragraph 153 was materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

155.    ***The statement highlighted above in paragraph 153 was made with scienter.***  At the time this statement was made, Smithers was the CEO, President, and Co-Founder of IIPR.  According to IIPR, the Company "rel[ied] on our management team," including Smithers, "to perform due diligence investigations" and monitor tenants' finances and operations.  Given (i) Smithers' role as a manager of IIPR, and (ii) the role management played in overseeing tenants,

then (iii) the most compelling inference here is that he either knew or recklessly disregarded that the statement highlighted in paragraph 153 was false or misleading. Also, as detailed below, Smithers had the clear motive to mislead investors because he stood to be awarded millions of dollars in discretionary compensation if IIPR's stock price performed well. This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

156.    Investment analysts believed Defendants' assurances that the issues with PharmaCann had been resolved, but still sought more information regarding potential risks of defaults with other tenants. Specifically, Tom Catherwood the BTIG analyst asked the following questions:

> [K]udos on the [s]wift resolution with PharmaCann, that was huge, and I know a very big lift. But if we step back and think more broadly about tenant risks, in the three cases where you've had to work through issues, and this includes Parallel and Green Peak, the tenant was also facing issues with their lenders. How are you thinking about risk for your tenant base over the course of the next year, given that 2026 is an outsized year for debt maturities across the cannabis industry?

157.    Defendant Gold responded by assuring investors that IIPR was "following and watching [issues with tenant debts] very closely":

> Well, thanks, Tom. I think that, first of all, you're talking about something that's going to occur in 2026, and we're – I think this is still February 2025. And we believe that the industry has continued to do [*sic*] show green shoots and to mature and do and perform better.
>
> And we believe that the broader markets should be in a much better position to be able to deal with the 2026 maturities that many of these tenants do have. But with that, we do acknowledge that the earlier the maturity of debt that occurs with our tenants, the more stress that they are seeing, and that is an issue that we are following and watching it very closely.

158.    ***The statement highlighted above in paragraph 157 was materially false or misleading when made.*** By telling investors that IIPR was "following and watching . . . very closely" for "stress" to tenants' finances caused by upcoming debt payments, Gold assured investors that Defendants were monitoring IIRP's tenants for financial "stress." In reality, as

would be fully revealed over the course of the next several months and culminating on March 28, 2025, four of IIPR's largest tenants, were failing, would be unable to pay rent, and would have to be evicted. These tenants were at least 27% of IIPR's revenues for the quarter in which the misstatement was made. IIPR stated elsewhere that management was undertaking ongoing monitoring of tenants' finances and ability to pay rent. The misstatement highlighted in paragraph 157 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial condition of the Defaulting Tenants well before those tenants defaulted. As a result, IIPR either (i) did not have a rigorous tenant-oversight process, in which case the highlighted statement in paragraph 157 was false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about the Defaulting Tenants, in which case the highlighted statement in paragraph 157 was materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

159. ***The statement highlighted above in paragraph 157 was made with scienter.*** At the time this statement was made, Gold was IIPR's Executive Chairman. According to IIPR, the Company "rel[ied] on our management team," including Gold, "to perform due diligence investigations" and monitor tenants' finances and operations. Given (i) Gold's role as a manager of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that he either knew or recklessly disregarded the statement highlighted in paragraph 157 was false or misleading. Also, as detailed below, Gold had the clear motive to mislead investors because he stood to be awarded millions of dollars in discretionary compensation if IIPR's stock price performed well. This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

160.    Aaron Grey, an analyst for Alliance Global Partners, then asked about other tenants not paying rent (or paying it out of security deposits):

> Thanks for the incremental color in terms of the security deposits.  So, it looks like 4.3 [million] of that 5.7 from PharmaCann.  So, regarding the other 1.3 [million] and 4 tenants.  I know you had mentioned, I believe, three of them in the prior calls, so would be relating to those and one more.  Just anything that you're doing in terms of working through that, were the[y] partial or non-payments?  And just how we should anticipate the security deposits going forward if that is being resolved or there might be incremental issues there.  So just a broader tenant portfolio on the security deposits being applied there?

161.    Defendant Gold responded to Mr. Grey's question as follows:

> Yes.  No, I think that – the way to look at it is that we're taking each situation as a unique and special situation and drilling down to – with the tenants and working with them to get them back to where they agreed to be where we expect them to be.  And so that's, I think, the best we can deal – we can say with regards to the actual tenants, given how the majority of our tenants are private, and we have confidentiality agreements with them.  And so, we have to be very careful with what we said, but we are working very closely with us [*sic*].

162.    ***The statement highlighted above in paragraph 161 was materially false or misleading when made.***  By telling investors that IIPR was "drilling down" on tenants "and working with them to get them back to where they agreed to be [and] where we expect them to be" and "working very closely with" certain unnamed tenants, Defendant Gold assured investors that IIPR was in fact monitoring its tenants' financial circumstances and proactively working with tenants to ensure they kept paying the rent that was owed to IIPR.  In reality, as would be fully revealed over the course of the next several months and culminating on March 28, 2025, four of IIPR's largest tenants, were failing, would be unable to pay rent, and would have to be evicted.  These tenants were at least 27% of IIPR's revenues for the quarter in which the misstatement was made.  IIPR stated elsewhere that management was undertaking ongoing monitoring of tenants' finances and ability to pay rent.  The misstatement highlighted in paragraph 161 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and

monitoring of, its tenants such that IIPR would have known the true financial condition of the Defaulting Tenants well before those tenants defaulted. As a result, IIPR either (i) did not have a rigorous tenant-oversight process, in which case the highlighted statement in paragraph 161 was false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about the Defaulting Tenants, in which case the highlighted statement in paragraph 161 was materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

163.    ***The statement highlighted above in paragraph 161 was made with scienter.*** At the time this statement was made, Gold was IIPR's Executive Chairman. According to IIPR, the Company "rel[ied] on our management team," including Gold, "to perform due diligence investigations" and monitor tenants' finances and operations. Given (i) Gold's role as a manager of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that he either knew or recklessly disregarded the statement highlighted in paragraph 161 was false or misleading. Also, as detailed below, Gold had the clear motive to mislead investors because he stood to be awarded millions of dollars in discretionary compensation if IIPR's stock price performed well. This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

164.    Defendant Regin then responded to Mr. Grey's question (*see supra* ¶160) confirming Defendants were "watching each of our tenants and working with them very closely":

> I think that's right, Alan. And I think really, when you think about tenant health, we're really talking about the health of the industry overall and the green shoots that we're seeing in the cannabis industry that Paul described. But – as Alan mentioned, we have a lot of private tenants, but we are, of course, watching each of our tenants and working with them very closely.

165.    ***The statement highlighted above in paragraph 164 was materially false or misleading when made***. By telling investors that Defendants were "of course, watching each of

our tenants and working with them very closely," Defendant Regin assured investors that IIPR had the due diligence and monitoring in place to detect and address tenants in financial distress before they stopped being able to pay rent. In reality, as would be fully revealed over the course of the next several months and culminating on March 28, 2025, four of IIPR's largest tenants, were failing, would be unable to pay rent, and would have to be evicted. These tenants were at least 27% of IIPR's revenues for the quarter in which the misstatement was made. IIPR stated elsewhere that management was undertaking ongoing monitoring of tenants' finances and ability to pay rent. The misstatement highlighted in paragraph 164 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial condition of the Defaulting Tenants well before those tenants defaulted. As a result, IIPR either (i) did not have a rigorous tenant-oversight process, in which case the highlighted statement in paragraph 164 was false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about the Defaulting Tenants, in which case the highlighted statement in paragraph 164 was materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

166.    ***The statement highlighted above in paragraph 164 was made with scienter.*** At the time this statement was made, Regin was IIPR's Chief Investment Officer. According to IIPR, the Company "rel[ied] on our management team," including Regin, "to perform due diligence investigations" and monitor tenants' finances and operations. Given (i) Regin's role as a manager of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that he either knew or recklessly disregarded the statement highlighted in paragraph 164 was false or misleading. This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

167.    Eric Des Lauriers, an analyst for Craig Hallum Capital Group, then asked if the

purported resolution with PharmaCann had led other tenants to seek rent reductions from IIPR:

> Regarding the PharmaCann resolution, which I'll also echo my congratulations on
> a [s]wift resolution there.  So, part of that did come with a certainly modest
> reduction in rents.  I'm just wondering if you're getting calls from existing tenants
> to sort of follow on with that?  I would imagine some of them are looking to do so?
> And just if so, how are you handling those discussions?  Is that something that we
> should perhaps be on the lookout for some of this minor or modest rent reductions
> to other tenants?

168.    Defendant Gold responded by saying that he wasn't going to disclose whether other

tenants were seeking rent reductions but confirmed "we have said that we are monitoring all of our

tenants, and we are monitoring all of our tenants":

> It's an interesting question.  ==It's a very difficult one for us to answer because if we
> were receiving calls, we wouldn't want to talk about that.  And if we – but we have
> said that we are monitoring all of our tenants, and we are monitoring all of our
> tenants.==  But the thing that we want to make very, very clear is that that this
> company relies on our leases that we do what we say we're going to do, and we
> expect our tenants to live to their agreements and that's what we should be focused
> on.

169.    ***The statement highlighted above in paragraph 168 was materially false or***

***misleading when made.***  By telling investors that IIPR could not confirm "if we were receiving

calls" from tenants seeking rent reductions (like the one given to PharmaCann) but assuring

investors "we have said that we are monitoring all of our tenants, and we are monitoring all of our

tenants," Gold told investors not to worry because IIPR had the due diligence and monitoring in

place to detect and address tenants in financial distress before they stopped being able to pay rent.

In reality, as would be fully revealed over the course of the next several months and culminating

on March 28, 2025, four of IIPR's largest tenants, were failing, would be unable to pay rent, and

would have to be evicted.  These tenants were at least 27% of IIPR's revenues for the quarter in

which the misstatement was made.  IIPR stated elsewhere that management was undertaking

ongoing monitoring of tenants' finances and ability to pay rent.  The misstatement highlighted in

paragraph 168 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial condition of the Defaulting Tenants well before those tenants defaulted.  As a result, IIPR either (i) did not have a rigorous tenant-oversight process, in which case the highlighted statement in paragraph 168 was false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about the Defaulting Tenants, in which case the highlighted statement in paragraph 168 was materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

170.    ***The statement highlighted above in paragraph 168 was made with scienter.***  At the time this statement was made, Gold was IIPR's Executive Chairman.  According to IIPR, the Company "rel[ied] on our management team," including Gold, "to perform due diligence investigations" and monitor tenants' finances and operations.  Given (i) Gold's role as a manager of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that he either knew or recklessly disregarded that the statement highlighted in paragraph 168 were false or misleading.  Also, as detailed below, Gold had the clear motive to mislead investors because he stood to be awarded millions of dollars in discretionary compensation if IIPR's stock price performed well.  This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

171.    Analysts kept pressing Defendants for more information regarding the existence of other at-risk tenants.  Specifically, Alexander Goldfarb of Piper Sandler asked:

> So, have you had any reassessments of credit of tenants that before you would have ranked highly and now, you're looking at them going, geez, they're current, and they're fine, but we may want to reduce exposure going forward?

172.    Defendant Gold did not directly answer Mr. Goldfarb's question but did assure investors that IIPR was "doing deep dives into every single one of our tenants":

> I think we're – as I said, we're watching all of our tenants.  We are doing deep dives into every single one of our tenants, including the strongest ones and the single state operators.

173.    ***The statement highlighted above in paragraph 172 was materially false or misleading when made.***  By reiterating that that IIPR was "watching all of our tenants" and "doing deep dives into every single one of our tenants, including the strongest ones," Gold assured investors that IIPR had the due diligence and monitoring in place to detect and address tenants in financial distress before they stopped being able to pay rent.  In reality, as would be fully revealed over the course of the next several months culminating on March 28, 2025, four of IIPR's largest tenants, were failing, would be unable to pay rent, and would have to be evicted.  These tenants were at least 27% of IIPR's revenues for the quarter in which the misstatement was made.  IIPR stated that management was undertaking ongoing monitoring of tenants' finances and ability to pay rent.  The misstatement highlighted in paragraph 172 misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants such that IIPR would have known the true financial condition of the Defaulting Tenants well before those tenants defaulted.  As a result, IIPR either (i) did not have a rigorous tenant-oversight process, in which case the highlighted statement in paragraph 172 was false, or (ii) such a process did exist but Defendants failed to disclose to investors what they knew about the Defaulting Tenants, in which case the highlighted statement in paragraph 172 was materially misleading because it gave investors an impression of the Company's current and future prospects that was materially different from the one internally understood within IIPR.

174.    ***The statement highlighted above in paragraph 172 was made with scienter.***  At the time this statement was made, Gold was IIPR's Executive Chairman.  According to IIPR, the

Company "rel[ied] on our management team," including Gold, "to perform due diligence investigations" and monitor tenants' finances and operations. Given (i) Gold's role as a manager of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that he either knew or recklessly disregarded that the statement highlighted in paragraph 172 was false or misleading. Also, as detailed below, Gold had the clear motive to mislead investors because he stood to be awarded millions of dollars in discretionary compensation if IIPR's stock price performed well. This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

**B.    Defendants' Misstatements Touting Investments in the Defaulting Tenants**

175.    In addition to Defendants' materially false or misleading statements assuring investors that Defendants were undertaking ongoing oversight of IIPR's tenants, Defendants also made materially misleading statements touting new leases and investments with the Defaulting Tenants but failed to disclose what Defendants knew about the Defaulting Tenants' then-existing finances.

**1.    Misstatements in the February 26, 2024 Press Release and FY23 10-K**

176.    The February 26, 2024 press release and FY23 10-K touted several new leases and investments in the Defaulting tenants.

177.    The FY23 10-K touted the following new investment in PharmaCann:

In February 2024, we amended our lease and development agreement with PharmaCann at one of our New York properties, increasing the construction funding by $16.0 million, which also resulted in a corresponding adjustment to the base rent for the lease at the property. We also amended the lease to extend the term.

178.    The February 26, 2024 press release also touted this new investment in PharmaCann, using substantially similar language:

[IIPR] [a]mended IIP[R]'s lease and development agreement with PharmaCann Inc. at one of IIP[R]'s New York properties to increase the improvement allowance by $16.0 million, adjust base rent accordingly and extend the lease term.

179.    ***The statements highlighted above in paragraphs 177 and 178 were materially misleading when made.***  By telling investors that IIPR had "increased construction funding" to PharmaCann "by $16.0 million" which resulted in increased rent revenues from PharmaCann, Defendants were touting IIPR's investment in PharmaCann.  These statements put in play the issue of what Defendants knew about PharmaCann that would undercut Defendants' touting of IIPR's new investment.  Without such a disclosure, the highlighted statements in paragraphs 177 and 178 misled investors into believing that additional investments in PharmaCann were beneficial to IIPR because it would generate additional rental revenues for the Company, when, in reality, as was known or recklessly disregarded by Defendants, PharmaCann was in dire financial straits and would soon not be able to pay rent.  Specifically, as a result of IIPR's "Ongoing Monitoring" of all IIPR's tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials," Defendants knew or recklessly disregarded the truth of PharmaCann's finances and their failure to disclose these facts made the highlighted statements in paragraphs 177 and 178 materially misleading by omission.

180.    The FY23 10-K further touted a new amendment to 4Front's lease:

In January 2024, we entered into lease amendments with subsidiaries of [4Front] at the four properties we lease to them in Illinois, Massachusetts and Washington, extending the term of each lease.  The Illinois property, which is under development, has experienced significant delays in construction, primarily relating to completion of required utilities enhancements, which has resulted in an extended delay of the estimated completion of the project.  As a result, we amended the Illinois lease to reduce base rent owing for the nine months ending September 30, 2024, defer the payback of the security deposit applicable to the lease (with the security deposit subject to future pro-rata monthly payback), and increase the base rent for the remainder of the term commencing November 1, 2024.

65

181.    ***The statement highlighted above in paragraph 180 was materially misleading when made.***  By telling investors that IIPR had amended its leases with 4Front to address purported construction delays while at the same time "increas[ing] the base rent" for the multi-year term of the lease starting in November 2024, Defendants were touting IIPR's investment in 4Front.  This statement put in play the issue of what Defendants knew about 4Front that would undercut their touting of IIPR's new investment.  Without such a disclosure, the highlighted statement in paragraph 180 misled investors into believing that IIPR's investments in 4Front were beneficial to IIPR because it would generate additional rental revenues for the Company in the future, when, in reality, as was known or recklessly disregarded by Defendants, 4Front was in dire financial straits and would soon not be able to pay rent.  Specifically, as a result of IIPR's "Ongoing Monitoring" of all IIPR's tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials," Defendants knew or recklessly disregarded the truth of 4Front's finances and their failure to disclose these facts made the highlighted statement in paragraph 180 materially misleading by omission.

182.    ***The statements highlighted above in paragraphs 177, 178, and 180 were made with scienter***.  The FY23 10-K was prepared and filed with the SEC at the direction of the Individual Defendants.  Indeed, the SEC filing was certified by Defendant Smithers and Defendant Hastings.  Both Smithers and Hastings certified that they had "reviewed" the FY23 10-K and represented that it did "not contain any untrue statement of material fact" or material misrepresentations.  According to IIPR, the Company "rel[ied] on our management team," of which the Individual Defendants were members, "to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information."  In addition, IIPR

told investors that the Company was engaged in "Ongoing Monitoring" of its tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials."  Given (i) the Individual Defendants' roles as managers of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that they either knew or recklessly disregarded that the statements highlighted in paragraphs 177, 178, and 180 were misleading.  Also, as detailed below, several of the Individual Defendants had the clear motive to mislead investors because Gold, Smithers, and Hastings stood to be awarded millions of dollars in discretionary compensation if IIPR's stock price performed well.  This inference of scienter is further supported by the facts alleged in paragraphs 252 through 254 below.

### 2.    Misstatements on the February 27, 2024, Earnings Call

183.    On February 27, 2024, Defendants held a call with investors and investment analysts to, among other things, discuss IIPR's full-year and fourth quarter 2023 results.

184.    On that call, Defendant Regin said the following as part of his prepared remarks, touting IIPR's latest investment in PharmaCann:

> We also executed a lease amendment with PharmaCann to provide additional construction funding of $16 million to our New York asset as PharmaCann executes on its strategy to expand production capacity after being awarded an adult-use production license late last year.

185.    ***The statement highlighted above in paragraph 184 was materially misleading when made.***  By telling investors that IIPR had "provide[d] additional construction funding of $16 million" to PharmaCann to help it "execute on its strategy to expand production capacity," Regin was touting IIPR's investment in PharmaCann.  This statement put in play the issue of what Defendants knew about PharmaCann that would undercut Regin's touting of IIPR's new investment.  Without such a disclosure, the highlighted statement in paragraph 184 misled

investors into believing that additional investments in PharmaCann were beneficial to IIPR because it would generate additional rental revenues for the Company, when, in reality, as was known or recklessly disregarded by Regin, PharmaCann was in dire financial straits and would soon not be able to pay rent.  Specifically, as a result of IIPR's "Ongoing Monitoring" of all IIPR's tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials," Regin knew or recklessly disregarded the truth of PharmaCann's finances and his failure to disclose these facts made the highlighted statement in paragraph 184 materially misleading by omission.

186.   *The statement highlighted above in paragraph 184 was made with scienter.*  At the time this statement was made, Regin was IIPR's Chief Investment Officer.  According to IIPR, the Company "rel[ied] on our management team," of which Regin was a member, "to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information."   In addition, IIPR told investors that the Company was engaged in "Ongoing Monitoring" of its tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials."   Given (i) Regin's role as a manager of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that Regin either knew or recklessly disregarded that the statement highlighted in paragraph 184 was misleading.  This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

187.    Later in this investor call, an analyst from BTIG asked for additional information about what Defendants were "seeing on the ground" in New York and Defendant Regin again touted IIPR's recent additional investment in PharmCann:

> **[Tom Catherwood (BTIG Analyst):]** Ben, and Paul, I know you both touched on New York and the challenges that it has had, but sentiment from MSOs seems to be improving in the market. I think PharmaCann announced plans to increase headcount by nearly 3x in the state and obviously, you've made incremental investments over the last few months in New York. What are you seeing on the ground in the state? And how do you expect the market to evolve going forward?

> **[Ben Regin Response:]** Yes. Thanks, Tom. I think we're seeing – we're happy to see the additional retail licenses being issued. There's certainly been some historical challenges, but we very much like the position that our tenant partners are in the state. To your comment about PharmaCann, we do – there's a tremendous amount of value in that asset in particular. A lot of cultivation in the state is either outdoor greenhouse. As Paul touched on, that is one of the very few high-quality indoor facilities in the state. I think it sets PharmaCann up very well to take advantage of the wholesale opportunities that we're going to see.

188.    ***The statements highlighted above in paragraph 187 were materially misleading when made.*** By telling investors that "there's a tremendous amount of value in [IIPR's PharmaCann] asset in particular" and that PharmaCann was set "up very well to take advantage of" new opportunities, Regin was touting IIPR's investments in PharmaCann. These statements put in play the issue of what Defendants knew about PharmaCann that would undercut Regin's touting of IIPR's PharmaCann investments. Without such a disclosure, the highlighted statements in paragraph 187 misled investors into believing that IIPR's investments in PharmaCann were beneficial to IIPR because they would generate additional rental revenues for the Company, when, in reality, as was known or recklessly disregarded by Regin, PharmaCann was in dire financial straits and would soon not be able to pay rent. Specifically, as a result of IIPR's "Ongoing Monitoring" of all IIPR's tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials," Regin knew or recklessly disregarded the truth of

PharmaCann's finances and his failure to disclose these facts made the highlighted statements in paragraph 187 materially misleading by omission.

189. ***The statements highlighted above in paragraph 187 were made with scienter.*** At the time these statements were made, Regin was IIPR's Chief Investment Officer. According to IIPR, the Company "rel[ied] on our management team," of which Regin was a member, "to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information." In addition, IIPR told investors that the Company was engaged in "Ongoing Monitoring" of its tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials." Given (i) Regin's role as a manager of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that Regin either knew or recklessly disregarded the statements highlighted in paragraph 187 were misleading. This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

190. Similarly, Defendant Hastings said the following as part of her prepared remarks, touting IIPR's 4Front investments:

> Rent collected for the quarter included approximately $800,000 of security deposits applied for the payment of rent in connection with an amendment with [4Front] at one of our Illinois properties. As we indicated in the past, this property has been under development since August of 2021 and has experienced significant delays to get permanent power delivered to the building, which is needed to get it operational. We recognized this hardship. And in January this year, restructured 4Front Illinois rental obligation to reduce the base rent due through September 2024 and increase their obligation thereafter, allowing for better alignment of 4Front's future Illinois rental obligations with their ability to generate revenue from the property, while also extending the term of all four leases we have with 4Front. We're also pleased to report that the building did finally get permanent power in January, and we look forward to this project's completion in the near future.

191.    ***The statement highlighted above in paragraph 190 was materially misleading when made.***  By telling investors that IIPR had (i) amended its leases with 4Front to address purported construction delays, while at the same time "increas[ing] their obligations thereafter" for the multi-year term of the lease, and (ii) representing that 4Front's construction "delays . . . get[ting] permanent power delivered to the building" were finally resolved, Defendant Hastings was touting IIPR's investment in 4Front.  This statement put in play the issue of what Defendants knew about 4Front that would undercut Hastings' touting of IIPR's 4Front investment.  Without such a disclosure, the highlighted statement in paragraph 190 misled investors into believing that IIPR's investments in 4Front were beneficial to IIPR because it would generate additional rental revenues for the Company in the future, when, in reality, as was known or recklessly disregard by Hastings, 4Front was in dire financial straits and would soon not be able to pay rent.  Specifically, as a result of IIPR's "Ongoing Monitoring" of all IIPR's tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials," Defendant Hastings knew or recklessly disregarded the truth of 4Front's finances and her failure to disclose these facts made the highlighted statement in paragraph 190 materially misleading by omission.

192.    ***The statement highlighted above in paragraph 190 was made with scienter.***  At the time this statement was made, Hastings was IIPR's Chief Operating Officer.  According to IIPR, the Company "rel[ied] on our management team," of which Hastings was a member, "to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information."  In addition, IIPR told investors that the Company was engaged in "Ongoing Monitoring" of its tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with

71

tenants to talk through operations and financials." Given (i) Hasting's role as a manager of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that Hastings either knew or recklessly disregarded that the statement highlighted in paragraph 190 was misleading. Also, as detailed below, Hasting had the clear motive to mislead investors because she stood to be awarded millions of dollars in discretionary compensation if IIPR's stock price performed well. This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

### 3.    Misstatements in the May 9, 2024 1Q 10-Q

193.    On May 8, 2024, IIPR issued financial results for the first quarter of 2024 and on May 9, 2024, filed its Form 10-Q with the SEC (the "1Q24 10-Q"). The 1Q24 10-Q touted IIPR's recent investments in three of the Defaulting Tenants, PharmaCann, 4Front, and GoldFlora.

194.    With respect to PharmaCann, the 1Q24 10-Q reiterated:

> In February 2024, we amended our lease and development agreement with PharmaCann at one of our New York properties, increasing the construction funding commitment by $16.0 million, which also resulted in a corresponding adjustment to the base rent for the lease at the property. We also amended the lease to extend the term.

195.    ***The statement highlighted above in paragraph 194 was materially misleading when made.*** By telling investors that IIPR had "increase[d] construction funding" to PharmaCann "by $16.0 million" which resulted in increased rent revenues from PharmaCann, Defendants were touting IIPR's investment in PharmaCann. This statement put in play the issue of what Defendants knew about PharmaCann that would undercut Defendants' touting of IIPR's new investment. Without such a disclosure, the highlighted statement in paragraph 194 misled investors into believing that additional investments in PharmaCann were beneficial to IIPR because it would generate additional rental revenues for the Company, when, in reality, as was known or recklessly disregarded by Defendants, PharmaCann was in dire financial straits and would soon not be able

to pay rent.  Specifically, as a result of IIPR's "Ongoing Monitoring" of all IIPR's tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials," Defendants knew or recklessly disregarded the truth of PharmaCann's finances and their failure to disclose these facts made the highlighted statement in paragraph 194 materially misleading by omission.

196.    With respect to 4Front, the 1Q24 10-Q stated the following:

In January 2024, we entered into lease amendments with subsidiaries of [4Front] at the four properties we lease to them in Illinois, Massachusetts and Washington, extending the term of each lease.  The Illinois property, which is under development, has experienced significant delays in construction, primarily relating to completion of required utilities enhancements, which has resulted in an extended delay of the estimated completion of the project.  As a result, we amended the Illinois lease to reduce base rent owing for the nine months ending September 30, 2024, defer the payback of the security deposit applicable to the lease (with the security deposit being subject to future pro-rata monthly payback), and increase the base rent for the remainder of the term commencing November 1, 2024.

* * *

In April 2024, we amended the lease with a subsidiary of 4Front at one of our Illinois properties to provide an additional improvement allowance of $1.6 million, which also resulted in a corresponding adjustment to the base rent for the lease at the property and increased the annual base rent escalations for the remainder of the lease term.

197.    *The statements highlighted above in paragraph 196 were materially misleading when made.*  By telling investors that IIPR had (i) amended its leases with 4Front to address purported construction delays, while at the same time "increas[ing] the base rent" for the multi-year term of the lease starting in November 2024, and (ii) invested an additional $1.6 million in 4Front further increasing the base rent, Defendants were touting IIPR's investment in 4Front. These statements put in play the issue of what Defendants knew about 4Front that would undercut their touting of IIPR's new investment.  Without such a disclosure, the highlighted statements in

73

paragraph 196 misled investors into believing that IIPR's investments in 4Front were beneficial to IIPR because it would generate additional rental revenues for the Company in the future, when, in reality, as was known or recklessly disregarded by Defendants, 4Front was in dire financial straits and would soon not be able to pay rent. Specifically, as a result of IIPR's "Ongoing Monitoring" of all IIPR's tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials," Defendants knew or recklessly disregarded the truth of 4Front's finances and their failure to disclose these facts made the highlighted statements in paragraph 196 materially misleading by omission.

198.    The 1Q24 10-Q also identified a new lease with "a tenant." While the 1Q24 10-Q does not identify the tenant, Defendant Regin on May 9, 2024, and IIPR's subsequent SEC filings, identify the tenant as Gold Flora (*see infra* ¶¶202, 213, 221). The 1Q24 10-Q stated the following:

> ==In March 2024, we executed a new lease for the entire property located at 63795 19th Avenue in Palm Springs California==, with the commencement date under the lease conditioned upon, among other things, the tenant's receipt of approvals to conduct cannabis operations by the requisite state and local authorities.

199.    ***The statement highlighted above in paragraph 198 was materially misleading when made.*** By telling investors that IIPR had "executed a new lease for [an] entire property located" in California, Defendants were touting IIPR's investment in Gold Flora. This statement put in play the issue of what Defendants knew about Gold Flora that would undercut their touting of IIPR's new lease. Without such a disclosure, the highlighted statement in paragraph 198 misled investors into believing that an additional lease to Gold Flora was beneficial to IIPR because it would generate additional rental revenues for the Company, when, in reality, as was known or recklessly disregarded by Defendants, Gold Flora was in dire financial straits and would soon not be able to pay rent. Specifically, as a result of IIPR's "Ongoing Monitoring" of all IIPR's tenants,

including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials," Defendants knew or recklessly disregarded the truth of Gold Flora's finances and their failure to disclose these facts made the highlighted statement in paragraph 198 materially misleading by omission.

200. ***The statements highlighted above in paragraphs 194, 196, and 198 were made with scienter.*** The 1Q24 10-Q was prepared and filed with the SEC at the direction of the Individual Defendants. Indeed, the SEC filing was certified by Defendant Smithers and Defendant Smith. Both Smithers and Smith certified that they had "reviewed" the 1Q24 10-Q and represented that it did "not contain any untrue statement of material fact" or material misrepresentations. According to IIPR, the Company "rel[ied] on our management team," of which the Individual Defendants were members, "to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information." In addition, IIPR told investors that the Company was engaged in "Ongoing Monitoring" of its tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials." Given (i) the Individual Defendants' roles as managers of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that they either knew or recklessly disregarded that the statements highlighted in paragraphs 194, 196, and 198 were misleading. Also, as detailed below, several of the Individual Defendants had the clear motive to mislead investors because Gold, Smithers, and Hastings stood to be awarded millions of dollars in discretionary compensation if IIPR's stock price performed well. This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

### 4.    Misstatements on the May 9, 2024, Earnings Call

201.    On May 9, 2024, Defendants held a call with investors and investment analysts to, among other things, discuss IIPR's first quarter 2024 results.

202.    On this call Defendant Regin said the following touting IIPR's new leases with Gold Flora:

> For my prepared remarks, I plan to highlight our continued leasing progress for our vacant and under-development [*sic*] assets.  Year to date, we've made substantial progress on this front, executing four new leases covering $69 million of invested capital in California and Michigan.  California, we've executed new leases for our 19th Avenue and McLane Street properties in Palm Springs with Gold Flora, an existing tenant of ours and a leading vertically integrated operator in California.
>
> *  *  *
>
> I don't think we can really overstate how pleased we've been with the leasing activity, not just the speed at which we are able to retenant these properties; the relatively low amount of capital required to retenant these properties; but really, as you noted, the strength of the operators and the credit upgrades we feel we got in each of these cases, whether that's Gold Flora in California or a group like Lume in Michigan. . ..

203.    ***The statements highlighted above in paragraph 202 were materially misleading when made.***  By telling investors that IIPR had "executed" two new leases, with Gold Flora, which were "credit upgrades" for IIPR, Regin was touting IIPR's new investments in Gold Flora.  These statements put in play the issue of what Defendants knew about Gold Flora that would undercut Regin's touting of IIPR's new leases.  Without such a disclosure, the highlighted statements in paragraph 202 misled investors into believing that additional leases to Gold Flora were beneficial to IIPR because they would generate additional rental revenues for the Company, when, in reality, as was known or recklessly disregarded by Defendants, Gold Flora was in dire financial straits and would soon not be able to pay rent.  Specifically, as a result of IIPR's "Ongoing Monitoring" of all IIPR's tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through

operations and financials," Regin knew or recklessly disregarded the truth of Gold Flora's finances and his failure to disclose these facts made the highlighted statements in paragraph 202 materially misleading by omission.

204.    ***The statements highlighted above in paragraph 202 were made with scienter.***  At the time these statements were made, Regin was IIPR's Chief Investment Officer.  According to IIPR, the Company "rel[ied] on our management team," of which Regin was a member, "to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information."  In addition, IIPR told investors that the Company was engaged in "Ongoing Monitoring" of its tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials."  Given (i) Regin's role as a manager of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that Regin either knew or recklessly disregarded the statements highlighted in paragraph 202 were misleading.  This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

205.    Defendant Regin also touted additional investments in 4Front as part of his prepared remarks:

> ==We also provided an additional $1.6 million to 4Front Ventures to round out development of 4Front's 250,000-square-foot production facility in Illinois.==

206.    ***The statement highlighted above in paragraph 205 was materially misleading when made.***  By telling investors that IIPR had "provided an additional $1.6 million to 4Front," Regin was touting IIPR's investment in 4Front.  This statement put in play the issue of what Defendants knew about 4Front that would undercut Regin's touting of IIPR's new investment.

Without such a disclosure, the highlighted statement in paragraph 205 misled investors into believing that IIPR's investment in 4Front were beneficial to IIPR because it would generate additional rental revenues for the Company in the future, when, in reality, as was known or recklessly disregarded by Regin, 4Front was in dire financial straits and would soon not be able to pay rent. Specifically, as a result of IIPR's "Ongoing Monitoring" of all IIPR's tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials," Regin knew or recklessly disregarded the truth of 4Front's finances and his failure to disclose these facts made the highlighted statement in paragraph 205 materially misleading by omission.

207.    ***The statement highlighted above in paragraph 205 was made with scienter.*** At the time this statement was made, Regin was IIPR's Chief Investment Officer. According to IIPR, the Company "rel[ied] on our management team," of which Regin was a member, "to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information." In addition, IIPR told investors that the Company was engaged in "Ongoing Monitoring" of its tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials." Given (i) Regin's role as a manager of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that Regin either knew or recklessly disregarded the statement highlighted in paragraph 205 was misleading. This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

### 5.    Misstatements in the August 6, 2024 2Q 10-Q

208.    On August 5, 2024, IIPR issued financial results for the second quarter of 2024 and on August 6, 2024, filed its Form 10-Q with the SEC (the "2Q24 10-Q").  The 2Q24 10-Q touted IIPR's recent investments in three of the Defaulting Tenants, PharmaCann, 4Front, and GoldFlora.

209.    With respect to PharmaCann, the 2Q24 10-Q reiterated the following:

> In February 2024, we amended our lease and development agreement with PharmaCann at one of our New York properties, increasing the construction funding commitment by $16.0 million, which also resulted in a corresponding adjustment to the base rent for the lease at the property.  We also amended the lease to extend the term.

210.    ***The statement highlighted above in paragraph 209 was materially misleading when made.***  By telling investors that IIPR had "increased construction funding" to PharmaCann "by $16.0 million" which resulted in increased rent revenues from PharmaCann, Defendants were touting IIPR's investment in PharmaCann.  This statement put in play the issue of what Defendants knew about PharmaCann that would undercut Defendants' touting of IIPR's new investment.  Without such a disclosure, the highlighted statement in paragraph 209 misled investors into believing that additional investments in PharmaCann were beneficial to IIPR because it would generate additional rental revenues for the Company, when, in reality, as was known or recklessly disregarded by Defendants, PharmaCann was in dire financial straits and would soon not be able to pay rent.  Specifically, as a result of IIPR's "Ongoing Monitoring" of all IIPR's tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials," Defendants knew or recklessly disregarded the truth of PharmaCann's finances and their failure to disclose these facts made the highlighted statement in paragraph 209 materially misleading by omission.

211.    With respect to 4Front, the 2Q24 10-Q reiterated the following:

In January 2024, we entered into lease amendments with subsidiaries of [4Front] at the four properties we lease to them in Illinois, Massachusetts and Washington, extending the term of each lease. The Illinois property, which is under development, has experienced significant delays in construction, primarily relating to completion of required utilities enhancements, which has resulted in an extended delay of the estimated completion of the project. As a result, we amended the Illinois lease to reduce base rent owing for the nine months ending September 30, 2024, defer the payback of the security deposit applicable to the lease (with the security deposit being subject to future pro-rata monthly payback), and increase the base rent for the remainder of the term commencing November 1, 2024.

\* \* \*

In April 2024, we amended the lease with a subsidiary of 4Front at one of our Illinois properties to provide an additional improvement allowance of $1.6 million, which also resulted in a corresponding adjustment to the base rent for the lease at the property and increased the annual base rent escalations for the remainder of the lease term.

212. ***The statements highlighted above in paragraph 211 were materially misleading when made.*** By telling investors that IIPR had (i) amended its leases with 4Front to address purported construction delays, while at the same time "increas[ing] the base rent" for the multi-year term of the lease starting in November 2024, and (ii) invested an additional $1.6 million in 4Front further increasing the base rent, Defendants were touting IIPR's investment in 4Front. These statements put in play the issue of what Defendants knew about 4Front that would undercut their touting of IIPR's new investment. Without such a disclosure, the highlighted statements in paragraph 211 misled investors into believing that IIPR's investments in 4Front were beneficial to IIPR because it would generate additional rental revenues for the Company in the future, when, in reality, as was known or recklessly disregarded by Defendants, 4Front was in dire financial straits and would soon not be able to pay rent. Specifically, as a result of IIPR's "Ongoing Monitoring" of all IIPR's tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials," Defendants knew or recklessly disregarded the truth of 4Front's

80

finances and their failure to disclose these facts made the highlighted statements in paragraph 211 materially misleading by omission.

213.    With respect to Gold Flora, the 2Q24 10-Q reiterated the following:

In March 2024, we executed a new long-term lease with a subsidiary of Gold Flora Corporation . . . at our property located at 63795 19th Avenue in Palm Springs, California (the '19th Ave. Lease').

* * *

In May 2024, we executed a new long-term lease with a subsidiary of Gold Flora at our property located at 19533 McLane Street in Palm Springs, California (the 'McLane Lease').

The commencement date under each of the 19th Ave. Lease and McLane Lease is conditioned upon, among other things, the tenant's receipt of approvals to conduct cannabis operations by the requisite state and local authorities.

214.    ***The statements highlighted above in paragraph 213 were materially misleading when made.***  By telling investors that IIPR had "executed" two "new long-term leases" with Gold Flora for properties in California, Defendants were touting IIPR's new investments in Gold Flora. These statements put in play the issue of what Defendants knew about Gold Flora that would undercut their touting of IIPR's new leases.  Without such a disclosure, the highlighted statements in paragraph 213 misled investors into believing that additional investments in Gold Flora were beneficial to IIPR because they would generate additional rental revenues for the Company, when, in reality, as was known or recklessly disregarded by Defendants, Gold Flora was in dire financial straits and would soon not be able to pay rent.  Specifically, as a result of IIPR's "Ongoing Monitoring" of all IIPR's tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials," Defendants knew or recklessly disregarded the truth of Gold Flora's finances and their failure to disclose these facts made the highlighted statements in paragraph 213 materially misleading by omission.

81

215. ***The statements highlighted above in paragraphs 209, 211, and 213 were made with scienter.*** The 2Q24 10-Q was prepared and filed with the SEC at the direction of the Individual Defendants. Indeed, the SEC filing was certified by Defendant Smithers and Defendant Smith. Both Smithers and Smith certified that they had "reviewed" the 2Q24 10-Q and represented that it did "not contain any untrue statement of material fact" or material misrepresentations. According to IIPR, the Company "rel[ied] on our management team," of which the Individual Defendants were members, "to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information." In addition, IIPR told investors that the Company was engaged in "Ongoing Monitoring" of its tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials." Given (i) the Individual Defendants' roles as managers of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that they either knew or recklessly disregarded that the statements highlighted in paragraphs 209, 211, and 213 were misleading. Also, as detailed below, several of the Individual Defendants had the clear motive to mislead investors because Gold, Smithers, and Hastings stood to be awarded millions of dollars in discretionary compensation if IIPR's stock price performed well. This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

### 6. Misstatements in the November 7, 2024, 3Q 10-Q

216. On November 6, 2024, IIPR released financial results for the third quarter of 2024 and on November 7, 2024, it filed its Form 10-Q with the SEC (the "3Q24 10-Q"). The 3Q24 10-Q touted IIPR's recent investments in three of the Defaulting Tenants, PharmaCann, 4Front, and GoldFlora.

217.    With respect to PharmaCann, the 3Q24 10-Q once again reiterated the following regarding PharmaCann:

> In February 2024, we amended our lease and development agreement with PharmaCann at one of our New York properties, increasing the construction funding commitment by $16.0 million, which also resulted in a corresponding adjustment to the base rent for the lease at the property. We also amended the lease to extend the term.

218.    ***The statement highlighted above in paragraph 217 was materially misleading when made.*** By telling investors that IIPR had "increased construction funding" to PharmaCann "by $16.0 million" which resulted in increased rent revenues from PharmaCann, Defendants were touting IIPR's investment in PharmaCann. This statement put in play the issue of what Defendants knew about PharmaCann that would undercut Defendants' touting of IIPR's new investment. Without such a disclosure, the highlighted statement in paragraph 217 misled investors into believing that additional investments in PharmaCann were beneficial to IIPR because it would generate additional rental revenues for the Company, when, in reality, as was known or recklessly disregarded by Defendants, PharmaCann was in dire financial straits and would soon not be able to pay rent. Specifically, as a result of IIPR's "Ongoing Monitoring" of all IIPR's tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials," Defendants knew or recklessly disregarded the truth of PharmaCann's finances and their failure to disclose these facts made the highlighted statement in paragraph 217 materially misleading by omission.

219.    The 3Q24 10-Q then stated the following about 4Front:

> In January 2024, we entered into lease amendments with subsidiaries of [4Front] at four properties we lease to them in Illinois, Massachusetts and Washington, extending the term of each lease. The Illinois property, which is under development, has experienced significant delays in construction, primarily related to completion of required utilities enhancements, which has resulted in an extended

delay of the estimated completion of the project. As a result, we amended the Illinois lease to reduce base rent owing for the nine months ending September 30, 2024, defer the payback of the security deposit applicable to the lease (with the security deposit being subject to future pro-rata monthly payback), and increase the base rent for the remainder of the term commencing November 1, 2024.

\*\*\*

In April 2024, we amended the lease with a subsidiary of 4Front at one of our Illinois properties to provide an additional improvement allowance of $1.6 million, which also result in a corresponding adjustment to the base rent for the lease at the property and increased the annual base rent escalations for the remainder of the lease term.

220. ***The statements highlighted above in paragraph 219 were materially misleading when made.*** By telling investors that IIPR had (i) amended its leases with 4Front to address purported construction delays, while at the same time "increas[ing] the base rent" for the multi-year term of the lease starting in November 2024, and (ii) invested an additional $1.6 million in 4Front further increasing the base rent, Defendants were touting IIPR's investment in 4Front. These statements put in play the issue of what Defendants knew about 4Front that would undercut their touting of IIPR's new investment. Without such a disclosure, the highlighted statements in paragraph 219 misled investors into believing that IIPR's investments in 4Front were beneficial to IIPR because it would generate additional rental revenues for the Company in the future, when, in reality, as was known or recklessly disregarded by Defendants, 4Front was in dire financial straits and would soon not be able to pay rent. Specifically, as a result of IIPR's "Ongoing Monitoring" of all IIPR's tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials," Defendants knew or recklessly disregarded the truth of 4Front's finances and their failure to disclose these facts made the highlighted statements in paragraph 219 materially misleading by omission.

221. The 3Q24 10-Q again touted recent leases to Gold Flora:

> In March 2024, we executed a new long-term lease with a subsidiary of Gold Flora Corporation . . . at our property located at 63795 19th Avenue, Palm Springs, California (the '19th Ave. Lease'). . . .

***

> In May 2024, we executed a new long-term lease with a subsidiary of Gold Flora at our property located at 19533 McLane Street in Palm Springs, California (the 'McLane Lease'). The commencement date under each of the 19th Ave. Lease and McLane Lease is conditioned upon, among other things, the tenant's receipt of approvals to conduct cannabis operations by the requisite state and local authorities.

222.    ***The statements highlighted above in paragraph 221 were materially misleading when made.*** By telling investors that IIPR had "executed" two "new long-term leases" with Gold Flora for properties in California, Defendants were touting IIPR's new investments in Gold Flora. These statements put in play the issue of what Defendants knew about Gold Flora that would undercut their touting of IIPR's new investment. Without such a disclosure, the highlighted statements in paragraph 221 misled investors into believing that additional investments in Gold Flora were beneficial to IIPR because they would generate additional rental revenues for the Company, when, in reality, as was known or recklessly disregarded by Defendants, Gold Flora was in dire financial straits and would soon not be able to pay rent. Specifically, as a result of IIPR's "Ongoing Monitoring" of all IIPR's tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials," Defendants knew or recklessly disregarded the truth of Gold Flora's finances and his failure to disclose these facts made the highlighted statements in paragraph 221 materially misleading by omission.

223.    ***The statements highlighted above in paragraphs 217, 219, and 221 were made with scienter.*** The 3Q24 10-Q was prepared and filed with the SEC at the direction of the Individual Defendants. Indeed, the SEC filing was certified by Defendant Smithers and Defendant Smith. Both Smithers and Smith certified that they had "reviewed" the 3Q24 10-Q and represented

85

that it did "not contain any untrue statement of material fact" or material misrepresentations. According to IIPR, the Company "rel[ied] on our management team," of which the Individual Defendants were members, "to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information."  In addition, IIPR told investors that the Company was engaged in "Ongoing Monitoring" of its tenants, including "Quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties" and "Meetings with tenants to talk through operations and financials."   Given (i) the Individual Defendants' roles as managers of IIPR, and (ii) the role management played in overseeing tenants, then (iii) the most compelling inference here is that they either knew or recklessly disregarded that the statements highlighted in paragraphs 217, 219, and 221 were misleading.  Also, as detailed below, several of the Individual Defendants had the clear motive to mislead investors because Gold, Smithers, and Hastings stood to be awarded millions of dollars in discretionary compensation if IIPR's stock price performed well.  This inference of *scienter* is further supported by the facts alleged in paragraphs 252 through 254 below.

## VII.   THE TRUTH IS REVEALED AND LOSS CAUSATION

### A.   November 6 and 7, 2024

224.   On November 6, 2024, near the close of trading, IIPR reported its financial results for the third quarter of 2024 and issued a press release regarding those results.  IIPR then held an earnings call during the early afternoon of November 7, 2024.  IIPR reported revenue of $76.5 million, missing the consensus estimate of $77.5 million and declining from $77.8 million in the same period in 2023.  IIPR stated that the year-over-year decrease was due, in part, to $1.3 million of contractually due rent and property management fees that were not collected during the third quarter.

225.    In the November 6 press release, IIPR explained that during the third quarter of 2024, it had applied $1.4 million of security deposits for payment of rent on four properties leased to 4Front, one property leased to Tilt, and one property leased to Emerald Growth Holdings LLC ("Emerald").  IIPR also noted that it had applied $0.9 million in security deposits for properties leased to 4Front, Tilt, and Emerald for rent owed in October 2024, and also collected partial payments of rent from those companies for that same month.

226.    During the November 7 earnings call, Defendant Smith further detailed that IIPR had "applied the remainder of [4Front] security deposits totaling $0.5 million for payment of rent owed for October."  Defendant Smith also stated that IIPR "expect[s] rent collection for [4Front] well below what is contractually do [*sic*] for the fourth quarter."

227.    Following IIPR's press release on November 6, IIPR's common stock price fell $9.34 per share, or 7.06%, to close at $123.00 per share.  That drop continued into the next trading day as investors digested the news IIPR released late on November 6 and heard more bad news about 4Front on IIPR's investor call.  On November 7, 2024, IIPR's common stock price fell another $12.93 per share, or 10.51%, to close at $110.7 per share.

228.    Investment analysts blamed the stock drop on the tenants' failure to pay rent and the resulting shortfall in receipt of contractually due rents during the quarter.  For example, an analyst with Piper Sandler stated on November 6, 2024, "We expect the stock to underperform on Thursday [November 7] given what looks to be a new tenant credit issue."  Another analyst with BTIG stated on November 7, 2024, "[W]e are concerned that the company's strong financial performance in 3Q24 could be overshadowed by emergent tenant issues as [4Front, Tilt, and Emerald] did not pay full rent in Q3 or October . . .."

229.    This announcement partially revealed the truth about the finances of IIPR's faltering tenant portfolio, but as discussed above in paragraphs 117 through 138, and paragraphs

216 through 223, on November 6 and 7, 2024, Defendants continued to make other materially false and misleading statements about Defendants' ongoing oversight and due diligence with respect to tenants, as well as their continued investments with the Defaulting Tenants, without revealing what they knew about the Defaulting Tenants' then-existing finances and so the full truth remained concealed.

**B.    December 20, 2024**

230.    On the morning of December 20, 2024, IIPR issued a press release attached to a Form 8-K entitled "Innovative Industrial Properties Reports Default by PharmaCann on All Leases."  In the press release, the Company explained that it had previously entered into leases with PharmaCann and its affiliates as tenants for eleven IIPR properties, which "represented 17% of [IIPR]'s total rental revenues for the three and nine months ended September 30, 2024."

231.    The press release explained that on December 19, 2024, PharmaCann "defaulted on its obligations to pay rent for the month of December under six of the eleven leases, for properties located in Illinois, Massachusetts, Michigan, New York, Ohio and Pennsylvania."  For those six properties, December rent, "including base rent, property management fees and estimated tax and insurance payments, totaled $4.2 million."  The Company "applied security deposits held by [the Company] pursuant to these Leases for the payment in full of the defaulted rent, in addition to late penalties and interest."

232.    The press release further explained that although PharmaCann "paid rent in full under the remaining five Leases totaling $90,000 for the month of December," under the cross-default provisions contained in each of the leases, PharmaCann had also defaulted on its obligations under those five leases.

233.    Finally, the Company stated that it was "continuing discussions with PharmaCann regarding the Leases and expects to enforce its rights under the Leases aggressively, which may

include, but is not limited to, commencing eviction proceedings as [the Company] deems necessary."

234.    Investors reacted quickly and negatively to this news: IIPR's common stock price fell $21.68 per share, or 22.74%, to close at $73.66 per share on December 20, 2024.

235.    Investors' negative reaction to the news of December 20, 2024, is further confirmed by the commentary of investment analysts covering IIPR's stock who also reacted to the news of December 20, 2024, with concern.  For example, a Piper Sandler analyst issued a report on December 20, 2024, stating that "the magnitude of PharmaCann's default cannot be overstated" and downgraded IIPR to "Underweight from Neutral" following the news.  The analyst explained further that "~17% delinquent rents is concerning for the future as management outlined roughly half of the space is already seeing interest for backfill while the other half will take longer."  The Piper Sandler analyst also claimed—following IIPR's lead—that PharmaCann "gave no indication up until recently that it would not pay the rent," but noted that "[p]revious to PharmaCann, Kings Garden has been the largest to date, which represented ~7% of invested capital prior to its default in mid-2022."

236.    Similarly, in a report issued on December 20, 2024, a Compass Point analyst stated, "[s]ince we had no information to indicate that this tenant was having trouble making lease payments, we do not know if other tenants are in similar distress."  The analyst noted that Compass Point was lowering its price target and downgrading the stock to Neutral "[b]ecause we fear that this might not be an isolated event, and because the dividend might not be well supported in coming quarters."

237.    In a report dated December 23, 2024, a BTIG analyst downgraded IIPR to Neutral, stating in the title of the report that "PharmaCann's Default Raises Concern for the Health of IIPR's Tenant Base."  The analyst further commented that PharmaCann "is the largest private cannabis

company in the U.S. with operations in eight states," and that the PharmaCann portfolio "would be the largest default since the company's founding."

238.    As detailed above in paragraphs 139 through 151, IIPR moved quickly to assure investors that PharmaCann's default was resolved and PharmaCann would quickly restart paying rent. Plaintiff alleges that these assurances were materially false or misleading and, as a result of Defendants' continued misstatements, the full truth about the Defaulting Tenants' then-existing finances was not revealed to investors.

239.    In the morning of January 30, 2025, IIPR issued a press release attached to a Form 8-K entitled "Innovative Industrial Properties Reports Resolution to Default by PharmaCann." In the press release, the Company announced that it had purportedly "reached an agreement" "to resolve PharmaCann's existing defaults." The press release summarized the "key terms of the agreement," including, among other things that IIPR utilized security deposits "for payment in full of defaulted rent for December 2024 and January 2025 and certain penalties."

240.    On news of the purported "resolution" with PharmaCann, IIPR's common stock price increased $6.71 per share, or 10.11%, to close at $73.05 on January 30, 2025.

241.    Analysts viewed a potential resolution of the PharmaCann default positively. A Roth analyst stated that the update was "a welcome, but partial remedy of investor concerns." A Piper Sandler analyst stated that the news was "a positive, as it restores a significant part of the associated earnings but does set a precedent for other tenants." Similarly, a BTIG analyst stated, "We view the news as a positive catalyst for IIPR as it signals the relative strength of specific markets (especially NY, IL, PA, and OH) and should allay investor fears regarding dividend coverage."

### C.    March 14, 2025

242.    Investors' positivity was short lived.  On March 14, 2025, after markets closed, IIPR issued a Form 8-K announcing that "PharmaCann defaulted on its obligations to pay rent for the month of March under nine of its eleven leases for properties located in New York, Illinois, Pennsylvania, Ohio, and Colorado."  The rent owed for March, "including base rent, property management fees and estimated tax and insurance payments," totaled $2.7 million.  The Company stated that it "is in continuing discussions with PharmaCann regarding the Leases and expects to enforce its rights under the Leases aggressively, which may include, but is not limited to, commencing eviction proceedings as the Company deems necessary."

243.    On this news, IIPR's common stock price fell $5.41 per share, or 7.7%, to close at $64.21 on March 17, 2025.

244.    Investors reacted negatively to this news as shown by the sharp decline in IIPR's stock price and the commentary of investment analysts.  A Compass Point analyst stated that this second default was "quite a blow," and called into question whether the Company will be able to maintain its dividend.  The analyst suggested that "[i]t seems reasonable to assume that other tenants might be facing similar difficulties, so we would not advise making incremental investments in IIPR at this time."  The analyst hypothesized that "[i]t is not just that IIPR's portfolio growth has stalled . . . it is that the initial underwriting rested on projections of growth that would support timely lease payments" and that "we have no way of knowing if the lease payments are being made from operating cash flows." The analyst continued, "despite IIPR's transparency in reporting results, we do not know whether its tenants'" earnings are "growing at the same pace as its lease escalation clauses."

245.    The news of PharmaCann's default did not, however, reveal the full truth about the financial woes of the Defaulting Tenants.  That would happen two weeks later.

### D.    March 28, 2025

246.    On March 28, 2025, after the markets closed, the Company issued a press release attached to a Form 8-K entitled "Innovative Industrial Properties Reports Defaults by Tenants." In this press release, IIPR announced that it had declared that three tenants, 4Front, Gold Flora, and Tilt, were "in default for failure to pay contractual rent in full."  In total, these defaults covered 9 properties, 10.8% of IIPR's contractual rent as of December 31, 2024, and $13.1 million in owed "[c]ontractual base rent, property management fees and estimated tax and insurance payments." Specifically, 4Front Ventures had leased four IIPR properties, representing 5.7% of the Company's total rent revenues, and owed $9 million. Gold Flora had leased three IIPR properties, representing 2.9% of the Company's total rent revenues, and owed $1.7 million.  Tilt had leased two IIPR properties, representing 2.2% of the Company's total rent revenues, and owed $2.4 million.  The Company stated that it "will take action to pursue its rights under such leases aggressively, which may include, but is not limited to, commencing eviction proceedings as the Company deems necessary."

247.    IIPR presented these defaults as part of "a significant tenant replacement and renewal initiative aimed at enhancing the performance of its real estate portfolio and driving long-term value for shareholders."  The Company admitted that "[t]his initiative focuses on strengthening tenant credit profiles and optimizing occupancy of the Company's properties to align with evolving market demands."  IIPR further stated that "market dynamics in the regulated cannabis industry have been extremely challenging," such as "federal, state and local taxation burdens; ineffective enforcement policies with respect to the illicit cannabis market; declines in unit pricing for regulated cannabis products; limited access to capital; and inflation and supply chain constraints."  IIPR continued by disclosing that "these challenges have negatively impacted the ability of certain of our tenants to make their lease payments on the properties they lease from

us."  As a result, IIPR conceded, "*the Company believes that it will be better served by proactively seeking to refresh a substantial portion of its tenant base with more financially viable long-term tenants to better position the Company for sustainable growth and improved financial performance*."

248.    On this news, IIPR's common stock price fell $9.66 per share, or 15.15%, to close at $54.09 per share on March 31, 2025.

249.    Investors' negative reaction to the news of March 28, 2025, is evident from the stark decline in IIPR's stock price and further confirmed by investment analysts who pointed to these tenant defaults as the reason for the recent decline in stock price.  For example, a Citizens analyst noted that "[i]n total, IIPR now has 27% of its rental/NOI stream in default," and explained that "[g]iven the decline in investor sentiment due to operator defaults and exposure to an industry that is not in favor, we see shares as fairly valued."  Similarly, a Roth analyst lowered 2025/2026 estimates to "account for ~10% of the potential 28% (including the PharmaCann) being unrecoverable."  Finally, a Wolfe Research analyst noted on April 22, 2025 that "IIPR's share price has fallen ~24% YTD on account of tenant defaults."

250.    As detailed above, when the truth about the misleading statements was revealed over time, the value of IIPR's securities declined precipitously as the prior artificial inflation no longer propped up the stock's price.  The declines in the price of IIPR securities were the direct result of the nature and extent of Defendants' misstatements finally being revealed to investors and the market.  The timing and magnitude of the share price decline negates any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, i.e., damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price

93

of the Company's securities and the subsequent significant decline in the value of the Company's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

251.    At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of IIPR's business and financial condition, as alleged herein. Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make the statements made not false or misleading, causing the price of IIPR securities to be artificially inflated.  Plaintiff and other Class members purchased IIPR securities at those artificially inflated prices, causing them to suffer damages as complained of herein.

## VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER

### A.    Additional Allegations Supporting the Inference Defendants Knew or Recklessly Disregarded Their Statements were Materially False or Misleading

252.    The Individual Defendants, as the senior management and executive team of IIPR, possessed the power and authority to control the contents of IIPR's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of IIPR's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions within IIPR, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.

253.    Further, the structure of IIPR's business supports the inference that Defendants knew or recklessly disregarded the truth about the dire financial circumstances of the Defaulting Tenants.  In particular, during the relevant period, IIPR was a very small, internally managed REIT, with only 22 to 23 full-time employees, and so there was very little, if any, separation between the Individual Defendants and the day-to-day activities of IIPR's business.  As a result, any problems with the Defaulting Tenants would have quickly become known to the Individual Defendants. Moreover, as IIPR repeatedly told its investors, "the success of [IIPR's] investments will be materially dependent on the financial stability of these tenants" and as a result, oversight and due diligence of tenants' finances and future prospects was central to the Company's ongoing business and part of its core operations.

254.    Defendants were also on notice that their due diligence and monitoring processes were likely deficient.  The significant tenant defaults of Kings Garden and Parallel that occurred just before the Class Period (*see supra* Section IV.D) meant that IIPR knew or recklessly disregarded that tenants—even large operators—were facing significant financial challenges, that prior underwriting and due diligence was likely to have underestimated the risk of tenant defaults, and so IIPR needed to "focus[] on strengthening tenant credit profiles."

**B.    Additional Allegations Supporting Certain Individual Defendants' Motives to Commit Fraud**

255.    Certain of the Individual Defendants stood to profit handsomely if they were able to keep IIPR's stock price artificially inflated through the end of 2024, through the award of incentive compensation tied directly to IIPR's stock price.

256.    A portion of certain Individual Defendants' annual compensation was derived from awards of "Performance Share Units" ("PSUs").  Each PSU represented the right to receive one share of IIPR common stock if the applicable performance goals were achieved.  The ultimate

value of the PSUs depended on the Company's total stockholder return ("TSR") over a three-year period. At the end of this period, the PSUs vest and are settled in shares of common stock at a rate depending on the Company's TSR over the three-year period as compared to two different comparator groups. Depending on IIPR's performance compared to these groups, recipients could receive as few as zero shares or as many as 150% of the target PSUs initially granted, plus dividends. In other words, to the extent IIPR's stock price increased to meet these performance goals, certain Defendants stood to receive very large payouts of PSUs and cash dividends on those PSUs.

257. Importantly, whether PSUs are awarded is determined at the end of IIPR's fiscal year, in December. As a result, PSUs awarded before the Class Period started would be awarded (if at all) based upon the performance of IIPR's stock as measured in December 2024. The potential award of PSUs and associated cash dividends in December 2024 is a clear motive for Defendants' Class Period misstatements. If Defendants were successful in misleading investors about the truth of the Defaulting Tenants' dire financial circumstances, they could benefit directly from artificially inflating IIPR's stock price because it would lead directly to an award of PSUs.

258. Defendants Gold, Smithers, and Hastings were all awarded PSUs in January 2022, that were due to be awarded in December 2024, if IIPR's stock performance could be maintained. Specifically, these Defendants received the following awards:

a) Gold received 46,188 PSUs with a grant date fair value of approximately $9 million, which would have been approximately 129% of his ultimate compensation in 2024.

b) Smithers received 30,792 PSUs with a grant date fair value of approximately $6 million, which would have been approximately 120% of his ultimate compensation in 2024.

c)      Hastings received 12,317 PSUs with a grant date fair value of approximately $2.4 million.

259.    Defendants Gold, Smithers, and Hastings had an extra incentive to ensure their awards of PSUs in 2024.  The collapse of Kings Garden and Parallel, among other things, caused a decline in IIPR's stock price which meant that PSUs awarded in 2021, and set to vest on December 31, 2023, were forfeited because IIPR's stock did not meet the necessary performance threshold.  As a result, Gold, Smithers, and Hastings lost out on millions of dollars' worth of compensation.

260.    Unfortunately, Defendants' attempts to inflate IIPR's stock price were not wholly successful, as the news of the Defaulting Tenants was slowly revealed to investors starting on November 6, 2024.  On December 31, 2024, the vesting period for the 2022 PSUs ended, but the performance thresholds for awards based on the 2022 PSUs were not met, and in accordance with the terms of the agreement, the 2022 PSUs were also forfeited.  Defendants' failure to achieve their windfall of PSUs and cash dividends at the expense of shareholders does not change the fact that the possibility of being paid millions of dollars is a strong motive for their fraud.

## IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD ON THE MARKET DOCTRINE

261.    The market for IIPR securities was open, well developed, and efficient at all relevant times.  As a result of Defendants' materially false or misleading statements and material omissions, the Company's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities, relying on the integrity of the market price of such securities and on publicly available market information relating to IIPR.  Plaintiff and Class Members have been damaged thereby.

262.    During the Class Period, the artificial inflation of the value of IIPR's securities was caused by the material misrepresentations and omissions alleged in this complaint, thereby causing the damages sustained by Plaintiff and other Class Members.  As alleged herein, during the Class Period, Defendants made, or caused to be made, a series of materially false or misleading statements, causing the price of IIPR's securities to be artificially inflated at all relevant times. When the truth was disclosed and/or materialized, it drove down the value of the Company's securities, causing Plaintiff and other Class Members that had purchased or otherwise acquired IIPR's securities at artificially inflated prices to be damaged as a result.

263.    At all relevant times, the market for IIPR's securities was efficient for the following reasons, among others:

a)    IIPR's securities met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market;

b)    As a regulated issuer, IIPR filed periodic public reports with the SEC and/or the NYSE;

c)    IIPR regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d)    IIPR was followed by securities analysts employed by brokerage firms, who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

264.    Based on the foregoing, during the Class Period, the market for IIPR's securities promptly digested information regarding the Company from all publicly available sources and

reflected such information in the price of IIPR's securities. Under these circumstances, the market for IIPR's securities was efficient during the Class Period and, therefore, investors' purchases and acquisitions of IIPR's securities at artificially inflated market prices give rise to a Class-wide presumption of reliance under the fraud-on-the-market doctrine.

265.    Because this action involves Defendants' failure to disclose and omission of material adverse information that Defendants were obligated to disclose during the Class Period but did not, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld were material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.    NO SAFE HARBOR

266.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be untrue or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions alleged herein. To the extent that statements alleged to be untrue or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had actual knowledge that the forward-looking statements were materially untrue or misleading at the time each such statement was made.

267.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those untrue or misleading forward-looking statements because at the time each of those forward-looking

statements was made, the speaker had actual knowledge that the forward-looking statement was materially untrue or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of IIPR who knew that the statement was untrue, misleading, or omitted relevant information when made.

## XI.    CLASS ACTION ALLEGATIONS

268.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all purchasers of IIPR securities during the Class Period.  Excluded from the Class are Defendants and their immediate families, the directors and officers of IIPR and their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

269.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, IIPR securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by IIPR or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Upon information and belief, these shares are held by hundreds or thousands of individuals located geographically throughout the country.  Joinder would be highly impracticable.

270.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws complained of herein.

271.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

272.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)    whether the prices of IIPR securities during the Class Period were artificially inflated because of Defendants' conduct as complained of herein;

c)    whether the statements alleged herein to be actionable were materially false, incomplete, or misleading and/or omitted to disclose material adverse facts required to be disclosed therein;

d)    whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements; and

e)    whether the members of the Class have sustained damages and, if so, the proper measure of damages.

273.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.    CLAIMS FOR RELIEF

### COUNT I
### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

274.    Plaintiff incorporates ¶¶1-273 by reference.

275.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

276.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

a)    employed devices, schemes, and artifices to defraud;

b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of IIPR securities during the Class Period.

277.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for IIPR securities.  Plaintiff and the Class would not have purchased IIPR securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

278.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of IIPR securities during the Class Period.

## COUNT II
### For Violation of §20(a) of the Exchange Act
### Against All Defendants

279.    Plaintiff incorporates ¶¶1-278 by reference.

280.    During the Class Period, the Individual Defendants acted as controlling persons of IIPR within the meaning of §20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about IIPR, the Individual Defendants had the power and ability to control the actions of IIPR and its employees.  In addition, IIPR controlled the Individual Defendants and its other officers and employees.  By reason of such conduct and control, Defendants are liable pursuant to §20(a) of the Exchange Act.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

a)    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as Class Representative under Fed. R. Civ. P. 23 and Plaintiff's counsel as Lead Counsel;

b)    Awarding Plaintiff and the members of the Class damages and interest;

c)    Awarding Plaintiff reasonable costs and attorneys' fees; and

d)    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XIV.  JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  June 23, 2025        Respectfully submitted,

**ABATO, RUBENSTEIN AND ABATO, P.A.**

*/s/ Corey Smith Bott*
Corey Smith Bott (Bar No. 25673)
Shauna Barnaska (Bar No. 16755)

809 Gleneagles Court, Suite 21286
Telephone: (410) 321-0990
Fax: (410) 321-1419
csbott@abatolaw.com
sbarnaskas@abatolaw.com

*Local Counsel for Lead Plaintiff City of Birmingham
Retirement and Relief System*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Jacob L. Lieberman (admitted *pro hac vice*)
Jessica M. Casey (admission forthcoming)
156 S. Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Fax: (860) 537-4432
jlieberman@scott-scott.com
jcasey@scott-scott.com

Donald A. Broggi (*pro hac vice* pending)
Susan Hu (admitted *pro hac vice*)
Lana V. Levin (admitted *pro hac vice*)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Fax: (212) 223-6334
dbroggi@scott-scott.com
shu@scott-scott.com
llevin@scott-scott.com

*Counsel for Lead Plaintiff City of Birmingham
Retirement and Relief System*