**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

|  |  |
|---|---|
| IN RE INNOVATIVE INDUSTRIAL PROPERTIES, INC. SECURITIES LITIGATION | No. 1:25-cv-00182-GLR<br><br>DEMAND FOR JURY TRIAL |

**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**<u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................................1

STATEMENT OF FACTS.....................................................................................................3

      A.    IIPR's Business and Tenants .................................................................................3

      B.    IIPR's Repeated Assurances of Tenant Oversight..................................................4

      C.    Assurances of Oversight Hid the Defaulting Tenants' Financial Problems ............6

      D.    Defendants Also Touted New Investments in the Defaulting Tenants....................9

      E.    The Truth About the Defaulting Tenants Was Revealed Gradually......................10

LEGAL STANDARD ..........................................................................................................12

ARGUMENT.......................................................................................................................13

I.      The Complaint Plausibly Alleges Securities Fraud Claims................................................13

      A.    The Complaint Plausibly Alleges Two Categories of Misstatements ...................13

      B.    Defendants' Misstatements Are Actionable. ........................................................21

      C.    The Complaint Plausibly Alleges Scienter ..........................................................23

II.      The Complaint Is Neither Prolix nor Improperly Pled .......................................................28

III.      The Complaint Adequately Alleges a Control Person Claim ...........................................30

CONCLUSION ...................................................................................................................30

## TABLE OF AUTHORITIES

**Cases**                                                                                                                        **Page(s)**

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
   741 F. Supp. 2d 511 (S.D.N.Y. 2010)................................................................................22

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)................................................................................................13

*Black v. Martek Biosciences Corp.*,
   2006 WL 8435572 (D. Md. June 14, 2006)............................................................30

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
   496 F. Supp. 3d 952 (E.D. Va. 2020) ...............................................24, 28, 29, 30

*City of Southfield Fire & Police Ret. Sys. v. Hayward Holdings, Inc.*,
   2025 WL 1577315 (D.N.J. June 4, 2025)..............................................................27

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat., PLC*,
   423 F. Supp. 2d 348 (S.D.N.Y. 2006).............................................................17, 19

*In re Comput. Sciences Corp. Sec. Litig.*,
   890 F. Supp. 2d 650 (E.D. Va. 2012) ...................................................................26

*In re Constellation Energy Grp., Inc. Sec. Litig.*,
   738 F. Supp. 2d 614 (D. Md. 2010)......................................................................21

*In re Countrywide Fin. Corp. Deriv. Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008) ...............................................................15

*De Vito v. Liquid Holdings Grp., Inc.*,
   2018 WL 6891832 (D.N.J. Dec. 31, 2018)...........................................................27

*In re Emergent BioSolutions Inc. Sec. Litig.*,
   2023 WL 5671608 (D. Md. Sept. 1, 2023) ......................................17, 19, 24, 26

*In re Genworth Fin. Inc. Sec. Litig.*,
   103 F. Supp. 3d 759 (E.D. Va. 2015) ........................................................ *passim*

*Inst. Inv. Grp. v. Avaya Inc.*,
   564 F.3d 242 (3d Cir. 2009)..................................................................................27

*In re Intuitive Surgical Sec. Litig.*,
   65 F. Supp. 3d 821 (N.D. Cal. 2014) ...................................................................29

*In re James River Gr. Holdings, Ltd. Sec. Litig.*,
   2023 WL 5538218 (E.D. Va. Aug. 28, 2023)............................................16, 25, 26

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
 2016 WL 3981236 (D.S.C. July 25, 2016) ........................................................................25, 27

*Keeney v. Larkin*,
 306 F. Supp. 2d 522 (D. Md. 2003) ........................................................................................18

*Klein v. Altria Grp, Inc.*,
 525 F. Supp. 3d 638 (E.D. Va. 2021) .....................................................................................24

*Kusnier v. Virgin Galactic Holdings, Inc.*,
 639 F. Supp. 3d 350 (E.D.N.Y. 2022) ....................................................................................19

*In re Lab. Corp. of Am. Holdings Sec. Litig.*,
 2006 WL 1367428 (M.D.N.C. May 18, 2006) ........................................................................22

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*,
 2011 WL 2444675 (D. Del. June 14, 2011)..............................................................................26

*In re Lucent Tech., Inc. Sec. Litig.*,
 217 F. Supp. 2d 529 (D.N.J. 2002) .........................................................................................23

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
 601 U.S. 257 (2024)......................................................................................................14, 18, 21

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
 513 F.3d 702 (7th Cir. 2008) ..................................................................................................28

*Malone v. Microdyne Corp.*,
 26 F.3d 471 (4th Cir. 1994) ....................................................................................................21

*Matrixx Initiatives, Inc. v. Siracusano*,
 563 U.S. 27 (2011)...................................................................................................................20

*In re MicroStrategy, Inc. Sec. Litig.*,
 115 F. Supp. 2d 620 (E.D. Va. 2000) .....................................................................................12

*In re Parmalat Sec. Litig.*,
 375 F. Supp. 2d 278 (S.D.N.Y. 2005)......................................................................................29

*Phillips v. LCI Intern., Inc.*,
 190 F.3d 609 (4th Cir. 1999) ..................................................................................................20

*Roofers Local No. 149 Pension Fund v. Amgen Inc.*,
 751 F. Supp. 3d 330 (S.D.N.Y. 2024).....................................................................................19

*Schulman v. Axis Surplus Ins. Co.*,
 90 F.4th 236 (4th Cir. 2024) ..................................................................................................13

*Singer v. Reali*,
 883 F.3d 425 (4th Cir. 2018) ...........................................................................12, 13, 21, 23

iii

*Sinnathurai v. Novavax, Inc.*,
645 F. Supp. 3d 495 (D. Md. 2022)................................................................13, 27

*Tchatchou v. India Globalization Cap. Inc.*,
2021 WL 307415 (D. Md. Jan. 29, 2021).................................................................18

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)..................................................................................................12

*In re Toronto-Dominion Bank Sec. Litig.*,
2018 WL 6381882 (D.N.J. Dec. 6, 2018).................................................................28

*In re Under Armour Sec. Litig.*,
540 F. Supp. 3d 513 (D. Md. 2021)..........................................................................13

*Virginia Bankshares, Inc. v. Sandberg*,
501 U.S. 1083 (1991)................................................................................................23

*In re Virtu Fin., Inc. Sec. Litig.*,
770 F. Supp. 3d 482 (E.D.N.Y. 2025) ......................................................................17

*In re Wells Fargo & Co. Sec. Litig.*,
2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021)..........................................................21

*In re Wilmington Tr. Sec. Litig.*,
29 F. Supp. 3d 432 (D. Del. 2014)............................................................................15

*Yates v. Mun. Mortg. & Equity, LLC*,
744 F.3d 874 (4th Cir. 2014) ....................................................................................27

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
780 F.3d 597 (4th Cir. 2015) ....................................................................................23

**Statute**

15 U.S.C. § 78u–4(b) .................................................................................................13

Lead Plaintiff City of Birmingham Retirement and Relief System ("Plaintiff"), respectfully submits this Opposition to (i) the Motion to Dismiss filed by Innovative Industrial Properties, Inc. ("IIPR" or the "Company"), Alan Gold, Paul Smithers, David Smith, Ben Regin, and Catherine Hastings (the "Individual Defendants" and, with IIPR, "Defendants") (Dkt. No. 60) ("Motion"); and (ii) Defendants' Memorandum in Support of the Motion (Dkt. No. 60-1) (the "Brief" or "Br.").

## **INTRODUCTION**

IIPR makes money by lending to growers and sellers of cannabis. IIPR's loans come in the form of sale-leaseback transactions and direct investments, which are paid back by the cannabis operators at a premium through monthly rent payments. All agree that making your money from tenants engaged in a federally illegal business carried some risk that the tenants might default and IIPR (and its investors) would lose money. This securities class action centers on what Defendants told investors they were doing to mitigate this risk.

Defendants repeatedly assured investors throughout the Class Period[1] that IIPR's tenants were not that risky (had a "much lower" "risk profile") and that the Company was undertaking the "underwriting" and "monitoring" steps necessary to oversee tenants' finances and protect IIPR's investments. Defendants explained that this oversight included, at least, a review of tenant "credit quality," "payment history data," a "detailed review of financial statements," a tenant's "history of successful capital raising," "quarterly reviews and information requests" relating to a tenant's financial operations, and a review of a tenant's "cash balance on hand today." And Defendants explicitly assured investors (when asked) *we have said that we are monitoring all of our tenants, and we are monitoring all of our tenants*," *i.e.*, IIPR was overseeing its tenants, knew what was going on with their finances, and there was nothing to worry about.

---

[1] The "Class Period" starts on February 26, 2024, and runs through March 28, 2025. ¶1. Citations to "¶__" are to paragraphs in Plaintiff's operative complaint (Dkt. No. 50 (the "Complaint")).

But unbeknownst to investors, throughout the Class Period, four of IIPR's largest tenants (who collectively generated about a quarter of the Company's revenues) were on the verge of financial collapse. These ticking timebombs exploded in a cascade of defaults between November 2024 and March 2025. Defendants' primary argument that they were blindsided by the collapse of these tenants is not credible. The Complaint alleges that throughout the Class Period there were numerous red flags that IIPR's oversight process would have detected (if Defendants were monitoring tenants at all). Specifically, that the four tenants in question were behind on payments to vendors, were not paying all their taxes, did not have money to fund their day-to-day operations, and were having difficulty financing these expenses.

From these facts—Defendants' assurances of tenant oversight and the glaring red flags about IIPR's tenants—it is easy to see the fraud. Defendants either (i) were not doing the oversight they told investors they were and so had no knowledge of the red flags, in which case they were *not* actually "monitoring all of [IIPR's] tenants" and their assurances to the contrary were materially false; or (ii) they knew about the red flags but failed to disclose this adverse information to investors, in which case their statements were materially misleading by assuring investors there were no red flags when this was not the case. Likewise, this disconnect between what Defendants said about tenant oversight and the reality of the teetering finances of four of IIPR's largest tenants, makes clear that it was materially misleading for Defendants to tout new investments in tenants they knew or recklessly disregarded were on the verge of financial collapse. These misstatements misled investors into believing that the new investments were a good thing for IIPR when, in reality, the Company was very likely throwing good money after bad.

The Motion largely ignores these facts and the allegations in the Complaint and instead tries to muddy the waters with baseless claims of "prolixity," "editorial manipulation," or that

2

fraudulent intent cannot be inferred solely from the fact that Defendants were in charge of a 23-person operation. As shown below, these arguments are meritless. The Complaint alleges a plausible claim for securities fraud and the Motion should be denied.

## STATEMENT OF FACTS

### A.      IIPR's Business and Tenants

IIPR is a real estate investment trust focused on properties for lease to state-licensed cannabis operators for cannabis cultivation and retail. ¶21. IIPR lends money to cannabis operators through (a) sale-leaseback transactions in which IIPR would buy a property from a cannabis operator and then lease that property back to the operator, and (b) directly investing money to pay for upgrades to the leased properties so that tenants could expand their business. ¶¶22, 56. In turn, tenants (the cannabis operators) pay IIPR rent every month. *Id.* Because cannabis remains federally illegal, and cannabis operators cannot access traditional lines of credit from banks to fund their operations, IIPR was able to charge tenants much higher rents than they would pay to borrow money from more traditional lenders. ¶57.

IIPR derived essentially all its revenues from rent payments made by businesses engaged in federally illegal activities, so investors understood that there was some risk associated with the Company acting as an unlicensed bank for cannabis operators. *See* ¶¶56-60. The Company also noted that the cannabis industry—in addition to being federally illegal—was facing industry-wide headwinds, from (i) "compress[d] operating margins," (ii) "inflation" impacting "costs of labor and production," and (iii) "labor shortages[,] and global supply chain issues." ¶59. So investors understood there was some risk tenants would default on their rent payments to IIPR.

The risk of tenants defaulting on their rent payments was especially concentrated and acute because IIPR had only about 30 tenants across its 109 properties, and rent from just ten tenants comprised 73% of IIPR's rental revenues, as of December 31, 2025. ¶¶25-26. And the risk had

3

materialized twice right before the start of the Class Period. *See* ¶¶45-55.  First, in July 2022, Kings Garden—which at the time was 8% of IIPR's total rental revenues—defaulted on its rental obligations.  ¶46.  Second, beginning in November 2022 and continuing into 2023, IIPR's then second-largest tenant, Parallel, defaulted on its rental obligations.  ¶49, *see also* ¶¶50-54.  At the time of this default, rent from Parallel was about 10% of IIPR's total rental revenue.  ¶49.  Both Kings Garden and Parallel were evicted and never resumed paying rent and news of these defaults caused dramatic declines in IIPR's stock price.  ¶¶47-48; 53-54.

B.     **IIPR's Repeated Assurances of Tenant Oversight**

Because of the risks associated with IIPR's business, the measures that IIPR took to identify, monitor, and mitigate those risks were highly material to investors in assessing IIPR's financial condition, its risk exposure, and the sustainability of its revenue stream.  ¶60. Throughout the Class Period, Defendants assured investors that the Company had a robust due diligence process and continuously monitored tenants' financials for red flags.  These assurances were important because the Company was engaged in a risky business—lending money to cannabis operators—and so placed special emphasis and importance on the steps taken to mitigate those risks.  These assurances are the first category of misstatements in the Complaint.  ¶¶86-174.

For example, IIPR's February 2024 10-K told investors that the Company "evaluate[s] the credit quality of our tenants and any guarantors on an ongoing basis," "monitor[s] the payment history data for all of our tenants," and "monitor[s] our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations."  ¶89.  Defendants also stated that IIPR "rel[ied] on our management to perform due diligence investigations" on tenants and guarantors and their "properties, operations, and prospects" where there is "little or no publicly available operating and financial information."  ¶91.

IIPR's investor presentations throughout the Class Period also highlighted the Company's

"ongoing monitoring" and "due diligence" processes.  ¶¶95, 100.  Such activities purportedly included, among other things, "quarterly reviews and requests for information pertaining to financial and ongoing operations of all properties," along with "meetings with tenants to talk through operations and financials."  ¶95.  Indeed, IIPR's leases with at least two tenants that ultimately defaulted required the tenant to provide IIPR with detailed information about the tenant's financial condition on a regular basis.  The lease agreement with PharmaCann Inc. ("PharmaCann"), for example, required the disclosure of financial budgets, forecasts, and investor materials, audited year-end consolidated financial statements, and unaudited quarterly financial statements before IIPR was required to make its periodic SEC disclosures to investors.  ¶¶32, 75-76.  The lease that IIPR executed with the other tenant contains substantially similar tenant-disclosure obligations.  ¶36.

Investment analysts covering IIPR also asked Defendants about their due diligence on, and monitoring of, tenants' finances throughout the Class Period.  Defendants responded to such questions by assuring investors that they were monitoring the tenants and so would know of, and presumably head off, any percolating problems.  For example, on November 7 , 2024, when asked by an investment analyst about whether "tenants that faced operating challenges" would "just stop paying out of the blue," Defendant Gold assured investors that "we *continue to work with all of our tenants* on understanding their businesses and making sure that we are [sic] know what they are doing and how things are going" and "*we are aware of what's going on with our tenants*."  ¶¶118-19.  Similarly, when pressed by analysts about the Company's monitoring of tenant finances on a February 20, 2025 call with investors, Defendant Gold said (i) "we are working very closely with" the tenants; (ii) "*we have said that we are monitoring all of our tenants, and we are monitoring all of our tenants*"; and (iii) "we're watching all of our tenants.  *We are doing deep*

5

*dives into every single one of our tenants, including the strongest ones.*"  ¶¶161, 164, 172. Defendant Regin echoed these sentiments on the February 20 investor call, claiming that IIPR was "working very closely with" tenants.  ¶161.  The Complaint alleges additional assurances were made to investors on other conference calls.  ¶¶114, 135, 157, 168.

Defendants also assured investors that the tenants in their current portfolio were on solid financial footing.  For example, on an August 6, 2024, earnings call, Defendant Regin said, "I feel very good about our current tenant roster of 30 tenants," "we really feel that we have some of the best operators in the industry in our portfolio," and "we feel very good about the state of the pipeline and the portfolio overall," ¶¶106, 110, and Defendant Smithers made similar statements. *See*, *e.g.*, ¶114 ("we're very pleased with the quality and strength of our tenants.").

Defendants also told investors that they applied "rigorous" underwriting standards to evaluate additional investments and changes to existing leases, and that the process was "highly selective."  ¶106.  In a March 4, 2024 presentation, IIPR explained that its "Detailed Financial Underwriting" process included an "[e]valuation of financial projections" and a "[d]etailed review of financial statements, strategic initiatives, and growth plans."  ¶95.  In response to a question about how IIPR was assessing new tenant investments and making "additional investment commitments" with its existing tenant roster, Defendant Regin stated that IIPR looked for tenants with "strong financials" and "a track record of performance *in the same rigorous underwriting criteria that we've used historically for our existing tenants.*"  ¶¶109-110; *see also* ¶¶102, 106.

C.    **Assurances of Oversight Hid the Defaulting Tenants' Financial Problems**

Throughout the Class Period, four of IIPR's top tenants—PharmaCann, 4Front Ventures Corp. ("4Front"), Gold Flora, LLC ("Gold Flora"), and Tilt Holdings Inc. ("Tilt") (collectively, the "Defaulting Tenants")—had mounting financial problems that would ultimately lead to a cascade of defaults that wiped out about 25% of IIPR's revenues.  By the end of the Class Period,

IIPR had 20 leases with the Defaulting Tenants and had also separately invested about $620 million in these properties. ¶26. Rental revenue from the Defaulting Tenants accounted for between 23% and 28% of IIPR's total revenue throughout the Class Period.[2] The Complaint details an extensive set of facts about each Defaulting Tenant's dire financial distress that both (i) existed during the Class Period, and (ii) would have been known to, or recklessly disregarded by, Defendants if they had, in fact, been engaged in monitoring and due diligence in the way Defendants said they were. ¶¶66-74. These facts (summarized below) come from SEC disclosures, public sources, and court filings and show that the Defaulting Tenants were near financial collapse:

*Unpaid Taxes.* Starting even before the Class Period, PharmaCann and 4Front—the two largest Defaulting Tenants—were not paying their taxes as required by law. ¶67. By the end of the Class Period, PharmaCann had nearly half a million in unpaid taxes, while 4Front owed a staggering $15,000,000. *Id*.

*Unpaid Bills.* At the same time PharmaCann and 4Front were not paying taxes, they were also unable to pay their bills, resulting in several lawsuits throughout the Class Period. ¶68. Gold Flora was experiencing the same problems. *Id*. As was revealed after the Class Period, Gold Flora and 4Front owed tens of millions of dollars in unpaid bills. *Id*.

*Going Concern Warnings.* 4Front, Gold Flora, and Tilt were warning their own investors from as early as 2023 that those tenants' auditors had substantial concerns about these companies being able to continue as going concerns. ¶69. Consistent with these "going concern" warnings, starting in 2022, these same tenants reported tens of millions of dollars in net losses and negative working capital (a measure of funds available to cover day-to-day expense, like paying rent). ¶70.

*Inability to Raise Capital.* Worse still, in the face of mounting expenses and limited cash

---

[2]      ¶¶65, 97, 104, 121, 158, 249.

flows, the Defaulting Tenants could not borrow money at reasonable rates to bridge the gap. As a result, Gold Flora, 4Front, and Tilt were only able to cover their mounting expenses through loans at astronomical interest rates of up to 40%, which only made things worse. ¶73.

In sum, the Complaint pleads a litany of contemporaneous, adverse facts about the Defaulting Tenants' finances which are unambiguous red flags that these tenants were on the brink of financial collapse. Indeed, 4Front and Gold Flora are both now in receivership and Tilt has shut down its cannabis operations.

The Complaint also alleges facts showing the Defendants knew or recklessly disregarded these red flags. *First*, the financial problems with the Defaulting Tenants were precisely the kinds of things that Defendants' "Ongoing Monitoring," and "Quarterly reviews and request for information pertaining to financial and ongoing operations," and "Meetings with tenants to talk through operations and financials" were meant to identify. ¶75. In an internally managed company, with 23 or fewer employees, and where management was responsible for due diligence, it is not credible that Defendants did not know what was going on with IIPR's tenants. ¶¶91-92, 253. Indeed, on conference calls with investors, Defendants repeatedly emphasized their rigorous monitoring process and assured investors that they were keeping a close eye on all of their tenants, stating variously that tenants' ability to pay lenders was "an issue that we are following and watching [] very closely," that IIPR was "working very closely with" its tenants, that they were "watching each of our tenants and working with them very closely," "watching all of our tenants, "monitoring all of our tenants," and "doing deep dives into every single one of our tenants, including the strongest ones and the single state operators." ¶¶157, 161, 164, 172.

*Second*, the Complaint alleges (based upon internal IIPR documents that were disclosed publicly in post-Class Period litigation) that IIPR's rental agreements required tenants to provide

8

detailed financial disclosures, including "budgets, forecast and investor materials" to the Company "within a reasonable time period before [IIPR] is required to make any filings with the SEC."  ¶75 (quoting PharmaCann lease agreement); *see also* ¶36 (detailing terms of disclosure obligations in 4Front lease agreement).  These provisions of the lease agreements ensured that Defendants would be able to fully inform themselves of the Defaulting Tenants' finances and operations *before* making any disclosures about those tenants to IIPR's investors.  ¶¶32, 76.

*Third*, PharmaCann, 4Front, and Gold Flora should have gone through IIPR's heightened pre-loan due diligence and underwriting process either just before or during the Class Period, because these tenants all entered into new leases with IIPR.  ¶¶102, 106.  Indeed, PharmaCann's February 24, 2024, lease amendment with IIPR included a cross-default provision stating that a default under any lease would trigger a default under all of PharmaCann's leases with IIPR.  ¶33.  This amendment demonstrates that as of February 24, 2024, Defendants viewed PharmaCann as a highly risky enterprise, such that IIPR needed additional protections on its leases.

**D.      Defendants Also Touted New Investments in the Defaulting Tenants**

Between February and March of 2024, Defendants invested additional money into certain of the Defaulting Tenants' properties, amended and extended certain lease terms, and signed two new leases.  Defendants announced these changes and framed them as positive developments.  This is the second category of misstatements challenged in the Complaint.  *See* ¶¶175-223.

Starting on February 26, 2024, IIPR announced that it had amended one of its lease agreements with PharmaCann to invest $16 million to help pay construction costs at a New York facility, which extended the lease term (increasing how much money it could generate for IIPR).  ¶177.  Later that day, Defendant Regin told investors "there's a tremendous amount of value in that asset in particular"—the New York facility—and "I think it sets PharmaCann up very well to take advantage of the wholesale opportunities that we're going to see."  ¶187.  IIPR touted this

new investment in financial disclosures throughout the Class Period.  *See* ¶¶187, 193, 209, 217.

IIPR also announced on February 26, 2024, that it had amended leases with 4Front, extending the duration of four leases but deferring some payments to IIPR in light of construction delays at an Illinois facility.  ¶180.  Then, in May 2024, IIPR announced it had provided 4Front with an additional $1.6 million to "round out development of 4Front's 250K square-foot production facility in Illinois" (and amended the lease agreement again).  ¶¶196, 205.  In November 2024, IIPR announced that 4Front had been unable to pay its rent for the last two months, but Defendant Regin assured investors that the additional investment was sound, stating that "we look at each of these situations individually, and we're looking to maximize value of our portfolio, and we feel very positive about the future resolution for these issues."  ¶131.  IIPR touted these changes in financial disclosures throughout the Class Period.  *See* ¶¶190, 196, 205, 211, 219.

IIPR also entered into two new leases with Gold Flora in March and May of 2024 and touted these new investments to investors.  For example, Defendant Regin said, "I don't think we can really overstate how pleased we've been with the leasing activity, not just the speed . . . but really, as you noted, the strength of the operators and the credit upgrades we feel we got in each of these cases, whether that's Gold Flora in California or [another group]."  ¶202.  The Gold Flora leases were also touted in financial disclosures.  *See* ¶¶196, 213, 221.

### E.  The Truth About the Defaulting Tenants Was Revealed Gradually

On November 6, 2024, IIPR issued a press release announcing that 4Front and Tilt (along with a third tenant) had stopped paying rent two months earlier, requiring IIPR to apply security deposits towards rent owed on six properties.  ¶¶81, 225.  Defendants hastened to tell investors that the underlying financial problems with these tenants had been resolved.  On a November 7, 2024 earnings call, in direct response to investor questions about 4Front and Tilt's ability to continue to pay rent, Defendants Gold and Smithers assured investors that the situation with 4Front

and Tilt was "unusual" and "unforeseen," and that IIPR had "been able to work through that issue with" 4Front and had "come to a very amicable and positive resolution for our shareholders and ourselves, in addition to themselves." ¶¶110, 119. Defendant Smithers told investors that IIPR did not declare default against 4Front or Tilt because IIPR only took "aggressive actions" where they "don't see a reasonable path for [the tenant] to restart paying rent," indicating that that was not the case here. ¶123. In response to another analyst, Defendant Gold downplayed the risk of future default, stating that while "every real estate sector has . . . tenants that over expand and need to retrench," "[t]he difference is we've been paid a very high adjusted rate of return for what we believe is a very—a much lower risk—risk profile." ¶128.

With IIPR's November 6, 2024, announcement of the 4Front and Tilt defaults investors began to understand that at least some of IIPR's tenants were not financially viable and IIPR's common stock dropped over 16% to close at $110.70 per share on November 7, 2024, down from a closing price of $132.34 per share at the close of the prior trading day. ¶227.

Then, on December 20, 2024, IIPR reported that PharmaCann had not paid rent on all its leases for December and that IIPR had applied security deposits to the leases to cover payment that was owed. ¶231. The default triggered the cross-default provision in PharmaCann's leases. *Id.* On December 20, 2024, following IIPR's announcement of PharmaCann's default, IIPR's common stock dropped 22.74% to close at $73.66 per share, down from $95.34 per share the day before. ¶234. Defendants again moved quickly to assure investors that any problems with PharmaCann were resolved, announcing a purported "Resolution to Default by PharmaCann" on January 30, 2025, and claiming to have "reached an agreement" to ensure PharmaCann would restart paying rent. ¶239.

But after the close of trading on March 14, 2025, IIPR announced that PharmaCann had

11

again defaulted and that IIPR was moving to evict PharmaCann. ¶242. In response to this news, IIPR's common stock dropped 7.77% to close at $64.21 per share on the next trading day, March 17. ¶243. Despite Defendants' assurance to investors in December 2024 of a "comprehensive resolution" with PharmaCann to resume rental payments, IIPR's March announcement revealed that IIPR had applied security deposits to cover PharmaCann's December and January rent and PharmaCann had only paid one month's rent before defaulting again. ¶239.

Two weeks later, on March 28, 2025, IIPR announced that it was declaring 4Front, Tilt, and Gold Flora in default for not paying rent. ¶246. IIPR further disclosed that it was looking to replace "a substantial portion of its tenant base with more financially viable long-term tenants to better position the Company for sustainable growth and improved financial performance." ¶247. On this news, IIPR's common stock price fell $9.66 per share, or 15.15%. ¶248.

In sum, as the truth trickled out to investors, IIPR's common stock dropped from $132.34 per share the day before the first 4Front and Tilt defaults were announced to close at $54.09 per share when Defendants finally admitted that "a substantial portion of [IIPR's] tenants" were not "financially viable long-term." As a result, investors lost millions.

## LEGAL STANDARD

On a motion to dismiss, the Court must "consider the complaint in its entirety," "accept all factual allegations in the complaint as true," and draw all reasonable inferences in Plaintiff's favor. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *see also Singer v. Reali*, 883 F.3d 425, 437 (4th Cir. 2018). And such a motion should be granted "only where it appears beyond a reasonable doubt that recovery would be impossible under any set of facts which could be proven." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 627 (E.D. Va. 2000). Claims of securities fraud are subject to Federal Rule of Civil Procedure 9(b) and the Private Securities

12

Litigation Reform Act of 1995 ("PSLRA").  Rule 9(b) requires that "the circumstances constituting fraud" be stated "with particularity."  Fed. R. Civ. P. 9(b).  The PSLRA requires a complaint to (i) "specify each statement alleged to have been misleading" and the "reasons why the statement is misleading," and (ii) "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter.  15 U.S.C. § 78u–4(b)(1)(B) & (b)(2)(A).  While these rules require more than bare assertions of fraud, "the elucidation of every detail of the alleged fraud" is not required.  *In re Under Armour Sec. Litig.*, 540 F. Supp. 3d 513, 519 (D. Md. 2021).

## ARGUMENT

## I.    THE COMPLAINT PLAUSIBLY ALLEGES SECURITIES FRAUD CLAIMS

A securities fraud claim under Section 10(b) of the Securities Exchange Act of 1934 has six elements:  "(1) that the defendant made a false or misleading statement or omission of material fact; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase of a sale or security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 513 (D. Md. 2022).  Defendants only challenge the first two elements, falsity and scienter.  *See* Br. at 12-28.[3]

### A.    The Complaint Plausibly Alleges Two Categories of Misstatements

To plead falsity, a complaint must "alleg[e] that the defendant acted deceptively, i.e., that the defendant engaged in deceptive acts such as misstatements" of material fact.[4]  *Singer*, 883 F.3d at 439.  But a plaintiff is not required to "prove absolute, incontrovertible falsity."  *In re Genworth*

---

[3]    In passing, Defendants assert the Complaint "fails to establish reliance" (element four) or that the misstatements "proximately caused Plaintiff's purported damages" (element six).  Br at 12.  There is no authority or argument to support these claims and the Court should disregard them.  *Schulman v. Axis Surplus Ins. Co.*, 90 F.4th 236, 245 n.5 (4th Cir. 2024) ("A party waives an argument by failing to . . . to develop its argument—even if its brief takes a passing shot at the issue.")  Defendants are also wrong.  The Complaint pleads the "presumption of reliance" applicable to securities cases.  ¶¶261-65; *see also Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988) ("presumption of reliance" applies to securities class actions).  There are also 28 paragraphs explaining how revelations of the truth concealed by the misstatements caused Plaintiff's losses.  ¶¶224-51.

[4]    Defendants' Motion does not argue (nor could it) that the misstatements were immaterial.

*Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 771 (E.D. Va. 2015).  Rather, on a motion to dismiss, a plaintiff need only allege "*sufficient facts* to support a *reasonable belief* in the allegation that a defendant's statement[s]" were misstatements.  *Id.* at 771.

There are two types of misstatements at issue here—"false statements or lies," and misleading statements or "half-truths" that "omit[] a material fact necessary to make the statements made not misleading."  *See*, *e.g.*, *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024).  The two categories of misstatements in the Complaint are both the kinds of "deceptive acts" that courts routinely find violate Section 10(b).

*First*, the Complaint challenges Defendants' repeated assurances to investors of "rigorous" due diligence on, and "ongoing monitoring" of, tenants.  *See* ¶¶86-174.  Defendants told investors that they tracked the "credit quality" and financial health of "all of [its] tenants" "on an ongoing basis" to "ensure that meet [IIPR's] strategic and financial criteria."[5]  For example, IIPR's quarterly investor presentation told investors the Company conducted "*detailed*" reviews and "*ongoing monitoring*," including "[q]uarterly reviews and request for information pertaining to ongoing operations and all properties" and "[m]eetings with tenants to talk through operations and financials."  ¶¶95, 100.  Similarly, the Company's SEC filings stated that IIPR "*rel[ied] on management to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations, and prospects*" and that IIPR was "*evaluat[ing] the credit quality of our tenants and any guarantors on an ongoing basis*."  ¶¶90-91.  And investment analysts routinely asked about the financial health of IIPR's tenants on conference calls and Defendants always claimed to be monitoring the tenants.[6]  For example, when asked about the "risk for [IIPR's] tenant base over the course of the next year," Defendants Gold and Regin stated that they

---

[5]        ¶¶87, 89, 114, 119, 168, 172.
[6]        ¶¶102-03, 106, 109-110, 113-14, 118-19, 123, 127-28, 131, 134-35, 156-57, 160-61, 164, 167-68, 171-72.

14

were "monitoring all of [its] tenants" "very closely," "following and watching [their tenants' debt maturity with outside lenders] very closely," "watching each of our tenants and working with them very closely."  ¶¶157, 161, 164, 168.  Similarly, when asked if IIPR "had any reassessments of credit of tenants that before you would have ranked highly and now, . . . they're current, and they're fine, but we may want to reduce exposure going forward?" Defendant Gold responded that "we're watching all of our tenants.  We are doing deep dives into every single one of our tenants, including the strongest ones and the single state operators," ¶¶171-72; *see also* ¶¶87, 89, 91, 95.  Regin and Gold also told investors that "we feel very good about our current tenant roster of our 30 tenants" and characterized their tenants as having a "much lower risk—risk profile."  ¶¶110, 128.

These statements are alleged to be (i) "false" to the extent that IIPR "did not have a rigorous tenant-oversight process"; or, in the alternative, (ii) "materially misleading" half-truths to the extent that "such a process did exist but Defendants failed to disclose to investors what they knew about the Defaulting Tenants" and their dire financial positions, which misled investors as to the risk of investing in IIPR.  E.g., ¶¶87, 88.  As shown herein, it is reasonable to infer that Defendants' oversight misstatements were either false or misleading half-truths because the numerous red flags about the Defaulting Tenants (¶¶67-76) are precisely what Defendants said their "robust due diligence" and "ongoing monitoring" was designed to detect.

Courts routinely hold that allegations like these are sufficient to plead falsity.  For example, in *Genworth*, 103 F. Supp. 3d at 773, the court found that assurances of a "broad, intensive review" of a business line were misleading for omitting that defendants did not conduct such a review.[7]

---

[7]    *See also In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 447-48 (D. Del. 2014) (statements about (i) "rigorous" underwriting and "regular[] review of all past due loans" to "mitigate credit risk"; and (ii) that "portfolio has held up well" when it was "experiencing significant deterioration" misleading because they "misrepresent[ed] the financial health" of the company); *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1072 (C.D. Cal. 2008) (statements that defendant had "stringent underwriting standards for riskier loans," "actively managed credit risk," and "only retained high credit quality mortgages" false and misleading for failure to disclose magnitude of risk of default for loans not up to underwriting standards).

15

Similarly, in *In re James River Gr. Holdings, Ltd. Sec. Litig.*, the court found an insurance company's assurance that "it monitored reserves, estimated losses for each individual claim, and based those estimate in part on historical information" was misleading where the plaintiff alleged "[d]efendants received information regarding the reserve process . . . including audit reports indicating the systemic under-reserving" of claims. 2023 WL 5538218, at *11 (E.D. Va. Aug. 28, 2023). So too here. Like in *Genworth* and *James River*, Defendants told their investors that they were monitoring whether IIPR's tenants could pay rent and misrepresented that risk by either not engaging in any monitoring or affirmatively misrepresenting the red flags at the Defaulting Tenants by failing to disclose them.[8] This was fraud.

*Second*, the Complaint challenges Defendants' touting of new investments in the Defaulting Tenants. ¶¶175-223. For example, Defendant Regin told investors "there's a tremendous amount of value in" PharmaCann's property, ¶187; that an additional investment in 4Front was sound, ¶131; and described the new leases with Gold Flora as a "credit upgrade" because of the "strength of the operator[]." ¶202. Defendants also heralded additional investments of $16 million into PharmaCann and $1.6 million into 4Front and two new leases with Gold Flora.[9] The Complaint alleges that this category of misstatements was misleading (but not false) as they "misled investors into believing that additional investments in the [Defaulting Tenants] were beneficial to IIPR because it would generate additional rental revenues" when, in reality, the Defaulting Tenants were on the verge of financial collapse and would not be able to pay rent, which meant that IIPR was simply throwing good money after bad. E.g., ¶¶179, 197, 203.

---

[8]     These red flags are not remotely like *Handal v. Innovative Industrial Properties, Inc.*, where the Third Circuit addressed allegations that Defendants' oversight process missed that IIPR "was defrauded of millions of dollars by one of its tenants." 2025 WL 2922871, at *1 (3d Cir. Oct. 15, 2025). Here, there is no suggestion that the Defaulting Tenants concealed their finances or defrauded IIPR. Indeed, that Defendants' "due diligence" and "monitoring" failed to detect this pre-Class Period fraud demonstrates they were on notice that those processes were deficient.

[9]     ¶¶177, 180, 184, 187, 190, 194, 196, 198, 202, 205, 209, 211, 213, 217, 219, 221.

Courts also routinely hold that these kinds of allegations are sufficient to plead a misleading statement under Section 10(b).  *See In re Emergent BioSolutions Inc. Sec. Litig.*, 2023 WL 5671608, at \*15 (D. Md. Sept. 1, 2023) (statements touting upgrades to facility misleading for failing to disclose "persistent, serious issues" that reasonable investor would have found material); *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat., PLC*, 423 F. Supp. 2d 348, 359 (S.D.N.Y. 2006) (statements that "[w]e've done a very thorough review . . . of our entire . . . portfolio" and "we're very happy with the present situation" false and misleading where value of two assets in defendants' portfolio had dropped significantly and Defendants remained silent about the extent of their exposure to these losses).  Defendants were obligated to reveal the truth of the Defaulting Tenants' finances, which they knew or recklessly disregarded: that PharmaCann, 4Front, and Gold Flora were in serious financial distress and had already stopped paying their other bills.[10]  These omissions were particularly significant in the context of Defendants' repeated statements throughout the Class Period that new investments were subject to "rigorous" due diligence. E.g., ¶¶87, 95.  *See In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 504 (E.D.N.Y. 2025) (statements "made repeatedly in an effort to reassure the investing public" material).

In the face of overwhelming evidence of falsity, Defendants fall back on a grab bag of erroneous arguments.  *See* Br. at 13-20.  *First*, Defendants argue there are no "facts suggesting that IIPR did not do due diligence" because the Complaint "cites neither confidential witness, nor internal documents, nor any contemporaneous facts."  Br. at 13-14.  Defendants are wrong.  To start, pleading securities fraud requires neither confidential witnesses nor internal documents.  *See*

---

[10]     For example, between February 26 and November 7, 2024, Defendants repeatedly touted IIPR's extension of 4Front's lease and an additional $1.6 million investment.  *See ¶¶*180, 190, 196, 205, 211, 219.  During this same period, 4Front reported negative working capital, faced collection efforts from three vendors, and was issued liens for not paying taxes.  *See* ¶¶67-70.  The same scenario was playing out with PharmaCann and Gold Flora. *Compare ¶¶*177, 184, 187, 193, 209, 217 (touting $16 million investment in PharmaCann and lease extension) *with* ¶67 (tax liens on PharmaCann); *also compare* ¶¶198, 202, 213, 221 (touting new Gold Flora leases) *with* ¶¶68-70, 73 (Gold Flora's negative working capital, difficulties getting loans to cover debt, and unpaid bills of over $6 million).

17

*Tchatchou v. India Globalization Cap. Inc.*, 2021 WL 307415, at \*8 (D. Md. Jan. 29, 2021) (falsity well-pled without confidential witnesses); *Keeney v. Larkin*, 306 F. Supp. 2d 522, 528 (D. Md. 2003) (no requirement to plead "detailed evidentiary matter" in defendants' exclusive possession).

More importantly, the Complaint *does allege* contemporaneous facts—including from IIPR's leases with PharmaCann and 4Front (¶¶32, 36, 75)—which show that if IIPR had been doing due diligence and monitoring as it claimed, it would have uncovered scores of red flags at the Defaulting Tenants. A review of the tenants' "payment history data" and "credit quality" alone would have shown that PharmaCann and 4Front each owed nearly $500,000 and $15 million in unpaid taxes and that Gold Flora and 4Front owed millions of dollars to vendors for unpaid invoices even before the start of the Class Period. ¶89. Likewise, a "[d]etailed review of financial statements" and "quarterly reviews and requests for information pertaining to" the tenant's financial operations would have revealed SEC disclosures filed by Tilt, 4Front, and Gold Flora reporting tens of millions of dollars in net losses each year, as well as the going concern warnings from their auditors. ¶95. A review of "cash balance on hand today" would have shown that at least Tilt, 4Front, and Gold Flora had very little cash on hand, because they had been reporting negative working capital each year since 2022. *Id.* And because the Defaulting Tenants were unable to secure loans at reasonable rates, they did not have a "[h]istory of successful capital raising," either. *Id.* And the Complaint alleges—based upon internal Company documents—that IIPR's leases required tenants to disclose this information to Defendants. ¶¶36, 75-76.

*Second*, Defendants assert (without supporting authority) that the Complaint "does not challenge as factually inaccurate" any of the alleged misstatements. Br. at 15. But it is black-letter law that "literal accuracy is not enough," as Defendants "must as well desist from misleading investors by saying one thing and holding back another." *Macquarie*, 601 U.S. at 263 (quoting

18

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015)). And in all events, the Complaint *does allege* both that the first category of misstatements was "false" (or alternatively, misleading) and "that Defendants withheld actual knowledge" (Br. at 16) of the Defaulting Tenants' red flags (e.g., ¶¶150, 162).[11]

*Third*, Defendants claim (again, without supporting authority) that IIPR's risk warnings meant investors could not have been "misled . . . into thinking that it was impossible that IIPR's tenants would default." Br. at 15. This is a red herring. All agree that investors understood cannabis operators were risky—but that is exactly why Defendants' "robust due diligence" and "ongoing monitoring" was so important to investors because those were the steps Defendants said they were taking to mitigate that risk. Defendants' repeated assurances of tenant oversight and touting new investments in the Defaulting Tenants misled investors into believing that investing in IIPR was less risky than it actually was by concealing the financial problems with the Defaulting Tenants that would ultimately wipe out 25% of IIPR's revenues. *See, e.g.*, *In re Emergent*, 2023 WL 5671608, at \*20; *Abbey Nat.*, 423 F. Supp. 2d at 359.[12]

*Fourth*, Defendants wrongly accuse Plaintiff of "distort[ing] Defendants' words." Br. at 16-20. Plaintiff has distorted nothing. The Complaint sets out the challenged statements verbatim and then explains *why* those statements were materially false or misleading. That is what the PSLRA requires. *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 368 (E.D.N.Y. 2022) (plaintiff must "identif[y] specific statements" and provide a "a list of reasons why those

---

[11]    Defendants' argument that a "serious investor" who understood IIPR's "accounting methodology" would have understood the "inherently risky business profile" of IIPR's tenants, Br at 15-16, also misses the point. Even if investors knew and understood that IIPR was engaged in a "risky business," it does not excuse Defendants from misrepresenting the steps taken to mitigate those risks, and Defendants cite no authority holding otherwise.

[12]    *See also Roofers Local No. 149 Pension Fund v. Amgen Inc.*, 751 F. Supp. 3d 330, 348 (S.D.N.Y. 2024) (failure to disclose "magnitude of the Company's potential liability to the IRS" misleading because it "did not reveal the information necessary . . . to make a proper assessment of the alleged risks.").

statements are allegedly misleading."). Defendants' argument is also belied by their own Exhibit 17 (Dkt. No. 60-21), which purports to identify where "Plaintiff inaccurately quotes statements." Br. at 16. But the accurate "text of [each] statement" that Defendants claim was "distorted" is "copied directly from the Consolidated Class Action Complaint," and Defendants have identified nothing that Plaintiff actually misquoted. Dkt. No. 60-21 at 3 n.1.[13]

As for Defendants' argument that the Complaint pleads "no facts" or is grounded on "editorial manipulation," the Court need only look at the examples in Defendants' Brief to see this is wrong. Defendants claim that it is an unsupported "leap of logic" to conclude that Defendants were monitoring all of IIPR's tenants. Br. at 17. But no leap is required. Defendant Gold, for example, told investors "*we have said that we are monitoring <u>all</u> of our tenants, and we are monitoring <u>all</u> of our tenants*." ¶168. Similarly, Defendants wrongly claim that "nothing ties . . . together" Gold's statement "that IIPR had received a 'high adjusted rate of return for . . . a much lower risk [] profile" and the idea that IIPR was performing due diligence and monitoring. Br. at 17. But how could Gold "determine what that 'risk profile' actually was as compared to the potential 'rate of return'" without the Company doing the due diligence and monitoring necessary to determine that risk? ¶129. And this statement was materially false to the extent that Defendants had not done the oversight needed to assess the risks, or materially misleading for not disclosing what Gold knew about the Defaulting Tenants that would increase IIPR's "risk profile." *Id.*

*Finally*, Defendants claim they "had no obligation to disclose any actual knowledge [they] might have had about tenants' finances." Br. at 20. Not so. Defendants had a duty to disclose all facts "necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011).

---

[13] Since Plaintiff's allegations of falsity are also not contradicted by any of Defendant's documents, Plaintiff's Complaint is nothing like *Phillips v. LCI Intern., Inc.*, 190 F.3d 609, 615-16 (4th Cir. 1999). *See* Br. at 17.

Thus, "[e]ven when there is no existing independent duty to disclose information, once a [defendant] speaks on an issue or topic, there is a duty to tell the whole truth." *Singer*, 883 F. 3d at 440; *see also Macquarie*, 601 U.S. at 264 (Rule 10b-5 "requires disclosure of information necessary to ensure that statements already made are clear and complete"). Once Defendants chose to speak about their due diligence, ongoing monitoring, and new investments in the Defaulting Tenants, those subjects trigged "a duty to tell the whole truth" about the red flags at the Defaulting Tenants. And Defendants cannot hide behind one self-serving quote from Defendant Smithers claiming that "confidentiality agreements" prohibited such disclosure. Br. at 20. This is wrong as a matter of law and, in all events, a factual dispute that cannot be resolved on a motion to dismiss where the purported "confidentiality agreements" are not before the Court. *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *13 (S.D.N.Y. Sept. 30, 2021) (statement still misleading when failed to disclose confidential information that a reasonable investor would "certainly consider" material because "even if the [information] itself was confidential, upon choosing to speak, one must speak truthfully about material issues.").

## B.   Defendants' Misstatements Are Actionable

Defendants assert that certain misstatements were non-actionable as either protected "forward-looking statements" or puffery. Br. at 20-21. None of the statements identified by Defendants are protected by the PSLRA's Safe Harbor, as it applies "to forward-looking statements only, and not to material omissions or misstatements of historical fact." *In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 625 (D. Md. 2010); *see also Malone v. Microdyne Corp.,* 26 F.3d 471, 479-80 (4th Cir. 1994) ("Misstatements or omissions regarding actual *past* or *present* facts are far more likely to be actionable than statements regarding projections of *future* performance."). So this argument fails out of the gate.

Defendants pluck one sentence—"We feel very confident in the Illinois Market"—out of

21

a two-paragraph misstatement (¶131) and argue Plaintiff is alleging that "IIPR's view[s] on how certain states would perform" are "fictionally portray[ed] . . . as guarantees."  Br. at 21.  But this contorts the Complaint.  Paragraph 131 focuses on Regin's statements about (i) prior 4Front investments ("we did make an investment in the Illinois facility" and "have four individual leases with [4Front]"); (ii) his understanding of 4Front's finances ("significant delays in construction, which understandably had an impact"); (iii) Illinois being "one of the top 5 markets in the U.S.";  (iv) the Company "look[ing] at each" tenants' "situations individually"; and (v) assurances that IIPR was then "looking to maximize value of our portfolio" and was then "very positive about the future resolution" of 4Front issues.  ¶131.  Each of these are statements of present or historical facts.  The attack on paragraph 150 (Br. at 21) is even farther afield because Defendants are quoting Plaintiff's explanation of a misstatement, not anything they actually said about future performance.

But even if some of the misstatements were forward-looking (and they are not), they were not accompanied by meaningful cautionary language.  *See In re Lab. Corp. of Am. Holdings Sec. Litig.*, 2006 WL 1367428, at \*5 (M.D.N.C. May 18, 2006) (no safe harbor protection without cautionary language that "convey[s] substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement.").  The boilerplate language cited by Defendants—that "actual results may differ materially due to a variety of risks, uncertainties and other factors" (Br. at 21)—does not address the specific risk at issue, namely, the Defaulting Tenants' teetering finances, and so is inadequate.  *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) (cautionary language "inadequate to shield defendants from liability for failing to disclose known specific risks.").

Likewise, none of the three misstatements identified by Defendants are inactionable "corporate optimism" or puffery.  Br. at 22 (citing ¶¶110, 187, 202).  Here, the alleged

22

misstatements are "reasonably understood to rest on a factual basis." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991). Each statement was made about a specific set of tenants, and each statement characterized the strength of IIPR's investment. *See, e.g.*, *In re Lucent Tech., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 559 (D.N.J. 2002) ("strong customer acceptance" not puffery because "reasonable investor likely would consider material any information relating to customer acceptance of key products"). Defendant Regin was specifically referring to IIPR's "current tenant roster of our 30 tenants" when he made the statement that "we really feel that we have some of the best operators in the industry." ¶110. Likewise, Regin's statement, "we very much like the position that our tenant partners are in the state," was in direct response to a question about IIPR's "incremental investments over the last few months in New York." ¶187. And Regin's statement about "the strength of the operators" was in reference to two specific tenants, Gold Flora and Luma, in the context of touting new leases with these tenants as "credit upgrades." ¶202. The health of IIPR's tenants was a key question for investors, so these statements are not so "obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance" as to be inactionable puffery. *Singer*, 883 F.3d at 440.

## C.     The Complaint Plausibly Alleges Scienter

To plead scienter, a plaintiff must allege a strong inference "that the defendant acted with a 'mental state embracing intent to deceive, manipulate, or defraud." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015). "Allegations of reckless conduct can satisfy the level of scienter necessary to survive a motion to dismiss." *Id.* Recklessness is conduct that is "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Singer*, 883 F.3d at 443. An inference of scienter "need not be irrefutable" "or even the 'most plausible of competing

23

inferences,'" and "'smoking-gun'" evidence is not required. *Klein v. Altria Grp, Inc.*, 525 F. Supp. 3d 638, 665 (E.D. Va. 2021) (quoting *Tellabs*, 551 U.S. at 324). Scienter allegations should be accepted as true and viewed holistically, not scrutinized "in isolation" to determine if "a reasonable person [would] deem the inference of scienter at least as strong as the opposing inference." *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 968 (E.D. Va. 2020).

Here, the strong inference of scienter is a straightforward syllogism: (1) Defendants repeatedly told investors that they were engaged in oversight of IIPR's tenants through due diligence and ongoing monitoring; (2) there were myriad red flags with the finances at four of IIPR's largest tenants, which showed that these tenants were at high risk of default; (3) IIPR's "robust due diligence" and "ongoing monitoring," as the process was explained by Defendants, should have detected these red flags; therefore, it is plausible to infer either (a) IIPR was not doing the oversight it represented to investors, and Defendants' statements like "*we have said that we are monitoring all of our tenants, and we are monitoring all of our tenants*" (¶165) were intentionally meant to deceive; or (b) the oversight did happen and Defendants either chose not to share the known red flags with investors or disregarded those red flags. In either situation, (a) or (b), the Complaint pleads a strong inference of scienter.[14] *In re Emergent BioSolutions Inc. Sec. Litig.*, 2023 WL 5671608, at *22 (D. Md. Sept. 1, 2023) ("The presence of 'red flags,' coupled with the 'breadth and gravity' of a company's problems" provides "substantial weight to an inference" of scienter and "[t]he more significant the error the stronger the inference it supports.").

The facts underlying this syllogism are as follows: IIPR stated that it "*rel[ied] on our*

---

[14]    Defendants are wrong that the Complaint "does not outright state" that Defendants "recklessly did not conduct any due diligence" or that the "due diligence was . . . recklessly flawed." Br. at 26. *See*, *e.g.*, ¶99 (alleging scienter because Defendants "either knew or recklessly disregarded" that statements touting "due diligence" and "monitoring" were false or misleading). And Defendants' competing inference that this was all business as usual and some tenants "paid rent for many years" and "some defaulted" (Br. at 29), is certainly not *more* compelling.

*management team to perform due diligence investigations* of our potential tenants . . . and their properties, operations, and prospects." ¶91. Each of the Individual Defendants was a part of IIPR's management during the Class Period. ¶¶14-19, 98. Defendants Gold, Smithers, Regin, and Hastings also made specific statements about IIPR's oversight of tenants and/or specific investments in the Defaulting Tenants.[15] Given what IIPR told investors "management['s]" role was in tenant oversight, and the specific statements of the individuals about their involvement in this process, it is clear the Individual Defendants were personally involved in the oversight process. This oversight, according to Defendants, included, among other things, "Ongoing monitoring," of tenants' "cash balance on hand today," "[e]valuation of financial projections," "[d]etailed review of financial statements, strategic initiatives, and growth plans," "[q]uarterly reviews and requests for information pertaining to financials and ongoing operations," and "[m]eetings with tenants to talk through operations and financials." *E.g.*, ¶95. Thus, if this process happened, then the Individual Defendants would have learned that the Defaulting Tenants were in serious financial distress, including that they were behind on taxes, could not pay vendors, did not have cash to fund their day-to-day operations, and could not effectively borrow money to cover expenses.[16] These allegations comfortably support an inference of scienter. *See James River*, 2023 WL 5538218, at \*19 (10-K filings stating that "senior management" conducted reviews "at least quarterly" of reserves supported scienter of executive defendants); *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at \*9 (D.S.C. July 25, 2016) (allegation that defendants were part of acquisition team supported that they "necessarily had access to confidential information regarding the state of the acquisition strategy" "[b]y nature of these positions").

---

[15]     *See*, *e.g.*, ¶¶106, 114, 119, 135, 161, 164, 168, 172, 190, 202, 205.

[16]     So Defendants are incorrect that the Complaint's scienter allegations rest solely on "general facts about the Individual Defendants' employment and/or roles at the Company." *See* Br. at 23.

The best response Defendants muster is claiming there can be no inference of scienter because Plaintiff does not "allege that Defendants withheld actual knowledge that IIPR's tenants *would default*." Br. at 25. "But to adequately allege scienter, the Plaintiffs do not need to allege that [Defendants] could have predicted that this particular incident would occur in the future. They need only allege that the Defendants were severely reckless in omitting material facts that could mislead investors" about the event's likelihood. *In re Emergent*, 2023 WL 5671608, at \*24.[17]

The Complaint's strong inference of scienter is further supported by additional facts. *First*, the content of the misstatements supports the inference of scienter. That Defendants claimed to be knowledgeable about how IIPR was "watching each of our tenants and working with them very closely," and doing "deep dives into every single one of our tenants" (¶¶164, 172), supports that they "possessed knowledge of the true state of affairs" and knew that their representations were false or misleading. *See Genworth*, 103 F. Supp. 3d at 785 (assertions of "intimate involvement" in a business line supported inference that defendants "possessed knowledge of the true state of affairs" of that business); *In re Comput. Sciences Corp. Sec. Litig.*, 890 F. Supp. 2d 650, 669 (E.D. Va. 2012) (statements that contract was one that defendant "watch[ed] most closely" supported scienter); *James River*, 2023 WL 5538218, at \*19 (statements that defendants were doing a "deep dive" and "watching [reserves] very carefully and very closely" supported scienter); *Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at \*12 (D. Del. June 14, 2011) (statements that defendants "closely monitor[ed]" advertiser usage supported scienter). *Second*, the context in which many of the misstatements were made—repeatedly, and in response

---

[17]    Nor does Plaintiff "stack inference upon inference" to plead scienter. Def. Br. at 25. Unlike in *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, scienter here is based on far more than "the mere fact that Defendants conducted due diligence." 75 F.4th 232, 243 (4th Cir. 2023). The Complaint pleads numerous additional factors that, viewed holistically, support a strong inference that Defendants knew, or were reckless in not knowing, that the Defaulting Tenants were at high risk of default, particularly since, unlike in *Syneos*, they had the specific tenant financial information that would have alerted them of the risk. *See James River*, 2023 WL 553828, at \*19.

26

to specific questions about oversight of tenants—supports the inference of scienter.[18]  *See Inst. Inv. Grp. v. Avaya Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) (scienter found where defendant "explicitly denied the existence of [] discounting in response to repeated questions about pricing by analysts"); *City of Southfield Fire & Police Ret. Sys. v. Hayward Holdings, Inc.*, 2025 WL 1577315, at *16 (D.N.J. June 4, 2025) (misstatements in responses to "direct and repeated questions" supported scienter); *KBC*, 2016 WL 3981236, at *9 (false and misleading responses to repeated questions from analysts asking about key business operations bolstered scienter).

*Third*, the inference of scienter is further buttressed because the alleged misstatements dealt with the "core operations" of IIPR's business.  *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 890 (4th Cir. 2014) (misleading statements that relate to a company's "core business" or core operations "are relevant to the court's holistic analysis of scienter."); *Novavax*, 645 F. Supp. 3d at 527.  IIPR's revenues depended on the ability of a small number of tenants to consistently pay rent, so the state of those tenants' finances was critical to IIPR's bottom line.  Thus, the alleged misstatements—about the thoroughness of IIPR's oversight of tenants' finance—go to the heart of IIPR's core operations, and further support an inference that the Individual Defendants knew or recklessly disregard the risks posed by the Defaulting Tenants.  *See Genworth*, 103 F. Supp. 3d at 784; *Novavax*, 645 F. Supp. 3d at 527-28 (vaccine that was "critical to [the company's] success" made it more plausible that Defendants "were aware of the facts underlying" the alleged concerning vaccine); *KBC*, 2016 WL 3981236, at *9.[19]

*Finally*, the Complaint also offers a motive for why at least three of the Individual

---

[18]    ¶¶113-14, 118-19, 127, 131, 135, 160-61, 164.

[19]    Additionally, IIPR's small size—only 22 to 23 full-time employees (¶253)—makes it more likely that the Individual Defendants were aware of any problems.  *See De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *36 (D.N.J. Dec. 31, 2018) (from "closeness of the connection to [Defendant's] core operations and the relative [small] size of the company" it is inferable that management was "making themselves aware of" customer problems).

27

Defendants would mislead investors, which further supports an inference of scienter.  The "desire for personal financial gain" provides a motive to engage in fraud and weighs in favor of scienter (but is not a required showing).  *Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d at 966.  Defendants Gold, Smithers, and Hastings were granted Performance Share Unit ("PSU") awards before the start of the Class Period that would vest during the Class Period.  ¶¶256-58.  If Defendants were successful in keeping IIPR's stock price up, they stood to receive large *cash* payments from back dividends on the PSU's they had already been granted, in addition to more shares in IIPR.  *Id*.; *see In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at \*15 (D.N.J. Dec. 6, 2018) (timing of vesting of defendants' PSUs supported scienter even though "PSUs were not technically exercised or sold").  As an added motive, Gold, Smithers, and Hastings did not receive these bonuses in the year before the Class Period started because the defaults at Kings Garden and Parallel, among other things, caused IIPR's stock price to decline.  ¶259.  Defendants' rejoinder—that this cannot be a motive because nobody "received any stock award" (Br. at 25)—misses the mark.  "The fact that a gamble . . . fails is not inconsistent with" scienter.  *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing").

## II.    THE COMPLAINT IS NEITHER PROLIX NOR IMPROPERLY PLED

Defendants attack the length and writing style of the Complaint on the grounds of "prolixity" and "group pleading."  Br. at 9-12.  This argument rests on a misreading of the Complaint and applicable law.  In fact, the Court can disregard Defendants' "prolixity" argument entirely because Plaintiff received leave to "file a complaint that shall not exceed 107 pages" "for good cause shown," and with Defendants' consent.  Dkt. No. 53.

Defendants seek to end run the Court's prior order by asserting that the Complaint is nonetheless too repetitive and lacks citations and exhibits.  Br. at 10-12.  But Defendants cite no

28

authority to support these arguments, presumably because dismissal under Rule 8 "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 311 (S.D.N.Y. 2005) (declining to dismiss 368-page page securities fraud complaint because it did not "overwhelm the defendants' ability to understand or to mount a defense"). That is not the case here. The Complaint identifies each misstatement, highlights the exact portion challenged, explains why those statements were false and misleading, states the precise facts giving rise to an inference of scienter—all as required by the PSLRA—and in doing so "fulfill[s] the purpose of Rule 8 by putting Defendants on notice of the true substance of the claims against them." *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014).[20]

And Defendants' Motion belies any claim that more citations or exhibits are required by attaching *over 700 pages* of exhibits. (Dkt. No. 60). Exhibits 1-18 are copies of the SEC filings, transcripts, and other statements at issue in this case, which shows Defendants are on notice.

Defendants' "group pleading" argument (Br. at 11-12) is even more tenuous. The Complaint does not "attribute certain statements to Individual Defendants who did not make them." *See* Br. at 11. The Complaint's allegations attribute each misstatement to a specific Defendant or Defendants. *See*, *e.g.*, ¶¶103, 123, 128 (attributing alleged misstatements to Regin, Smithers, and Gold, respectively); ¶91 (attributing alleged misstatements in IIPR's 10-K to Smithers and Hastings who certified the filing). Each Defendant is liable under for the specific misstatements attributed to them, and each Defendant is liable as a control person because they had the power to "control public statements about IIPR." ¶280. No more is required. *Jeld-Wen*,

---

[20] The cases Defendants cite are inapposite as the complaints were not subject to the PSLRA. *See* Br. at 12 (citing *Kitchings v. Integral Consulting Servs., Inc.*, 2021 WL 3418838 (D. Md. Aug. 5, 2021); *Plumhoff v. Central Mort. Co.*, 286 F. Supp. 3d 699 (D. Md. 2017); *Jianqing Wu v. TrustPoint Int'l*, 2015 WL 13091378 (D. Md. Oct. 5, 2015); *Arnold v. CitiMortgage, Inc.*, 578 F. Supp. 2d 801 (D. Md. 2008)).

496 F. Supp. 3d at 967 (no group pleading where plaintiffs "specifically identified false or misleading statements made by the defendants.").

### III.    THE COMPLAINT ADEQUATELY ALLEGES A CONTROL PERSON CLAIM

"Control person liability" under § 20(a) requires only allegations of (i) a primary violation under § 10(b); and (ii) "control by the defendant over the primary violator." *Jeld-Wen*, 496 F. Supp. 3d at 971.  A heightened pleading standard does not apply.  *Id.* at 972.  "[D]etermining whether an individual is a control person presents a complex factual question," and "is not ordinarily subject to resolution on a motion to dismiss." *Black v. Martek Biosciences Corp.*, 2006 WL 8435572, at *7 (D. Md. June 14, 2006).  Here, Plaintiff alleges (i) a primary violation, (ii) that all the Individual Defendants were part of IIPR's "senior management team," (iii) had the power and ability to "control public statements about IIPR," (iv) made numerous public statements on behalf of the Company, and (iv) made misleading statements, including in SEC filings.  *See*, *e.g.*, ¶¶93, 98, 105, 108, 116, 151, 182, 200, 215, 280.  These allegations plead Defendants' liability under § 20(a).  *See*, *e.g*., *Martek*, 2006 WL 84345572, at *7 (that defendants signed actionable SEC filings, controlled contents of public documents, and made public statements sufficient to plead control).

**CONCLUSION**

For the foregoing reasons, Defendants' Motion should be denied.[21]

---

[21]    If the Court grants the Motion, Plaintiff requests leave to amend.  *See Sciolino v. City of Newport News, Va.*, 480 F.3d 642, 651 (4th Cir. 2007) ("Leave to amend shall be freely given when justice so requires.").

DATED:  October 21, 2025          Respectfully submitted,

**ABATO, RUBENSTEIN AND ABATO, P.A.**

*/s/ Corey Smith Bott*
Corey Smith Bott (Bar No. 25673)
Shauna Barnaska (Bar No. 16755)
809 Gleneagles Court, Suite 21286
Telephone: (410) 321-0990
Fax: (410) 321-1419
csbott@abatolaw.com
sbarnaskas@abatolaw.com

*Local Counsel for Lead Plaintiff City of Birmingham Retirement and Relief System*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Jacob L. Lieberman (admitted *pro hac vice*)
Jessica M. Casey (Bar No. 31720)
156 S. Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Fax: (860) 537-4432
jlieberman@scott-scott.com
jcasey@scott-scott.com

Susan Hu (admitted *pro hac vice*)
Lana V. Levin (admitted *pro hac vice*)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Fax: (212) 223-6334
shu@scott-scott.com
llevin@scott-scott.com

*Counsel for Lead Plaintiff City of Birmingham Retirement and Relief System*