IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ALAIN GIRAUDON, individually and on behalf of all others similarly situated, | * | |
| | * | |
| Plaintiffs, | | |
| | * | Civil Action No. GLR-25-182 |
| v. | | |
| | * | |
| INNOVATIVE INDUSTRIAL PROPERTIES, INC., et al., | * | |
| | | |
| Defendants. | * | |

\*\*\*

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Innovative Industrial Properties, Inc. ("IIPR"), Alan Gold, Paul Smithers, David Smith, Benjamin C. Regin, and Catherine Hastings' (collectively, "Defendants") Motion to Dismiss (ECF No. 60). The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2025). For the reasons set forth below, the Court will grant the Motion.

## I.    BACKGROUND

This litigation arises from alleged violations of the Securities Exchange Act of 1934 ("SEA"). (Am. Compl. ¶ 1, ECF No. 50). Lead Plaintiff City of Birmingham Retirement and Relief System ("Birmingham") brings this action individually and on behalf of all others who acquired IIPR securities between February 26, 2024, and March 28, 2025, (the "Class Period"). (Id. at 4).[1]

---

[1] Unless otherwise noted, citations to page numbers refer to the pagination assigned by the Court's Case Management/Electronic Files ("CM/ECF") system.

## A.    Factual Background[2]

IIPR is a publicly traded real estate investment trust that invests in and rents properties to state-licensed cannabis companies, primarily. (Id. ¶¶ 13, 21). Via sale-leaseback transactions, IIPR purchases properties from these companies, then leases those properties back to the companies. (Id. ¶ 56). The tenant-companies pay rent monthly, and a portion of the rent proceeds—IIPR's primary source of income—goes to IIPR's investors as dividends and stock buybacks. (Id. ¶¶ 2, 22).

IIPR's focus on the cannabis industry involves some risk. Most significantly, the sale of recreational cannabis remains illegal under federal law, exposing IIPR's tenants to unfavorable tax treatment and lower profitability. (Id. ¶¶ 57–58). IIPR also has acknowledged some recent industry drawbacks: declining cannabis prices; increased labor and production costs; labor shortages; and "global supply chain issues." (Id. ¶ 59). Despite these risks, Defendant Gold—IIPR's co-founder and Executive Chairman, (id. ¶ 14)—stated that the sale-leaseback model has produced "above average returns" for IIPR, (id. ¶ 57). Indeed, the federal illegality of selling recreational cannabis precludes cannabis companies from obtaining traditional bank loans, which enables IIPR, operating as a sort of non-traditional bank for the cannabis companies, to charge higher rents than the companies may have paid in interest on traditional bank loans. (Id.).

---

[2] Unless otherwise noted, the Court takes the following facts from the Consolidated Class Action Complaint (ECF No. 50) and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

IIPR's investors, including Birmingham, were aware of the risks involved in IIPR's business model. (Id. ¶ 60). As such, they valued the risk mitigation efforts that IIPR said it implemented: "robust due diligence practices"; monitoring tenants' finances; visits to tenants' operation sites; and meetings with tenants. (Id.). According to Birmingham, even as some tenants experienced losses and increased expenses during the Class Period, IIPR made new investments in its tenants and assured its investors that it continued to monitor its tenants' finances regularly. (Id. ¶¶ 60–61). Birmingham now alleges that these assurances were materially false or misleading. (Id. ¶¶ 64–65).

### 1.    The Defaulting Tenants

Birmingham asserts that four of IIPR's largest tenants—PharmaCann, Inc. ("PharmaCann"), 4Front Ventures Corp. ("4Front"), Gold Flora, LLC, and Tilt Holdings, Inc. ("Tilt") (collectively, the "Defaulting Tenants")—were struggling during the Class Period and that IIPR misled investors into believing Defendants were monitoring the situation closely and that business remained good. (Id. ¶¶ 3–4, 27). Specifically, before and during the Class Period, the Defaulting Tenants were failing to pay taxes and invoices, warning investors that the companies may not be able to continue as going concerns, experiencing "mounting expenses" and "limited cash flow," and struggling to raise capital. (See id. ¶¶ 67–74). Eventually, in March 2025, all four companies defaulted on their obligations to IIPR, and the price of IIPR's common stock plummeted as a result. (Id. ¶¶ 82–83).

3

### a.    PharmaCann, Inc.

PharmaCann, a vertically integrated cannabis company, was IIPR's "largest and longest-standing tenant." (Id. ¶ 29). It had eleven leases with IIPR that constituted 17% of IIPR's total contractual rent as of December 31, 2024. (Id. ¶ 30). Birmingham points to one of those leases as having a financial disclosure agreement that required PharmaCann to provide IIPR audited annual financial statements, unaudited quarterly financial statements, and copies of "budgets, forecasts and investor materials"—information that would not have been available to the public. (Id. ¶ 32). In February 2024, IIPR added a "cross-default provision" to PharmaCann's leases such that a default under any one of PharmaCann's leases would trigger a default under all its leases. (Id. ¶ 33).

Before and during the Class Period, PharmaCann was unable to pay its taxes in multiple states, which led to tax liens against it totaling approximately $500,000 by March 2025. (Id. ¶ 67). PharmaCann also failed to pay many vendors and third parties, prompting one vendor to file a lawsuit in December 2024 for over $1,000,000 in unpaid invoices. (Id. ¶ 68(a)). PharmaCann defaulted on six of its leases in December 2024, which triggered defaults under all eleven leases. (Id. ¶ 82). IIPR and PharmaCann reached an agreement to resolve the defaults in January 2025. (Id.). PharmaCann defaulted again under nine of its leases in March 2025, and IIPR announced its plan to evict PharmaCann. (Id.).

### b.    4Front Ventures Corp.

4Front "owns, operates, and manages cannabis cultivation and manufacturing facilities" in a few states. (Id. ¶ 34). It had four leases with IIPR that constituted 5.7% of IIPR's total contractual rents as of December 31, 2024. (Id. ¶ 35). Birmingham points to

4

one of 4Front's leases as having a financial disclosure provision that required 4Front and the tenant-subsidiary of 4Front to provide IIPR audited quarterly financial documents and consolidated annual financial statements—non-public information. (Id. ¶ 36).

4Front failed to pay all its tax obligations for the 2022 to 2023 period. (Id. ¶ 67). Consequently, in April 2024, Illinois and California filed tax liens against 4Front for $1,561,245 and $19,648 in back taxes, respectively, and in January 2025, the U.S. government filed a tax lien against 4Front for $15,000,000. (Id.). 4Front also failed to pay third parties, leading to at least three lawsuits in 2024—one for $68,000 in unpaid invoices, another for $25,000 in unpaid marketing fees, and a third for over $100,000 in unpaid invoices. (Id. ¶ 68(b)). 4Front experienced net losses and had negative working capital in 2022, 2023, and 2024 (during the Class Period) and warned its investors that auditors doubted whether 4Front could continue as a going concern. (Id. ¶¶ 69–70). 4Front struggled to cover its expenses and attempted to obtain a $10,000,000 loan from a specialty finance firm in 2023 but received only $4,400,000 "due to its inability to satisfy certain covenants." (Id. ¶ 73(b)). Ultimately, 4Front defaulted on its rent obligations in March 2025, and IIPR announced its intent to evict 4Front. (Id. ¶ 83).

### c.   Gold Flora, LLC

Gold Flora, like PharmaCann, is a vertically integrated cannabis company. (Id. ¶ 38). It had three leases with IIPR that constituted 2.9% of IIPR's total contractual rent as of December 31, 2024. (Id. ¶ 39). Like PharmaCann and 4Front, Gold Flora struggled to pay its vendors, resulting in lawsuits. (Id. ¶ 68(c)). In September 2024, a California court entered a $6,000,000 judgment against Gold Flora for failure to pay the consideration in

an asset purchase agreement, and in October 2024, a supplier sued Gold Flora for more than $250,000 in unpaid invoices. (Id.). Gold Flora also suffered from net losses and had negative working capital in 2022, 2023, and 2024 (during the Class Period), and it warned investors of auditors' doubts that Gold Flora could continue as a going concern. (Id. ¶¶ 69–70). Gold Flora struggled to raise funding to pay off its debts and, faced with limited options, secured a private loan of $6,900,000 with a high interest rate of about 40%. (Id. ¶ 73(a)). By March 27, 2025, Gold Flora owed over $52,000,000 to lenders and over $60,000,000 to unsecured creditors and filed a petition for dissolution. (Id. ¶ 68(d)). Gold Flora ultimately defaulted on its rent obligations to IIPR in March 2025, and IIPR announced its intent to evict Gold Flora. (Id. ¶ 83).

> ### d. Tilt Holdings, Inc.

Tilt is "a business solutions provider to the global cannabis industry" that had two leases with IIPR constituting 2.2% of IIPR's total contractual rent as of December 31, 2024. (Id. ¶ 42–43). Tilt, like 4Front and Gold Flora, reported net losses and had negative working capital in 2022, 2023, and 2024 (during the Class Period) and warned investors of auditors' doubts that it could continue as a going concern. (Id. ¶¶ 69–70). Tilt also had difficulties raising capital after a change in one supplier's payment terms in 2023 forced Tilt to obtain additional financing and seek waivers from default provisions in other agreements. (Id. ¶ 73(c)). Tilt was still paying default rates of 24% and 25% as of December 31, 2024. (Id.). Tilt eventually defaulted on its obligations to IIPR alongside the other Defaulting Tenants in March 2025, and IIPR announced its intent to evict Tilt. (Id. ¶¶ 82–83).

### 2.   Defendants' Statements During the Class Period

Birmingham alleges that, as the Defaulting Tenants' financial conditions declined, Defendants made either materially false or materially misleading statements regarding IIPR's oversight of its tenants and its investments in the Defaulting Tenants during the Class Period. (Id. at 29, 67). Birmingham specifically points to statements in IIPR's U.S. Securities and Exchange Commission ("SEC") filings, press releases, earnings conference calls, and analyst and media reports as the bases of its allegations. (Id. at 4).

### a.   Oversight and Monitoring of Tenants

On February 27, 2024, IIPR filed a Form 10-K with the SEC ("FY23 10-K") in which it stated that it "utilitze[d] rigorous underwriting standards for evaluating acquisitions and potential tenants to ensure that they meet our strategic and financial criteria," "evaluate[d] the credit quality of [its] tenants and any guarantors on an ongoing basis," "monitor[ed] the payment history data for all of [its] tenants and, in some instances, . . . monitor[ed] [its] tenants by periodically conducting site visits and meeting with the tenants to discuss their operations." (Id. ¶¶ 86–87, 89). The FY23 10-K also stated that IIPR's management team "perform[ed] due diligence investigations of [IIPR's] potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information." (Id. ¶ 91).

On March 4, 2024, IIPR published a "Company Presentation" on its website. (Id. ¶ 95). One slide in the presentation covered IIPR's "Underwriting & Monitoring" processes, which included "[e]valuation of financial projections," "[d]etailed review of

financial statements, strategic initiatives, and growth plans," [q]uarterly reviews and requests for information pertaining to financials and ongoing operations of all properties," and "[m]eetings with tenants to talk through operations and financials." (Id. at 34).

On August 6, 2024, Defendants held a conference call with investors and investment analysts in which Defendants Gold, Regin (IIPR's Chief Investment Officer, (id. ¶ 17)), and Smithers (IIPR's co-founder, President, and Chief Executive Officer, (id. ¶ 15)) commented on IIPR's "highly selective" underwriting process, the continued success of the sale-leaseback concept, and the "quality and strength of [their] tenants" as "some of the best operators in the industry," (id. ¶¶ 101, 103, 106, 110, 114).

On November 7, 2024, Defendants held an earnings call with investors and investment analysts. (Id. ¶ 117). Analysts asked about tenants that paid partial or no rent in the past, how Defendants handled those situations, and Defendants' decision to continue investing in those tenants' businesses. (Id. ¶¶ 118, 127, 134). Gold and Smithers emphasized their continued monitoring of their tenants and discussed their varying approach to unusual issues, like supply chain issues during the COVID-19 pandemic, versus their "aggressive" approach when a tenant stops paying rent altogether. (Id. ¶¶ 119, 123). Gold also, in response to a question about Defendants' continued investments in tenants even though issues seemed to arise just as quickly as they were resolved, stated that "we've been paid a very high adjusted rate of return for what we believe is a very—a much lower risk—risk profile." (Id. ¶¶ 127–28). Regin further defended Defendants' investments in tenants that had faced some issues recently, explaining that they "look at each of these

8

situations individually, and we're looking to maximize [the] value of our portfolio, and we feel very positive about the future resolution for these issues." (Id. ¶ 131).

On December 20, 2024, IIPR announced that PharmaCann defaulted on all its leases. (Id. ¶ 139). Birmingham alleges that "Defendants moved quickly to assure investors that matters with PharmaCann were being handled appropriately and being resolved quickly." (Id. ¶ 140). Then, on January 30, 2025, IIPR issued a press release stating that it reached an agreement with PharmaCann to resolve the defaults. (Id. ¶ 141). IIPR reiterated the resolution of those defaults in another press release on February 19, 2025. (Id. ¶ 145). Then on February 21, 2025, IIPR filed a Form 10-K with the SEC (the "FY24 10-K"), reporting its financial results for the fourth quarter and 2024 overall. (Id. ¶ 149). The FY24 10-K explained that PharmaCann defaulted in December 2024 and that IIPR and PharmaCann resolved the defaults in January 2025 by amending PharmaCann's leases such that rent was reduced or abated for all its properties. (Id.). IIPR stated that it used security deposits to cover the two months of defaulted rent. (Id.). According to Birmingham, the FY24 10-K also "reiterated the many misstatements made in the FY23 10-K . . . ." (Id.).

On February 20, 2025, Defendants held another conference call in which Smithers told investors and investment analysts that Defendants "reached a comprehensive resolution to PharmaCann's defaults that included, among other things, PharmaCann recommencing rent payments on 9 of 11 leases in February, a required capital infusion by PharmaCann investors and a junior secured note issued to [IIPR]." (Id. ¶¶ 152–53). When asked about the risk for Defendants' tenant base moving forward, particularly for the year 2026, Gold suggested that such concerns were premature, and that Defendants were

9

monitoring the maturity of their tenants' debts closely. (Id. ¶¶ 156–57). Gold and Regin also reiterated Defendants' commitment to monitoring and working closely with their tenants. (Id. ¶¶ 161, 164, 168, 172).

Birmingham alleges that all these statements were materially false or misleading because Defendants "misled investors into believing that IIPR performed sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants" when in fact their tenants were struggling financially. (Id. ¶ 173) In Birmingham's view, Defendants either did not conduct the monitoring that they told investors they had, or Defendants did conduct such monitoring and concealed or misrepresented the truth of the tenants' financial situations. (Id. ¶ 173)

### b. Investments in the Defaulting Tenants

In its February 26, 2024 press release and FY23 10-K, IIPR stated that it amended one of its lease agreements with PharmaCann "to increase the improvement allowance by $16.0 million, adjust base rent accordingly and extend the lease term." (Id. ¶¶ 176, 178). Regin mentioned this lease amendment during the February 27, 2024 conference call. (Id. ¶ 184). IIPR also "touted a new amendment to 4Front's lease" in the FY23 10-K that reduced the base rent for nine months (until September 30, 2024), deferred the payback of the security deposit, and increased the base rent for the rest of the lease term. (Id. ¶ 180).

During the February 27, 2024 conference call, Regin informed investors and analysts that IIPR executed a lease amendment with PharmaCann to provide an additional $16 million of construction funding for a property in New York "as PharmaCann executes on its strategy to expand production capacity after being awarded an adult-use production

license" in late 2023. (Id. ¶ 184). One analyst asked what Defendants were "seeing on the ground" in New York and asked how they "expect[ed] the market to evolve going forward." (Id. ¶ 187). Regin stated that Defendants were "happy to see the additional retail licenses being issued" and that, despite "some historical challenges," Defendants "very much like[d] the position that [their] tenant partners [were] in" in New York. (Id.). Regin commented that there was a "tremendous amount of value in" PharmaCann's New York property and said, "I think it sets PharmaCann up very well to take advantage of the wholesale opportunities that we're going to see." (Id.).

During the same conference call, Defendant Hastings—IIPR's Chief Operating Officer, (id. ¶ 18)—explained that IIPR amended one of 4Front's leases for a property in Illinois to reduce the base rent through September 2024 because the property had been "under development since August 2021" and "experienced significant delays to get permanent power delivered to the building," (id. ¶ 190). Hastings said the building secured permanent power in January 2024 and that Defendants "look[ed] forward to this project's completion in the near future." (Id.). Hastings also reported that IIPR extended the term of all four of its leases with 4Front. (Id.).

On May 8, 2024, IIPR released its financial results for the first quarter of 2024. (Id. ¶ 193). IIPR filed its Form 10-Q with the SEC (the "1Q24 10-Q") the following day. (Id.). The 1Q24 10-Q reported IIPR's $16 million construction funding investment in PharmaCann's New York property and the extension of the lease on that property. (Id. ¶ 194). The 1Q24 10-Q also reported the extensions of 4Front's leases and the January 2024 amendment to 4Front's lease on the Illinois property that had construction delays.

(Id. ¶ 196). Additionally, the 1Q24 10-Q stated that in April 2024, IIPR amended 4Front's lease on the Illinois property "to provide an additional improvement allowance of $1.6 million" and to adjust the base rent. (Id.). Finally, the 1Q24 10-Q announced a new lease, executed in March 2024, with a tenant later identified as Gold Flora. (Id. ¶ 198).

On May 9, 2024, Defendants held a conference call with investors and analysts to discuss IIPR's 2024 first quarter results. (Id. ¶ 201). Regin Stated that IIPR executed two new leases with Gold Flora. (Id. ¶ 202). In discussing these and other new leases, Regin commented on "the strength of the [tenant-]operators and the credit upgrades" that Defendants felt they received from the new leases. (Id.). Regin also mentioned the additional $1.6 million that IIPR invested in 4Front's Illinois property "to round out development" of that facility. (Id. ¶ 205).

On August 5, 2024, IIPR released its financial results for the second quarter of 2024. (Id. ¶ 208). IIPR filed its Form 10-Q with the SEC (the "2Q24 10-Q") the following day. (Id.). Birmingham highlights the same information in the 2Q24 10-Q as in the 1Q24 10-Q regarding the $16 million investment in PharmaCann's New York property, the extension of that lease, the extension of 4Front's four leases, and the amendments to 4Front's lease on the Illinois property, including the $1.6 million improvement allowance. (Id. ¶¶ 209, 211). The 2Q24 10-Q also stated that IIPR executed two new leases with Gold Flora in March 2024 (as reported in the 1Q24 10-Q) and May 2024. (Id. ¶ 213).

On November 6, 2024, IIPR released its financial results for the third quarter of 2024. (Id. ¶ 216). IIPR filed its Form 10-Q with the SEC (the "3Q24 10-Q") the following day. (Id.). The 3Q24-10-Q repeated the same information from the 1Q24 10-Q and the

2Q24 10-Q regarding the investments in PharmaCann's and 4Front's properties, the amendments to some of those leases, and the new leases with Gold Flora. (Id. ¶¶ 217, 219, 221).

Birmingham alleges that by "touting" their investments in the Defaulting Tenants without disclosing the Defaulting Tenants' dire financial situations, Defendants misled investors into believing that those investments would bring in more revenue when in fact the Defaulting Tenants were on their way to defaulting on their rent obligations. (Id. ¶ 220).

### 3.    IIPR Stock Fluctuations

After reporting its financial results for the third quarter of 2024, IIPR issued a press release on November 6, 2024, explaining that it applied $1.4 million of security deposits towards unpaid rents on four properties leased to 4Front, one property leased to Tilt, and one property leased to another tenant. (Id. ¶ 225). The press release also stated that IIPR collected partial rent payments from 4Front, Tilt, and another tenant in October 2024 and applied $0.9 million in security deposits to those rents. (Id.). On November 6, 2024, IIPR's common stock price fell $9.34 per share (7.06%) down to $123 per share. (Id. ¶ 227).

On November 7, 2024, IIPR held an earnings call in which it reported revenue of $76.5 million, which was less than the consensus estimate of $77.5 million and less than the $77.8 million in revenue reported for the same period in 2023. (Id. ¶ 224). Birmingham alleges that IIPR blamed the 2023 to 2024 revenue decrease, in part, on $1.3 million of uncollected rents and fees during the third quarter of 2024. (Id.). During the earnings call, Smith also explained that IIPR applied the rest of 4Front's security deposits, $0.5 million, to cover October rents and that IIPR expected to collect rent from 4Front that was "well

below what [was] contractually do [sic] for the fourth quarter." (Id. ¶ 226). On November 7, 2024, IIPR's common stock price fell another $12.93 per share (10.51%) down to about $110.70 per share. (Id. ¶ 227). According to Birmingham, investment analysts believed the drop in IIPR's stock price was the result of the unpaid rents and raised concerns regarding IIPR's "emergent tenant issues." (Id. ¶ 228).

On December 20, 2024, IIPR issued a press release explaining that, on December 19, PharmaCann defaulted on six of its eleven leases, resulting in $4.2 million in unpaid rent, fees, and tax and insurance payments. (Id. ¶¶ 230–31). IIPR applied security deposits to cover the unpaid rent and imposed late penalties, plus interest. (Id.). The press release further stated that, due to the recent lease amendments, the six defaults triggered defaults under all eleven of PharmaCann's leases, and that IIPR intended to "enforce its rights under the Leases aggressively," potentially through eviction proceedings. (Id. ¶¶ 232–33). After the press release was issued on December 20, 2024, IIPR's common stock price fell $21.68 per share (22.74%) to about $73.66 per share. (Id. ¶ 234). Investment analysts expressed concerns regarding "the magnitude of PharmaCann's default" and the "[h]ealth of IIPR's [t]enant [b]ase," particularly as to whether other tenants were in "similar distress." (Id. ¶¶ 235–37).

On January 30, 2024, IIPR issued another press release reporting that IIPR resolved the PharmaCann defaults by, among other things, covering rent for December 2024 and January 2025 with security deposits and imposing penalties. (Id. ¶ 239). Investment analysts considered this a "welcome, but partial remedy of investor concerns." (Id. ¶ 241).

14

That day, IIPR's common stock price increased $6.71 per share (10.11%) to about $73.05 per share. (Id. ¶ 240).

On March 14, 2025, after the markets closed, IIPR issued a press release stating that PharmaCann defaulted on nine of its eleven leases for the month of March 2025, leading to $2.7 million in unpaid rent, fees, and tax and insurance payments. (Id. ¶ 242). As in December 2024, IIPR explained that it intended to "enforce its rights under the Leases aggressively," potentially through eviction proceedings. (Id.). IIPR's common stock price fell $5.41 per share (7.7%) to $64.21 by March 17, 2025. (Id. ¶ 243). Investment analysts expressed concerns regarding the second default, suggested that "other tenants might be facing similar difficulties," and advised against investing in IIPR at that time. (Id. ¶ 244).

On March 28, 2025, after the markets closed, IIPR issued another press release stating that 4Front, Gold Flora, and Tilt defaulted, leading to $13.1 million in unpaid rent, fees, and tax and insurance payments. (Id. ¶ 246). Again, IIPR stated that it intended to "pursue its rights under such leases aggressively," including through eviction, if necessary. (Id.). According to Birmingham, "IIPR presented these defaults as part of 'a significant tenant replacement and renewal initiative aimed at enhancing the performance of its real estate portfolio and driving long-term value for shareholders.'" (Id. ¶ 247). IIPR acknowledged that challenges in the cannabis industry "negatively impacted the ability of certain of [its] tenants to make their lease payments," and stated that it "believes that it will be better served by proactively seeking to refresh a substantial portion of its tenant base with more financially viable long-term tenants to better position [IIPR] for sustainable growth and improved financial performance." (Id.) After IIPR issued this press release, its

15

common stock price fell $9.66 per share (15.15%) to $54.09 per share by March 31, 2025. (Id. ¶ 248).

Birmingham contends that Defendants engaged in a "fraudulent scheme to artificially inflate the price of [IIPR's] securities" through allegedly false or misleading statements and that, once "Defendants' prior misrepresentations and other fraudulent conduct were revealed" in November 2024 through March 2025, IIPR's stock price plummeted. (Id. ¶ 250).

## B.      Procedural Background

On January 17, 2025, Alain Giraudon filed a Class Action Complaint in this Court, individually and on behalf of all others who acquired IIPR securities during the Class Period, alleging violations of the SEA. (Compl. at 1–2, 18–22, ECF No. 1). The Court later appointed Birmingham as Lead Plaintiff. (Apr. 22, 2025 Mem. Op. at 11, ECF No. 38; Apr. 4, 2025 Order at 2, ECF No. 39). On June 23, 2025, Birmingham filed an Amended Complaint, alleging two counts against all Defendants for: violations of § 10(b) of the SEA and SEC Rule 10b-5 (Count I); and violations of § 20(a) of the SEA (Count II). (Am. Compl. ¶¶ 274–80). Defendants filed the instant Motion to Dismiss on August 22, 2025. (ECF No. 60). Birmingham filed an Opposition on October 21, 2025, (ECF No. 65), and Defendants filed a Reply on November 20, 2025, (ECF No. 68).

## II.      DISCUSSION

## A.      Standard of Review

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of

16

defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, accept the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. See Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cnty., 407 F.3d 266, 268 (4th Cir. 2005). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

## B.    Analysis

Defendants move to dismiss the Amended Complaint for failure to state a claim. (Defs.'s Mem. L. Supp. Mot. Dismiss ["Mot. Dismiss"] at 18–36, ECF No. 60-1).[3] As explained in greater detail below, the Court finds that Birmingham fails to allege facts sufficient to satisfy the elements of its two claims and will dismiss the Amended Complaint.

### 1.    Count I – Violations of § 10(b) of the SEA and SEC Rule 10b-5

In Count I of the Amended Complaint, Birmingham asserts violations of § 10(b) of the SEA and SEC Rule 10b-5 against all Defendants. (Am. Compl. ¶¶ 274–78). "Section 10(b) of the [SEA] prohibits the use of 'any manipulative or deceptive device or contrivance' in connection with the sale of a security in violation of the SEC rules." Yates v. Mun. Mortg. & Equity, LLC, 744 F.3d 874, 884 (2014) (quoting 15 U.S.C. § 78j(b)). SEC Rule 10b-5, in turn, makes it unlawful:

---

[3] Defendants first move to dismiss the Amended Complaint as prolix. (Mot. Dismiss at 15). A plaintiff's compliance with Rule 8's "short and plain statement" requirement is left to the Court's discretion. Plumhoff v. Cent. Mortg. Co., 286 F.Supp.3d 699, 702 (D.Md. 2017) (quoting Stone v. Warfield, 184 F.R.D. 553, 555 (D.Md. 1999)). Birmingham's Amended Complaint is lengthy, but Defendants consented to, and the Court granted, Birmingham's request to file the excess pages. (See Mot. File Excess Pages at 1–2, ECF No. 49; June 24, 2025 Order, ECF No. 53). Although the Amended Complaint is sometimes repetitive, it is not so redundant, disorganized, or uninterpretable to warrant dismissal under Rule 8, particularly given the heightened pleading standard Birmingham must satisfy. Contra Plumhoff, 286 F.Supp.3d at 704 (dismissing complaint under Rule 8 because it was "way too long, detailed and verbose for either the Court or the defendants to sort out the nature of the claims or evaluate whether the claims are actually supported by any comprehensible factual basis" (quoting Belanger v. BNY Mellon Asset Mgmt., LLC, 307 F.R.D. 55, 58 (D.Mass 2015))). The Court, therefore, will not dismiss the Amended Complaint on this ground.

18

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5. To state a claim under § 10(b), a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Yates, 744 F.3d at 884 (quoting Stoneridge Inv. Partners v. Scientific–Atlanta, Inc., 552 U.S. 148, 157 (2008)). The plaintiff also must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud," which include "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." Weidman v. Exxon Mobil Corp., 776 F.3d 214, 219 (4th Cir. 2015) (quoting Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999)). Likewise, the PSLRA demands a heightened level of specificity:

> [As to any misleading statements or omissions,] the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
>
> [As to scienter,] the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity

19

facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(1), (b)(2)(A).

Here, Defendants challenge the sufficiency of the Amended Complaint as to elements one (material misrepresentation or omission) and two (scienter).[4] (Mot. Dismiss at 19, 28–29). The Court will address each element in turn.

### a.    Material Misrepresentation or Omission

As to the first element, Birmingham points to thirty-four statements Defendants made during the Class Period as allegedly material misrepresentations or omissions. (See Am. Compl. ¶¶ 87, 89, 91, 95, 103, 106, 110, 114, 119, 123, 128, 131, 141, 145, 149, 153, 161, 168, 177, 178, 180, 184, 190, 194, 196, 198, 202, 205, 209, 211, 213, 217, 219, 221). To be actionable, these statements and omissions must meet three requirements: (1) they must be factual (i.e., "demonstrable as being true or false"); (2) the statements must be false or the alleged omissions "must render the statement[s] misleading"; and (3) the statements or omissions must be material. In re Marriot Int'l, Inc. Customer Data Sec. Breach Litig., 543 F.Supp.3d 96, 110 (D.Md. 2021) (quoting Longman v. Food Lion, Inc., 197 F.3d 675, 682 (4th Cir. 1999)). As to materiality:

> A statement or omission of fact is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed

---

[4] In one sentence, Defendants argue briefly that Birmingham also fails to establish elements four (reliance) and six (loss causation). (Mot. Dismiss at 33–34). Defendants, however, provide no legal analysis to support this contention, either in their Motion or in their Reply, and the Court will not provide such analysis for them. (See generally id.; Reply).

the total mix of information made available to be significantly altered by disclosure of the fact.

Id. (quoting Longman, 197 F.3d at 683). Regarding omitted information, "Section 10(b) and Rule 10b-5 'do not create an affirmative duty to disclose any and all material information.'" In re Marriot, 543 F.Supp.3d at 111 (quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011)). But disclosure is required "when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading." Id. (quoting Matrixx, 563 U.S. at 44). Thus, "companies can control what they have to disclose under [§ 10(b) and Rule 10b-5] by controlling what they say to the market." Id. (quoting Matrixx, 563 U.S. at 45).

### i.    Statements about Tenant Oversight and Due Diligence

As described above, Birmingham alleges that Defendants made material misrepresentations and omissions during the Class Period regarding their due diligence practices and monitoring of their tenants. (See Am. Compl. at 29–66). The focus of these statements, generally, is that Defendants "utilize[d] rigorous underwriting standards," conducted thorough due diligence investigations of potential tenants, and were "aware of what[] [was] going on with [their] tenants" during the Class Period. (Am. Compl. ¶¶ 87, 119; see id. at 29–66). Birmingham alleges that these statements were materially false or misleading because at the time they were made, the Defaulting Tenants were struggling financially, which adequate due diligence and monitoring would have revealed, and because they gave investors the false impression that Defendants conducted sufficient

21

oversight "such that IIPR would have known the true financial condition of the Defaulting Tenants well before those tenants defaulted." (Id. ¶ 88).

To start, some of the challenged statements constitute "puffery" or opinions and, consequently, are not actionable. In re Marriot, 543 F.Supp.3d at 111 ("Statements of opinion or puffery generally are not actionable."). Statements of puffery are "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." In re Emergent BioSolutions Inc. Secs. Litig., No. DLB-21-955, 2023 WL 5671608, at *16 (D.Md. Sep. 1, 2023) (quoting Sinnathurai v. Novavax, Inc., No. TDC-21-2910, 2022 WL 17585715, at *18 (D.Md. Dec. 12, 2022)). Such statements are unactionable unless they are worded as guarantees or the speaker does not reasonably believe their statement. In re Marriot, 543 F.Supp.3d at 119 (quoting IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC, 783 F.3d 383, 392 (2d Cir. 2015)).

Here, Gold stated during the August 6, 2024 earnings call that "the sale-leaseback concept is our basic business model that we've been following since [sic] for the last 8 years, and it seems to be—it has continued to produce what we think are below average risks with above average returns." (Am. Compl. ¶ 103). Also during that call, Regin stated, "we really feel that we have some of the best operators in the industry in our portfolio and have continued to support them over the years," and Smithers later stated, "we believe that there are tenants that because of supply chain issues or getting up to speed with the changing environment that there will be some difficulties. But in general, we're very—as

22

[Regin] and [Hastings] has [sic] indicated, we're very pleased with the quality and strength of our tenants." (Id. ¶¶ 110, 114). Additionally, during the November 7, 2024 earnings call, Gold stated, "[t]he difference [between IIPR and other real estate companies] is we've been paid a very high adjusted rate of return for what we believe is a very—a much lower risk—risk profile." (Id. ¶ 128). These statements, which "utilize[e] opinion and exaggeration" to describe the strengths of IIPR's tenants and business model generally are not worded as guarantees, and Birmingham does not allege that Defendants did not believe these opinions at the time they expressed them. In re Emergent, 2023 WL 5671608, at *16 (quoting Dunn v. Borta, 369 F.3d 421, 431 (4th Cir. 2004)). The statements, therefore, are unactionable under § 10(b).

Statements of opinion, like statements of puffery, are unactionable under § 10(b), unless (1) "the speaker does not actually hold the stated belief"; (2) the statement "contains an embedded statement of fact that is false"; or (3) "the statement omits material facts about the speaker's 'inquiry into or knowledge concerning a statement of opinion' and those facts 'conflict with what a reasonable investor would take from the statement itself.'" In re Marriot, 543 F.Supp.3d at 119 (quoting Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 184–85 (2015)). As to the third category, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." Omnicare, 575 U.S. at 194.

In this case, during the November 7, 2024 earnings call, Regin stated:

> I just wanted to touch on your question on [4Front]. I mean we did make an investment in the Illinois facility to round out construction there. We do have four individual leases with [4Front], but that is by far the largest, and there was significant delays in construction, which understandably had an impact on the overall cash flow.
>
> That asset is in Illinois, which is one of the top 5 markets in the U.S. We feel very confident in the Illinois market. And as [Smithers] described, we look at each of these situations individually, and we're looking to maximize value of our portfolio, and we feel very positive about the future resolution for these issues [in the Illinois facility].
>
> * * *
>
> This asset, given the size and what we think this is going to produce once this is fully up and running, is going to be very meaningful to their business overall going into 2025. We really like the Illinois market. We think it's going to be a tremendous boost to their business once . . . [the] Illinois building is fully operational.

(Am. Compl. ¶¶ 131, 135). Birmingham alleges that these statements are misleading because Regin omitted facts regarding Defendants' allegedly insufficient due diligence and the Defaulting Tenants' financial situations. (Id. ¶¶ 132, 136). As explained below, however, Birmingham does not allege sufficient facts demonstrating that Defendants did not conduct due diligence or relevant research before Regin expressed this opinion. Birmingham also does not allege what information Defendants knew about the Defaulting Tenants' financial situations when Regin made this statement. See Handal v. Innovative Indus. Props., Inc., 157 F.4th 279, 297 (3d Cir. 2025) ("[I]n the third Omnicare scenario, the speaker is aware of what she is omitting or that there is foreseeably material information that could affect the veracity of her opinion and that she has failed to investigate."). Even

24

assuming Regin knew that 4Front was struggling with taxes, unpaid invoices, and raising capital before the November 7 earnings call, this information would not render misleading Regin's opinions regarding the business potential of 4Front's Illinois facility following IIPR's construction investment.

As to the remaining statements, Birmingham's allegations that Defendants "did not have a rigorous tenant-oversight process" or did not conduct "sufficiently robust and comprehensive due diligence on, and monitoring of, its tenants" fail for a few reasons. (Am. Compl. ¶ 88). To start, in some of the challenged statements, Defendants did not "promise[] that [their] diligence would meet any particular standard of thoroughness." Handal, 157 F.4th at 295. For example, in the FY23 10-K and FY24 10-K, IIPR states:

> We evaluate the credit quality of our tenants and any guarantors on an ongoing basis. In addition, we monitor the payment history data for all of our tenants and, in some instances, we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations.
>
> * * *
>
> We rely on our management team to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information.

(Am. Compl. ¶¶ 89, 91, 149).[5] Even if Defendants conducted subpar due diligence and "missed obvious red flags," that fact would not render these statements false or misleading

---

[5] Defendants make similar statements in the investor presentation (specifically those regarding quarterly reviews and meetings with tenants) and during the February 20, 2025 earnings call. (Am. Compl. ¶¶ 95, 114, 119, 168).

because they contain no promises that Defendants' due diligence would meet a certain standard. See Handal, 157 F.4th at 295.

In other statements, Defendants characterize their underwriting and oversight practices as meeting a certain degree of thoroughness. For example, in the FY23 10-K and FY24 10-K, IIPR states: "We utilize rigorous underwriting standards for evaluating acquisitions and potential tenants to ensure that they met our strategic and financial criteria." (Am. Compl. ¶¶ 87, 149). Similarly, during the August 6, 2024 earnings call, Regin stated:

> [Defendants] are still highly selective on the types of opportunities in markets we like with tenants we like as we have been since our inception.
>
> * * *
>
> We, of course, will look at new opportunities to work with new operators as we see fit with management teams that we like that have strong financials, track record of performance in the same rigorous underwriting criteria that we've used historically for our existing tenants.

(Id. ¶¶ 106, 110).[6] Birmingham, however, relies on mere speculation to reach the conclusion that Defendants' due diligence efforts did not meet the standards described in the challenged statements. The two cases that Birmingham cites for support are distinguishable. (See Lead Pl.'s Opp'n Def.s' Mot. Dismiss ["Opp'n"] at 20–21, ECF No. 65). In In re Genworth Financial Inc. Securities Litigation, 103 F.Supp.3d 759 (E.D.Va. 2015), the defendant told investors in 2013 that it was conducting a "deep review" of its

---

[6] Defendants make similar statements in the investor presentation (specifically those regarding "detailed" reviews of background and management and "detailed" financial underwriting) and during the February 20, 2025 earnings call. (Am. Compl. ¶¶ 95, 157, 161, 164, 172).

business, but the defendant later admitted that its last "deep review" occurred in 2012 and

that the scope of the 2013 review was much narrower. Id. at 766–67, 772–74. Similarly, in

In re James River Group Holdings, Ltd. Securities Litigation, No. 3:21-cv-444 (DJN), 2023

WL 5538218 (E.D.Va. Aug. 28, 2023), the defendants told investors that they "continually

monitor[ed] reserves using new information" and concluded that their reserves were

"reasonable" and "appropriate," but former employees' deposition testimonies and the

defendants' internal documents showed that the defendants had no internal policy for

monitoring reserves and that they kept reserves artificially low. Id. at *3–4, 11. Here,

Birmingham does not allege that Defendants admitted to not conducting the due diligence

they described, nor does Birmingham cite to testimony or internal documents

demonstrating the falsity or misleading nature of Defendants' due diligence statements.[7]

Even if not false, Birmingham alleges that Defendants' statements are "'materially

misleading' half-truths" in that Defendants conducted due diligence and regular monitoring

of its tenants but "'failed to disclose to investors what they knew about the Defaulting

Tenants' and their dire financial positions, which misled investors as to the risk of investing

in IIPR." (Opp'n at 20 (quoting Am. Compl. ¶¶ 87–88)). This argument fails as well.

---

[7] In another portion of the challenged statements, Defendants do not mention their due diligence practices at all. (See Am. Compl. ¶ 123 (discussing how Defendants work with tenants who face operating issues); id. ¶¶ 141, 145, 149, 153 (announcing and discussing the resolution of PharmaCann's first default)). Birmingham alleges that these statements are false for the same reason as the due diligence-related statements: because IIPR allegedly "did not have a rigorous tenant-oversight process . . . ." (Id. ¶¶ 125, 142, 146, 150, 154). The absence of rigorous due diligence practices, however, would not render these statements false, as Defendants do not mention such practices in these statements.

First, as to the "red flags" described in the Amended Complaint, Birmingham does not allege whether or when Defendants became aware of such information. For example, Birmingham alleges that:

> no later than January 30, 2024, PharmaCann was unable to pay its state tax obligations in Ohio, New York, and Illinois, resulting in these states filing numerous tax liens against PharmaCann for unpaid taxes totaling nearly half a million dollars by the end of the Class Period. Similarly, 4Front was not paying all of its federal income taxes for the period 2022 to 2023, which on January 3, 2025, resulted in the U.S. government filing a tax lien against 4Front for $15,000,000. Illinois and California also placed tax liens on 4Front in April 2024 for failure to pay $1,561,245 and $19,648 in back taxes, respectively.

(Am. Compl. ¶ 67). Birmingham does not allege that Defendants learned of these unpaid taxes before, contemporaneously with, or after the filings of the tax liens and, therefore, does not adequately allege that Defendant knew about these tax issues before making any of the challenged statements. The same can be said regarding the unpaid invoices and resulting lawsuits, the Defaulting Tenants' "going concern" warnings, and the issues with raising capital, (see id. ¶¶ 68–73)—Birmingham does not allege when Defendants allegedly learned of those red flags and, therefore, does not adequately allege that Defendants knew of this information prior to any of the challenged statements, In re Under Armour Sec. Litig., 342 F.Supp.3d 658, 680 (D.Md. 2018) ("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." (quoting In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1330 (3d Cir. 2002))).

Even if Defendants did learn of these red flags prior to making the challenged statements, investors also had access to that information through public records (i.e., tax liens, court filings, and SEC filings). (Opp'n at 12 (stating that "facts about each Defaulting Tenant's dire financial distress . . . c[a]me from SEC disclosures, public sources, and court filings")). Disclosure of information that is "already publicly available does not materially alter the 'total mix' of available information" and, therefore, omission of that information is immaterial. Smith v. Cir. City Stores, Inc., 286 F.Supp.2d 707, 721 (E.D.Va. 2003); see also Hillson Partners Ltd. P'ship v. Adage, Inc., 42 F.3d 204 (4th Cir. 1994) ("'The securities laws require disclosure of information that is not otherwise in the public domain,' not information that has already been publicly—indeed, officially—disclosed by the company." (quoting Sailors v. N. States Power Co., 4 F.3d 610, 613 (8th Cir.1993))). Consequently, Defendants' alleged failure to disclose the red flags contemporaneously with the challenged statements is excusable because that information was "made credibly available to the market by other sources." Raab v. Gen. Physics Corp., 4 F.3d 286, 289 (4th Cir. 1993) (quoting In re Apple Computer Sec. Litig., 886 F.2d 1109, 1115 (9th Cir. 1989)); see also In re Constellation Energy Grp., Inc. Secs. Litig., 738 F.Supp.2d 614, 628 (D.Md. 2010) (finding no material misrepresentation in part because plaintiff failed to allege that defendant "knew more than the market did about [financial services firm's] volatile situation prior to [its] bankruptcy such that [defendant] should have specifically disclosed the risks posed by [defendant's] counterparty relationship to" the financial services firm).

29

Second, Birmingham fails to plead materiality as to any non-public information that Defendants allegedly obtained from the Defaulting Tenants. Birmingham alleges that Defendants had access to non-public financial information from the Defaulting Tenants due to the disclosure requirements in some tenants' leases. (See Am. Compl. ¶¶ 32, 36, 40, 44, 75–76). Birmingham, however, does not state what information Defendants allegedly obtained or if it differed from what was available to the market via public record and, consequently, has not demonstrated that a reasonable investor "would have viewed the total mix of information made available to be significantly altered by disclosure of" that information. In re Marriot, 543 F.Supp.3d at 110 (quoting Longman, 197 F.3d at 683).

Birmingham also does not allege when Defendants allegedly obtained non-public financial information from the Defaulting Tenants. Birmingham assumes that Defendants obtained financial information from all four Defaulting Tenants based on disclosure requirements in one of IIPR's leases with PharmaCann and one of its leases with a Gold Flora subsidiary. (Am. Compl. ¶¶ 32, 36, 40, 44). Per those two disclosure requirements— which, based on Birmingham's descriptions, were not exactly the same, (id. ¶¶ 32, 36)— Birmingham speculates that all the Defaulting Tenants were required to, and did, provide quarterly and year-end financial information to Defendants, (id. ¶¶ 40, 44). Although the Court views all allegations in the light most favorable to Birmingham at this stage of the proceedings, see Albright, 510 U.S. at 268, the Court need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (quoting Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001)); see also Twombly, 550 U.S. at 555 ("Factual

30

allegations must be enough to raise a right to relief above the speculative level . . . .". And the Court declines to accept as true these conclusory inferences within inferences.

Finally, Birmingham's overall argument that Defendants misled investors about the risks of investing in IIPR by touting their due diligence and monitoring practices is unreasonable given the detailed and repeated warnings Defendants made regarding such risks, including the possibility that IIPR's tenants could default. For example, in IIPR's FY23 10-K, after stating that its management team conducts due diligence investigations, IIPR acknowledged the potential limitations of its due diligence efforts and the possibility of default:

> We may not learn of all the material information we need to know regarding these businesses through our investigations, and these businesses are subject to numerous risks and uncertainties, including but not limited to regulatory risks and the rapidly evolving market dynamics of each state's regulated cannabis program. As a result, it is possible that we could enter into a sale-leaseback arrangement with tenants or otherwise lease properties to tenants that ultimately are unable to pay rent to us, which could adversely impact our cash available for distributions.
>
> Many of our existing tenants are, and we expect that many of our future tenants will be, companies with limited histories of operations that are not profitable when they enter triple-net leasing arrangements with us and, therefore, may be unable to pay rent with funds from operations.
>
> *  *  *
>
> Some of our tenants may be subject to significant debt obligations and may rely on debt financing to make rent payments to us. Tenants that are subject to significant debt obligations may be unable to make their rent payments if there are adverse changes in their business plans or prospects, the regulatory environment in which they operate or in general economic conditions. In addition, the payment of rent and debt

service may reduce the working capital available to tenants for the start-up phase of their business. <u>Furthermore, we may be unable to monitor and evaluate tenant credit quality on an on-going basis.</u>

(FY23 10-K at 26, ECF No. 60-5 (emphasis added)).[8] IIPR also notified investors of previous defaults by other tenants:

In July 2022, Kings Garden defaulted on its obligations to pay rent at all of the properties it leases with us, and pursuant to a confidential, conditional settlement agreement executed on September 11, 2022 between us and Kings Garden, we terminated the leases for two properties that were in development or redevelopment as of December 31, 2023 and regained possession of those properties. In September 2023, we regained possession of the four remaining properties that Kings Garden had occupied, where Kings Garden paid stipulated rent during its period of occupancy until September 20, 2023.

In November 2022, Parallel defaulted on its obligations to pay rent at one of our properties in Pennsylvania, and we regained possession of that property in October 2023. In February 2023, Parallel also defaulted on its obligations to pay rent at one of our properties in Texas, and we regained possession of that property in March 2023.

In November 2022, Green Peak defaulted on its obligations to pay rent at one of our properties in Michigan. In March 2023, a receiver was appointed over substantially all of Green Peak's assets, and we subsequently regained possession of one property that was under redevelopment as a regulated cannabis cultivation and processing facility and three retail properties in

---

[8] The parties do not challenge the authenticity of the documents that Birmingham references in its Amended Complaint and which Defendants attach as exhibits. The Court, therefore, may rely on these documents when ruling on Defendants' motion to dismiss. <u>In re USEC Sec. Litig.</u>, 190 F.Supp.2d 808, 812–13 (D.Md. 2002) ("In ruling on a motion to dismiss a securities fraud complaint, the Court is entitled to rely on public documents quoted by, relied upon, incorporated by reference in or otherwise integral to the complaint, and such reliance does not convert such a motion into one for summary judgment."), <u>aff'd and remanded sub nom.</u>, <u>Cohen v. USEC, Inc.</u>, 70 F.App'x 679 (4th Cir. 2003).

> Michigan. We also expect to regain possession of the remaining regulated cannabis cultivation and processing facility still occupied by the receiver on March 1, 2024.

(Id. at 27). IIPR references or restates the same warnings and the same or additional default notifications in its other SEC filings and at the beginning of each conference call that Birmingham quotes in the Amended Complaint. (See FY24 10-K at 26–28, ECF No. 60-6; 1Q24 10-Q at 65, ECF No. 60-7; 2Q24 10-Q at 39, ECF No. 60-8; 3Q24 10-Q at 71, ECF No. 60-9; Feb. 27, 2024 Earnings Call at 3, ECF No. 60-11; May 9, 2024 Earnings Call at 3, ECF No. 60-12; Aug. 6, 2024 Earnings Call at 3, ECF No. 60-13; Nov. 7, 2024 Earnings Call at 3, ECF No. 60-14; Feb. 20, 2025 Earnings Call at 3, ECF No. 60-15). Conducting thorough due diligence does not mean that the risks Defendants warned its investors about would not materialize, and Birmingham provides no allegations to suggest that a reasonable investor would believe otherwise. See In re Marriot, 543 F.Supp.3d at 115 (rejecting plaintiff's argument that defendant's statements regarding due diligence related to its integration with another entity misled investors into thinking there were "no issues that would impede the merger" because "'[w]orking hard' on due diligence and integration does not mean that there would be no issues, and Plaintiff provide[d] no factual allegations to support the proposition that a reasonable investor would believe otherwise").

For all the reasons stated above, Birmingham fails to allege sufficient facts showing that Defendants' statements regarding due diligence and monitoring were either false or materially misleading.

### ii.    Statements about Investments in Defaulting Tenants

In the second category of statements, Birmingham alleges that Defendants made material misrepresentations and omissions during the Class Period regarding their investments in the Defaulting Tenants and amendments to their leases. (See Am. Compl. at 67–89). Birmingham alleges that these statements were materially misleading because such statements "put in play the issue of what Defendants knew about [the Defaulting Tenants] that would undercut Defendants' touting of IIPR's new investment[s]," and by failing to disclose such information, the challenged statements "misled investors into believing that additional investments in [the Defaulting Tenants] were beneficial to IIPR" and would "generate additional rental revenues, when, in reality, . . . [the Defaulting Tenants were] in dire financial straits and would soon not be able to pay rent." (Id. ¶ 179).

Birmingham's allegations that these statements are misleading fail for some of the same reasons as above. First, information about the red flags was available in the public record. (See Opp'n at 12). Thus, Defendants' failure to disclose those red flags to its investors contemporaneously with their statements regarding investments in the Defaulting Tenants and amendments to their leases is excusable because information on those red flags was "made credibly available to the market by other sources." Raab, 4 F.3d at 289 (quoting In re Apple, 886 F.2d at 1115). Second, Birmingham pleads insufficient facts demonstrating what non-public information Defendants knew and when they learned that information and, as a result, has not demonstrated that a reasonable investor "would have viewed the total mix of information made available to be significantly altered by disclosure of" that information. In re Marriot, 543 F.Supp.3d at 110 (quoting Longman, 197 F.3d at

34

683). Birmingham, therefore, has failed to plead sufficient facts to satisfy element one as to any of the challenged statements.

### a.    Scienter

Even if Birmingham had satisfied the first element, the Complaint fails on the second element: scienter. "To meet the scienter requirement for a Section 10(b) and Rule 10b-5 claim, a plaintiff 'must show that the defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud."'" Id. at 142 (quoting Zak v. Chelsea Therapeutics Int'l Ltd., 780 F.3d 597, 606 (4th Cir. 2015)). To make this showing, "a plaintiff must allege that the defendant made the misleading statement or omission intentionally or with 'severe recklessness' regarding the danger of deceiving the plaintiff . . . A showing of mere negligence will not suffice." Id. (quoting Tchrs.' Ret. Sys. of LA v. Hunter, 477 F.3d 162, 183–84 (4th Cir. 2007)). Recklessness, in this context, encompasses acts that are "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Id. (quoting Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc., 576 F.3d 172, 181 (4th Cir. 2009)).

The PSLRA further imposes a heightened pleading standard for this element: a plaintiff must allege particularized facts demonstrating a "strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). A "strong inference" is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs v. Makor Issues &

35

Rts., Ltd., 551 U.S. 308, 314 (2007). The plaintiff must satisfy this pleading requirement as to each individual defendant and, for corporate defendants, the plaintiff must demonstrate that at least one authorized agent of the corporation acted with the requisite state of mind. In re Marriot, 543 F.Supp.3d at 142 (citing Tchrs.' Ret. Sys. of LA, 477 F.3d at 183–84).

To determine whether a plaintiff has satisfied this standard, a court must engage in a holistic analysis, considering "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 323. Additionally, the court's analysis must be comparative, considering "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." Id. at 314. A complaint will survive this analysis only "if the malicious inference is at least as compelling as any opposing innocent inference." Yates, 744 F.3d at 885 (quoting Zucco Partners, LLC v. Digimore Corp., 552 F.3d 981, 991 (9th Cir. 2009)).

Here, Birmingham alleges that there is a strong inference of scienter because:

> (1) Defendants repeatedly told investors that they were engaged in oversight of IIPR's tenants through due diligence and ongoing monitoring; (2) there were myriad red flags with the finances at four of IIPR's largest tenants, which showed that these tenants were at high risk of default; (3) IIPR's "robust due diligence" and "ongoing monitoring," as the process was explained by Defendants, should have detected these red flags; therefore, it is plausible to infer either (a) IIPR was not doing the oversight it represented to investors, and Defendants' statements like "we have said that we are monitoring all of our tenants, and we are monitoring all our tenants" ([Am. Compl.] ¶ 165) were intentionally meant to deceive; or (b) the oversight did happen and Defendants either

36

chose not to share the known red flags with investors or disregarded those red flags.

(Opp'n at 29). In support of this argument, Birmingham cites Gold, Regin, Smithers, and Hastings' (collectively, the "Individual Defendants") senior positions at IIPR and IIPR's small size; their personal involvement in the tenant oversight process and the preparation, filing, and review of IIPR's SEC filings; the alleged nature of due diligence investigations as a "core operation" of IIPR's business; and Gold, Smithers, and Hastings' alleged financial motives to engage in fraud. (Opp'n at 30–33; Am. Compl. ¶¶ 252–54). Even when viewed holistically, these allegations do not support a strong inference of scienter.

Birmingham is correct that, as stated in several challenged statements, the Individual Defendants held senior positions within IIPR and were involved in due diligence investigations and monitoring of potential and current tenants. (See, e.g., March 4, 2024 Presentation at 17, ECF No. 60-16 (identifying Individual Defendants as members of "Senior Management Team"); FY23 10-K at 26 ("We rely on our management team to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects . . . ."); Feb. 20, 2025 Earnings Call at 9, 13 ("[W]e are, of course, watching each of our tenants and working with them very closely. . . . [W]e're watching all of our tenants. We are doing deep dives into every single one of our tenants, including the strongest ones and the single state operators.")). Defendants do not dispute that due diligence is a core operation of IIPR, nor do they dispute that the Individual Defendants assisted in preparing, filing, and reviewing IIPR's SEC

filings. (See, e.g., FY23 10-K at 87 (showing signatures of Smithers and Gold, among others not named in this lawsuit)).

Allegations regarding seniority and involvement in core operations are relevant to the Court's analysis, "provided, of course, that they are accompanied by particularized allegations that a defendant was aware of problems in those operations." In re Emergent, 2023 WL 5671608, at *26. "[W]e cannot impute factual knowledge to individuals merely based on their professional position or because 'such knowledge relates to the business's core operations.'" San Antonio Fire & Police Pension Fund v. Syneos Health Inc., 75 F.4th 232, 242 (4th Cir. 2023) (quoting KBC Asset Mgmt. NV v. DXC Tech. Co., 19 F.4th 601, 612 (4th Cir. 2021)).

In this case, Birmingham does not provide detailed allegations demonstrating that the Individual Defendants knew that their due diligence process was deficient, if indeed it was. Birmingham suggests that, had sufficient due diligence investigations occurred, then the Individual Defendants would have known that the Defaulting Tenants were heading towards default. (Opp'n at 30). "But that proposition, in effect, merely argues that [the Individual] Defendants negligently performed due diligence . . . [a]nd mere negligence cannot support a § 10(b) claim." San Antonio Fire & Police Pension Fund, 75 F.4th at 242.

Birmingham also fails to provide particularized allegations demonstrating whether or when the Individual Defendants learned of the red flags. See In re Emergent, 2023 WL 5671608, at *26–27 (finding inference of scienter as to certain defendants who—as shown in emails, confidential witness testimonies, and personal admissions—had actual knowledge of "red flags," but not as to other defendants for whom plaintiffs did not include

38

sufficient allegations of actual knowledge). Birmingham asks the Court to infer from the financial disclosure requirements in two of IIPR's leases—one with PharmaCann and one with a subsidiary of 4Front—that all IIPR's leases have such disclosure requirements; that the Individual Defendants received financial information from all the Defaulting Tenants (i.e., quarterly and annual financial statements and "budgets, forecasts and investor materials"); and that the Individual Defendants received that information before making the challenged statements. (Am. Compl. ¶¶ 32, 36, 40, 44). Birmingham also invites the Court to infer from descriptions of IIPR's due diligence processes (i.e., "Detailed review of financial statements, strategic initiatives, and growth plans"; "Quarterly reviews and requests for information pertaining to financials and ongoing operations of all properties"; "Meetings with tenants to talk through operations and financials," (March 4, 2024 Presentation at 14)) that the Individual Defendants learned about the red flags and other unspecified non-public financial information before making the challenged statements, and that the information obtained indicated that the Defaulting Tenants were headed towards default, (Opp'n at 30). While these allegations may support a plausible inference of scienter, such stacking of "inference upon inference" cannot satisfy the heightened § 10(b) pleading standard. San Antonio Fire & Police Pension Fund, 75 F.4th at 243.

Even if the Court infers that the Individual Defendants knew of the red flags before making the challenged statements, "[s]imply knowing this information would not be enough for scienter. [The Individual] Defendants would also have to know—or, at a bare minimum, be reckless to a risk—that declining to share that information would render" their statements about due diligence, investments, and lease amendments misleading to

investors. Id.; see also In re Constellation, 738 F.Supp.2d at 637 ("Even assuming [defendant placed the financial services firm on its internal credit-watch list before the firm filed for bankruptcy], it cannot be reasonably inferred that simply because [defendant] was concerned, along with the rest of the market, about [the firm's] financial condition in the summer of 2008, it intentionally or recklessly concealed a material exposure to a company it somehow knew was on the verge of bankruptcy."). Birmingham does not plead sufficient facts indicating that the Individual Defendants acted with such intent or reckless disregard, especially given Defendants' extensive disclosures regarding the many financial challenges IIPR's tenants likely would face and the risk of default. (See, e.g., FY23 10-K at 26–39); see also In re Marriot, 543 F.Supp.3d at 153 (finding that defendants' repeated disclosures that they "may not be able to keep up with information, security, and privacy requirements and [were] not impervious to cyberattacks . . .weigh[ed] against an inference of scienter that the Individual Defendants were intentional or severely reckless in leading investors to believe the opposite").

In addition to seniority and involvement in core operations, Birmingham alleges that Gold, Smithers, and Hastings were motivated to engage in fraud because a portion of their 2024 compensation depended on IIPR achieving certain "performance goals." (Am. Compl. ¶¶ 256–59). Gold, Smithers, and Hastings all received Performance Share Units ("PSU") in 2022, each of which "represented the right to receive one share of IIPR common stock if the applicable performance goals were achieved" by the end of 2024. (Id. ¶¶ 256, 258). These PSUs would vest in December 2024, and the value of the PSUs depended on the relative performance of IIPR's common stock from January 2022 to December 2024.

(Id. ¶ 256). Thus, according to Birmingham, Gold, Smithers, and Hastings had an incentive to keep the price of IIPR common stock artificially high to increase the cash dividends they would receive on their PSUs. (Id. ¶ 257).

"Allegations that a defendant 'would personally benefit from a special bonus' may support scienter." City of Southfield Gen. Emps.' Ret. Sys. v. Advance Auto Parts, Inc., 167 F.4th 637, 647 (4th Cir. 2026) (quoting Boykin v. K12, Inc., 54 F.4th 175, 186 (4th Cir. 2022)). But "motivations to . . . increase one's own compensation are common to every company and thus add little to an inference of fraud." Id. (quoting Cozzarelli v. Inspire Pharms. Inc., 549 F.3d 618, 627 (4th Cir. 2008)). Moreover, although Defendants made sometimes optimistic statements regarding due diligence, investments, and lease amendments, they also made lengthy and oft-repeated risk warnings; they announced unfulfilled rent obligations and explained IIPR's response to such; and they disclosed the first PharmaCann default immediately—just one day after it occurred. (See, e.g., FY23 10-K at 26–39 (risk disclosures); Nov. 7, 2024 Earnings Call at 5–6 (discussing some tenants' unpaid rent obligations and IIPR's response); Am. Compl. ¶¶ 230–31 (Dec. 20, 2024 press release announced that PharmaCann defaulted on Dec. 19, 2024)). These risk disclosures, discussions of unpaid rent, and quick self-reporting, all of which caused IIPR's common stock price to decrease and resulted in Gold, Smithers, and Hastings having to forfeit their PSUs, (Am. Compl. ¶ 260), weigh against an inference of intent to defraud, see In re Marriot, 543 F.Supp.3d at 153 (finding that repeated risk disclosures weighed against inference of scienter); Yates, 744 F.3d at 892 (finding the fact that defendants "continued

41

to update investors about newly discovered weaknesses tend[ed] to negate an inference that the defendants acted with an intent to defraud").

Overall, Birmingham has shown that the Individual Defendants held senior positions at IIPR and participated in IIPR's core operations. But without detailed allegations showing that the Individual Defendants had <u>actual knowledge</u> of any deficiencies in their due diligence or <u>actual knowledge</u> of the red flags, these allegations "are not sufficient to raise a strong inference of scienter. If they were, every corporate executive who participates in the day-to-day management of his company would be exposed to liability for securities fraud." <u>In re Criimi Mae, Inc. Sec. Litig.</u>, 94 F.Supp.2d 652, 661 (D.Md. 2000). Birmingham also has shown that Gold, Smithers, and Hastings may have been financially motivated to keep IIPR's common stock price artificially high to increase their compensation in December 2024. But Defendants' regular announcements regarding certain tenants' struggles and quick disclosure of PharmaCann's first default, which, at least in part, caused Gold, Smithers, and Hastings to lose out on their extra compensation, weighs against an inference of scienter. <u>See</u> <u>In re Marriot</u>, 543 F.Supp.3d at 153; <u>Yates</u>, 744 F.3d at 892.

As Birmingham says in its Opposition, its allegations arguably create a plausible inference that (1) Defendants did not conduct the oversight they claimed to be conducting and, thus, intentionally deceived investors when they touted their rigorous due diligence processes, or (2) Defendants did conduct such due diligence, discovered the red flags, and then intentionally concealed those red flags from investors or recklessly disregarded the risk that failing to disclose those red flags would render their statements misleading to

investors. (Opp'n at 29). But the PLSRA requires more than a <u>plausible</u> inference of scienter; it requires a <u>strong</u> inference of scienter. <u>See</u> <u>Tellabs</u>, 551 U.S. at 314. And the facts alleged here do not meet that higher standard. The more compelling inference is that, even assuming the Individual Defendants knew of the red flags before making the challenged statements, they believed that they adequately warned investors of the risks inherent to IIPR's business, that additional investments and lease amendments would help address any financial distress and enable tenants to continue to pay rent, and that signs of financial distress among certain tenants did not foreclose or render misleading optimistic statements or announcements regarding investments, lease amendments, and due diligence processes. Birmingham, therefore, has failed to plead sufficient facts showing that the Individual Defendants acted with the requisite state of mind and, as a result, has failed to satisfy this element as to IIPR as well. <u>In re Marriot</u>, 543 F.Supp.3d at 142 (citing <u>Tchrs.'</u> <u>Ret. Sys. of LA</u>, 477 F.3d at 183–84). Accordingly, the Court will dismiss Count I of the Amended Complaint.

### 2.     Count II – Violations of § 20(a) of the SEA

In Count II of the Amended Complaint, Birmingham alleges violations of § 20(a) of the SEA. (Am. Compl. ¶¶ 279–80). Section 20(a) of the SEA imposes joint and several liability upon "[e]very person who, directly or indirectly, controls any person liable under any provision of [15 U.S.C. §§ 78a–78rr] or of any rule or regulation thereunder" to the same extent as the liable, controlled person, "unless the controlling person acted in good faith and did not directly or indirectly induce" the violative actions. 15 U.S.C. § 78t(a). "[T]o state a claim under § 20(a), a plaintiff must allege: '(1) a predicate violation of

43

§ 10(b) and (2) control by the defendant over the primary violator.'" In re Constellation, 738 F.Supp.2d at 638–39 (quoting In re Mut. Funds Inv. Litig., 566 F.3d 111, 129–30 (4th Cir. 2009), rev'd sub nom. on other grounds, Janus Cap. Grp., Inc. v. First Derivative Traders, 564 U.S. 135 (2011)). Because § 20(a) requires a "predicate violation of § 10(b)," if a plaintiff fails to state a claim under § 10(b) or SEC Rule 10b-5, then the plaintiff also fails to state a claim under § 20(a). Id. (quoting In re Mut. Funds Inv. Litig., 566 F.3d at 130).

Here, as stated above, Birmingham cannot state a claim under § 10(b) or SEC Rule 10b-5. Consequently, Birmingham has failed to satisfy the first element of a § 20(a) claim, see id. at 638–39 (quoting In re Mut. Funds Inv. Litig., 566 F.3d at 130), and the Court will dismiss Count II of the Amended Complaint.

### III.    CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss the Consolidated Class Action Complaint (ECF No. 60). A separate Order follows.

Entered this 27th day of May, 2026.

       /s/       
George L. Russell, III
Chief United States District Judge
